Scott Hochstetter
5419 HOLLYWOOD BLVD
STE C 137
Los Angeles, CA 90027
630-465-3557
Theloreofdoa@gmail.com
*In Pro Per*



FILED

PAID

JUN 24 2026

CLERK, U.S. DISTRICT COURT
COURT 4612

2026 JUN 24 PM 12: 33

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

SCOTT THOMAS HOCHSTETTER,

aka "Defender of Ants,"

                 Plaintiff;

     v.

DETECTIVE MICHELLE GOMEZ, Los
Angeles Police Department, in her individual
and official capacities;

CITY OF LOS ANGELES;

CITY OF SAN LUIS OBISPO;

JOHN/JANE DOE, Commissioner of the
California Highway Patrol, in his or her
official capacity;

OFFICER FRANCISCO R. PEREZ,
California Highway Patrol, in his individual
and official capacities;

OFFICER MITCHELL D. HENDRICKS,
California Highway Patrol, in his individual
and official capacities;

Case # 2:26 CV - 6868-DOC-KS

42 U.S.C. § 1983

First Amendment

Fourth Amendment

Fourteenth Amendment

Monell Municipal Liability

Failure to Intervene

Supervisor Liability / Ratification

Judicial Deception / Material
Omissions

Civil Conspiracy to Violate
Constitutional Rights

**DEMAND FOR JURY TRIAL**

COMPLAINT  1

SERGEANT CHARLES R. WILSON, California Highway Patrol, in his individual and official capacities;

OFFICER CALEB J. BRADSHAW, California Highway Patrol, in his individual and official capacities;

OFFICER PHILLIP C. OLSEN, California Highway Patrol, in his individual and official capacities;

OFFICER LOPEZ, California Highway Patrol, in his or her individual and official capacities;

SERGEANT CHARLIE LEE McMICHAEL, California Highway Patrol, in his individual and official capacities;

OFFICER CHRIS PROPER, California Highway Patrol, in his individual and official capacities; and

DOES 1–50, inclusive,

Defendants.

## COMPLAINT

### I. VENUE AND JURISDICTION

1. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

2. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents federal constitutional claims.

COMPLAINT  2

3. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) because Plaintiff seeks redress for the deprivation, under color of state law, of rights secured by the United States Constitution.

4. The constitutional rights at issue include the First Amendment right to record police activity, livestream matters of public concern, protest, and criticize government conduct; the Fourth Amendment right to be free from unreasonable searches and seizures; and the Fourteenth Amendment right to equal protection of the laws.

5. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

6. Plaintiff seeks costs and, if applicable, attorney's fees under 42 U.S.C. § 1988.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Central District of California, including the Los Angeles Police Department warrant process, transfer, search, retention, and eventual return of Plaintiff's cellular telephones within this District.

8. At all relevant times, Defendants acted under color of state law and within the course and scope of their employment.

9. Plaintiff is presently unaware of the true names and capacities of certain Defendants sued as DOES. Plaintiff will seek leave to amend this Complaint to substitute the true names and capacities of Doe Defendants when they are ascertained.

## II. INTRODUCTION

10. This civil-rights action arises from a July 10, 2024 swatting incident that resulted in Plaintiff Scott Thomas Hochstetter being detained at gunpoint by San Luis Obispo Police Department ("SLOPD") officers and California Highway Patrol ("CHP"), followed by the warrantless seizure, prolonged retention, transfer, search-warrant processing, forensic examination, and eventual return of Plaintiff's cellular telephones by Los Angeles Police Department ("LAPD").

11. Plaintiff is an activist, livestreamer, and public critic of Scientology.

12. Plaintiff regularly used his cellular telephones to livestream, record police encounters, document protest activity, communicate with viewers, preserve evidence, and publish matters of public concern.

COMPLAINT  3

13. Anti Scientology protesters had been the target of about forty swatting incidents in numerous jurisdictions in front or around Scientology properties in New York, Boston, Chicago, Texas, California, Utah, Washington, and Portland.

14. Plaintiff was a victim of 19 swattings in numerous jurisdictions including San Francisco, D.C., Tucson, Seattle, Los Angeles, Pasadena, Malibu, Sacramento.

15. In prior swatting incidents involving Plaintiff in Tucson, Seattle, Washington, Sacramento and D.C. responding officers were able to assess the totality of the circumstances and determine that the reports appeared suspicious or false without escalating the encounters in the same manner alleged here.

16. Plaintiff alleges that nearly all of the swatting incidents directed at him occurred while he and other protesters were actively livestreaming events on the internet.

17. In many instances, the livestreams captured Plaintiff's location, activities, and interactions in real time, providing law enforcement with readily available information that could be used to evaluate the credibility of the reported emergencies and whether Plaintiff could have been the source of the calls being reported.

18. In the months leading up to the July 10, 2024 incident, numerous emails and communications were sent to the Los Angeles Police Department by individuals associated with the Church of Scientology accusing protesters of criminal conduct.

19. These accusations included claims that protesters had attempted to commit murder, arson, and made false emergency reports.

20. Plaintiff alleges that these repeated accusations contributed to an atmosphere in which law enforcement agencies were repeatedly exposed to claims portraying protesters as dangerous criminals despite the absence of corroborating evidence for many of the allegations.

21. On July 9, 2024, the night before the San Luis Obispo incident, Ventura Police Department officers detained Plaintiff at gunpoint during another suspected swatting incident.

22. Ventura officers later reviewed Plaintiff's livestream and determined that Plaintiff could not have been the person who made the false emergency call because Plaintiff was live on YouTube at the time of the false police call

23. On July 10, 2024, another false emergency report alleged that Plaintiff had pointed a machine gun from a white recreational vehicle.

COMPLAINT   4

24. San Luis Obispo Police Department officers responded and conducted a felony stop of Plaintiff's recreational vehicle near Santa Rosa Street and Olive Street.

25. Plaintiff was removed from the vehicle at gunpoint and detained.

26. Officers conducted a protective sweep of the vehicle.

27. After the RV was cleared and no machine gun or dangerous occupant was found, the original safety justification ended.

28. Plaintiff was released from handcuffs and advised, in substance, that he appeared to be the victim of a swatting incident.

29. At that point, the reported threat had been dispelled, the vehicle had been cleared, and the original basis for the felony stop no longer existed.

30. Despite those facts, California Highway Patrol officers initiated a separate investigation and shifted from treating Plaintiff as a victim to treating him as a suspect.

31. Plaintiff informed CHP officers that he had been swatted the night before and that Ventura Police Department could verify that fact.

32. Plaintiff informed CHP officers that he was livestreaming during the July 10, 2024 incident.

33. Plaintiff offered to show CHP officers his call logs and livestream to prove he was not the caller.

34. Rather than examine readily available exculpatory evidence, CHP officers seized Plaintiff's two Samsung Galaxy S24 Ultra cellular telephones without a warrant.

35. One phone was actively recording police activity that SLOPD officers had removed from Plaintiff's vehicle and turned the camera away from the search.

36. The camera that was removed from the RV was then found outside the R.V. by CHP officers.

37. The phones contained extensive private digital information, including communications, videos, photographs, location information, recordings, livestream archives, and other protected data.

38. The phones were retained by law enforcement for approximately ten months.

39. They were later transferred to the Los Angeles Police Department, where Defendant Michelle Gomez sought a warrant authorizing a broad search of Plaintiff's digital data.

40. Plaintiff alleges that the seizure and prolonged retention of his phones violated the First, Fourth, and Fourteenth Amendments.

COMPLAINT   5

41. Plaintiff further alleges that the seizure interfered with his right to record police activity, livestream matters of public concern, preserve evidence, and engage in protest activity.

42. Following the seizure, Plaintiff attempted to file complaints with both the California Highway Patrol and San Luis Obispo Police Department.

43. Plaintiff alleges that CHP refused to accept or process his complaint.

44. Plaintiff alleges that San Luis Obispo Police Department later claimed no complaint records existed although Plaintiff filmed his complaint to the SLOPD officer in front of the police department.

45. Plaintiff later submitted numerous California Public Records Act requests seeking body-worn camera footage, reports, dispatch records, complaint records, and communications relating to the incident.

46. Plaintiff received responses stating that records could not be located, that no responsive records existed, or that agencies did not possess responsive records.

47. Later disclosures revealed that responsive incident records, dispatch materials, internal communications, and other records did exist.

48. This action seeks redress for violations of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

49. The framing of the victim to the swatter fueled an online smear campaign of defamation by Scientology and large youtube channels.

## III. PARTIES

50. Plaintiff Scott Thomas Hochstetter is a natural person and resident of the United States. Plaintiff is also known publicly as "Defender of Ants," "DOA," and "The Lore of DOA."

51. Defendant Mitchell D. Hendricks was, at all relevant times, a California Highway Patrol ("CHP") officer acting under color of state law.

52. Defendant Caleb J. Bradshaw was, at all relevant times, a CHP officer acting under color of state law.

53. Defendant Francisco R. Perez was, at all relevant times, a CHP officer acting under color of state law.

54. Defendant Charles R. Wilson was, at all relevant times, a CHP officer or supervisor acting under color of state law.

55. Defendant Phillip C. Olsen was, at all relevant times, a CHP officer acting under color of state law.

56. Defendant Chris Proper was, at all relevant times, an employee, officer, supervisor, or agent of CHP acting under color of state law.

57. Defendant Sergeant McMichael was, at all relevant times, an employee, officer, supervisor, or agent of CHP acting under color of state law.

58. Defendant Michelle Gomez was, at all relevant times, a detective employed by the Los Angeles Police Department ("LAPD") acting under color of state law.

59. Defendant Officer Church was, at all relevant times, a police officer employed by the San Luis Obispo Police Department ("SLOPD") acting under color of state law.

60. Defendant City of San Luis Obispo is a municipal entity organized under the laws of the State of California.

61. Defendant City of Los Angeles is a municipal entity organized under the laws of the State of California.

62. Defendant JOHN/JANE DOE is the Commissioner of the California Highway Patrol and is sued solely in his or her official capacity for declaratory, injunctive, and prospective relief concerning the policies, practices, record preservation, evidence retention, and constitutional violations alleged herein.

63. DOES 1 through 50 are individuals whose true names and capacities are presently unknown to Plaintiff.

64. Plaintiff is informed and believes that DOES 1 through 50 include law-enforcement officers, supervisors, dispatch personnel, evidence personnel, forensic personnel, records personnel, public-records personnel, complaint-intake personnel, and other officials who participated in, directed, approved, ratified, concealed, or failed to prevent the violations alleged herein.

65. Plaintiff will amend this Complaint to allege the true names and capacities of DOE Defendants when they are ascertained.

66. At all relevant times, each Defendant acted under color of state law and within the course and scope of his or her employment, authority, or agency.

67. At all relevant times, each Defendant personally participated in, directed, approved, ratified, or otherwise caused the violations of Plaintiff's constitutional rights alleged herein.

COMPLAINT  7

## IV. FACTUAL ALLEGATIONS

### A. Background: Plaintiff's Activism, Livestreaming, and Prior Swattings

68. Plaintiff Scott Thomas Hochstetter is an activist, livestreamer, and public critic of Scientology.

69. Plaintiff is publicly known as "Defender of Ants."

70. Plaintiff regularly livestreams, records police activity, documents protest activity, communicates with viewers, preserves video evidence, and publishes matters of public concern.

71. Plaintiff's cellular telephones are essential tools for his protected speech, protest activity, livestreaming, recording, publication, and documentation of law-enforcement conduct.

72. Prior to July 10, 2024, Plaintiff had been the target of numerous suspected swatting incidents.

73. These swatting incidents involved false emergency reports that caused law-enforcement officers to respond to Plaintiff with firearms, felony-stop procedures, detentions, searches, and other high-risk tactics.

74. Plaintiff had repeatedly informed law enforcement that he was being targeted by false emergency calls.

75. Plaintiff had repeatedly explained that he was being swatted in connection with his public protest activity and livestreaming.

76. Plaintiff had repeatedly documented these incidents on livestream.

77. Plaintiff's livestreams were relevant because they showed where Plaintiff was, what Plaintiff was doing, and whether Plaintiff was actively broadcasting when false emergency calls were made.

78. Plaintiff's livestreams were also relevant because they showed that Plaintiff was not the person making the false emergency reports.

79. On February 2, 2024 Plaintiff was at gunpoint by LAPD and cuffed for about 30 minutes leaving plaintiffs hands numb.

80. On March 9th, 2024 Plaintiff was a victim of another swatting. He was protesting at the Main Scientology headquarters and was forced to lay down in an active intersection at gunpoint as cars drove around him.

COMPLAINT  8

81. On March 25, 2024 Plaintiff was swatted and held at gun point with a handgun 3 feet from his head.  Plaintiff laid down with his hands out.   He was told he was a victim. While cuffed officers took his hand and put his finger on some type of device.

82. On July 6th 2024 Plaintiff was swatted three times.

83. On July 6th 2024 LAPD Hollywood division extracted Plaintiff out of his R.V. at gunpoint on Hollywood blvd and had him kneel as guns were pointed at him.  Officers identified Plaintiff as Defender of Ants but continued to keep him cuffed in the back of a squad car.

84. Lapd officers on July 6th approached Plaintiff at a gas station at Sunset Blvd and Pacific Coast Highway and said that there was a swatting call.

85. They observed that Plaintiff did not appear to be on drugs and that the call was likely a false call and did not pull guns out.

86. A third swatting occurred on Pacific Coast Highway by Malibu Sheriffs and Plaintiff was extracted at gun point and was cuffed for about half an hour again causing great pain.

## B. July 9, 2024 Ventura Swatting Incident

87. On July 9, 2024, the night before the San Luis Obispo incident, Plaintiff was detained at gunpoint by Ventura Police Department officers during another suspected swatting incident at the Ventura Scientology building

88. The Ventura incident involved a police response to a false or suspicious emergency call.

89. During the Ventura incident, Plaintiff was detained and/or arrested by Ventura Police Department officers and was held at gun point.

90. Ventura officers reviewed Plaintiff's livestream.

91. The livestream showed that Plaintiff was actively broadcasting at the time of the false emergency call.

92. Ventura officers determined that Plaintiff could not have been the caller because Plaintiff was live on YouTube at the time and did not have a long gun.

93. Ventura officers determined, in substance, that Plaintiff appeared to be the victim of a swatting incident.

94. An anti Scientology protester by the name of Luna was swatted twice at the Ventura Scientology location in or around February.

COMPLAINT  9

95. Ventura officers determined that they were false swatting calls yet told Luna that she should be out there protesting.

96. The July 9, 2024 Ventura incident is relevant because Plaintiff told CHP officers about it on July 10, 2024.

97. Plaintiff informed CHP officers that Ventura Police Department could verify that Plaintiff had been swatted the night before and was not the caller.

98. Plaintiff informed CHP officers that livestream evidence could verify Plaintiff's account.

## C. July 10, 2024 False Machine-Gun Report

99. On July 10, 2024, Plaintiff was operating a white Dodge recreational vehicle in the San Luis Obispo area.

100. Plaintiff was traveling in connection with his public protest activity and livestreaming at different Scientology locations.

101. On that date, California Highway Patrol Incident No. 240710SL0110 was opened concerning Plaintiff.

102. CHP records identify the incident as beginning at approximately 15:56 hours.

103. The incident was initially entered as a reckless-driving matter.

104. The incident was later changed to a Penal Code section 417 brandishing incident.

105. The reporting party alleged that a male driver in an older white Dodge recreational vehicle pointed what appeared to be a machine gun from the vehicle window.

106. The reporting party described the driver as a white male adult with a beard.

107. Plaintiff did not make the false emergency call.

108. Plaintiff did not request that law enforcement be sent to stop him.

109. The reporting party refused or declined to meet with officers.

110. The reporting party declined requests to meet at the CHP office.

111. The reporting party declined requests to meet at the San Luis Obispo Police Department.

112. The reporting party stated he had to put his McLaren onto a ship.

113. The reporting party claimed to be driving a McLaren while following Plaintiff's RV. McLaren vehicles are relatively uncommon and high-value automobiles, with many

COMPLAINT   10

models selling for hundreds of thousands of dollars and some models exceeding one million dollars in value.

114. Plaintiff alleges that a person operating such a vehicle would be more readily identifiable than the average motorist and that law enforcement had investigative avenues available to identify or locate the reporting party if they chose to do so.

115. The reporting party stated he needed to go to a gas station rather than a police station.

116. The reporting party disconnected the call.

117. The reporting party declined direct contact with CHP officers.

118. These facts were relevant because they made the original report suspicious.

119. These facts were also relevant because the caller refused ordinary verification and refused to meet with officers.

## D. SLOPD Felony Stop and Initial Protective Sweep

120. Plaintiff observed law-enforcement activity behind him.

121. Plaintiff believed he was being swatted.

122. Plaintiff voluntarily pulled into the Jack in the Box parking lot near Santa Rosa Street and Olive Street.

123. Plaintiff pulled into the parking lot because he believed it would be safer for officers to contact him off the roadway.

124. Plaintiff did not attempt to flee, resist or threaten officers.

125. At approximately 16:22 hours, San Luis Obispo Police Department reported officers conducted a felony stop on Plaintiff's vehicle.

126. Plaintiff did not see emergency lights activated before pulling into the parking lot and alleges that he was parked in a private business before Plaintiff was sure the police were after him.

127. SLOPD officers ordered Plaintiff out of the recreational vehicle at gunpoint.

128. Plaintiff complied with all officer commands while multiple officers aimed firearms at him and multiple laser sights were visible on Plaintiff's body.

129. Plaintiff was detained at gunpoint.

130. Plaintiff was handcuffed and then put in the back of a police car

131. Plaintiff was not free to leave.

132. Plaintiff's freedom of movement was restrained by a show of force.

COMPLAINT  11

133. Plaintiff was seized within the meaning of the Fourth Amendment.

134. SLOPD officers conducted a protective sweep of Plaintiff's recreational vehicle.

135. The purpose of the initial sweep was to determine whether the reported machine gun or any dangerous person was inside the vehicle.

136. Officers removed the cell-phone that was actively recording the search and turned the camera away.

137. The SLOPD officers appeared to conduct the sweep without any CHP officers as far as Plaintiff could see.

138. Plaintiff's camera captured three SLOPD officers with a shield and long guns pass by the front of the R.V. and then pass again. The third time an officer grabs the camera and pulls it outside of the van.

139. The SLOPD officers did not pull the other camera out of the R.V. even though when grabbing the camera it would have been directly under the officer.

140. Officers did not locate a machine gun, a weapon, drugs or a dangerous occupant hiding inside the vehicle.

141. After the vehicle was cleared, the original safety basis for the protective sweep was dispelled.

## E. SLOPD and CHP Firearm Display and Use-of-Force Documentation

142. SLOPD Policy 300.4.2 recognizes that members of the public may perceive the display of a firearm as a potential application of force.

143. SLOPD Policy 300.4.2 requires officers to carefully evaluate each tactical situation and use sound discretion when drawing a firearm in public.

144. Policy 300.4.2 further provides that firearms may be directed toward a perceived threat during a high-risk stop only so long as the officer reasonably believes a threat exists based on the totality of the circumstances.

145. SLOPD Policy 300.5 requires that any use of force by a member of the department be reported to a supervisor and documented promptly, completely, and accurately in an appropriate written report.

146. Policy 300.5 further requires the officer to articulate the factors perceived and why the officer believed the use of force was reasonable under the circumstances.

147. On July 10, 2024, SLOPD officers conducted a felony stop of Plaintiff at gunpoint.

COMPLAINT  12

148. Plaintiff is informed and believes that SLOPD officers displayed, drew, pointed, or held firearms during the felony stop.

149. Plaintiff is informed and believes that the firearm display was subject to SLOPD Policy 300.4.2.

150. Plaintiff is informed and believes that firearm display and use of force during the felony stop required supervisory notification and documentation under SLOPD Policy 300.5.

151. Plaintiff later sought records concerning the incident, including body-worn camera footage, use-of-force documentation, firearm-display documentation, and supervisor review records.

152. Despite the felony stop and firearm display, Plaintiff has not received any complete use-of-force report, firearm-display report, supervisor review, or Policy 300.5 documentation concerning the firearm display during the July 10, 2024 firearm display.

153. The absence or non-production of firearm-display and use-of-force documentation is relevant to the reasonableness of the detention, the completeness of SLOPD's records, the preservation of body-worn camera footage, supervisory review, and the credibility of later no-record or no-report responses.

154. The official California Highway Patrol Highway Patrol Manual 70.6, Chapter 1, Use of Force policy requires officers involved in a use-of-force incident who are not the arresting officer to complete a supplemental report to the arresting officer's report.

155. CHP policy further provides that all officers involved in a use-of-force incident shall write their own report and/or supplemental if feasible.

156. Plaintiff alleges that Defendants Perez, Bradshaw, Hendricks, Wilson, Olsen, and any other involved CHP personnel participated in, assisted with, directed, reviewed, or approved the continued detention, search, seizure, and/or use-of-force-related incident.

157. To the extent CHP treated the July 10, 2024 felony stop, gunpoint detention, handcuffing, continued detention, or property seizure as a use-of-force incident, CHP policy required individual documentation or supplemental reports from involved officers.

158. The absence, withholding, or non-production of such supplemental reports is relevant to the reasonableness of the detention, the completeness of CHP's investigation, supervisory review, chain of command approval, preservation of evidence, and credibility of CHP's later account.

COMPLAINT   13

## F. Plaintiff Released as Victim and Threat Dispelled

159. After the protective sweep, Plaintiff was uncuffed.

160. Plaintiff was told, in substance, that he appeared to be the victim of a swatting incident.

161. Plaintiff was thanked for being cooperative.

162. Plaintiff was not arrested for brandishing a firearm.

163. Plaintiff was not booked for brandishing a firearm.

164. Plaintiff was not charged with brandishing a firearm arising from the July 10, 2024 incident as of June 23rd, 2026.

165. Plaintiff was not charged with making a false emergency call arising from the July 10, 2024 incident as of June 23rd, 2026.

166. The vehicle had been cleared.

167. No weapon had been found.

168. No dangerous person had been found.

169. No evidence supported the original machine-gun allegation.

170. At that point, the original reported threat had been dispelled.

171. Plaintiff was then told that CHP officers wanted to speak with him.

172. Plaintiff uncuffed walked about 30 ft over to CHP unescorted by SLOPD.

## G. CHP Officers Were on Scene and Begin a Separate Investigation

173. CHP records identify Defendants Francisco R. Perez, Caleb J. Bradshaw, Mitchell D. Hendricks, Charles R. Wilson, and Phillip C. Olsen as CHP personnel assigned to the incident.

174. CHP records state that SLOPD was speaking with the driver before CHP completed its response.

175. CHP records state that SLOPD conducted the felony stop and requested CHP assistance.

176. CHP officers arrived at approximately 16:23 hours.

177. CHP officers participated in the continued investigation.

178. After SLOPD cleared the vehicle and released Plaintiff from handcuffs, Plaintiff walked over to CHP officers.