179. Plaintiff spoke with CHP officers voluntarily after being told CHP wanted to speak with him.

180. CHP did not notify Plaintiff was under arrest and did not read him his Miranda rights.

181. Plaintiff advised CHP officers that he was an activist protesting Scientology.

182. Plaintiff advised CHP officers that he had been live-streaming.

183. Plaintiff advised CHP officers that he had been repeatedly swatted.

184. Plaintiff advised CHP officers that he had been detained at gunpoint by police numerous times over the prior months because of false emergency reports.

185. Plaintiff advised CHP officers that he had been swatted at the Ventura Scientology building the night before.

186. Plaintiff advised CHP officers that Ventura Police Department had reviewed his livestream and could verify that Plaintiff was not the caller.

187. Plaintiff advised CHP officers that LAPD was conducting an investigation into similar swatting incidents.

188. Plaintiff advised CHP officers that he was listed as a victim in that investigation.

189. CHP records reflected information that the July 10, 2024 incident was a possible swatting event.

190. CHP records reflected information that Plaintiff was a protester.

191. CHP records reflected information that Plaintiff was protesting Scientology.

192. CHP records reflected information that Plaintiff had been swatted multiple times.

193. The CHP Arrest-Investigation Report explicitly admits under the Section 1 Summary that the anonymous reporting party gave a highly suspicious, uncooperative account to dispatch, refusing direct contact, declining to meet at any police facility, and asserting an abrupt need to put his vehicle on a ship.

194. The report narrative authored by Defendant Officer Hendricks admits that upon Plaintiff's identification at the scene, Plaintiff immediately and transparently disclosed that Plaintiff was an activist protesting the Church of Scientology, traveling up the coast to livestream matters of public concern.

195. The report explicitly documents that Plaintiff informed the officers that Plaintiff had been detained at gunpoint by police numerous times over the prior four months due to unfounded, false emergency reports, including an identical swatting incident the night before in Ventura, California whilst protesting Scientology.

COMPLAINT  15

196. The report narrative contains a direct, formal administrative admission regarding the retaliatory motivation behind the property extraction, stating: "*Sergeant Wilson and Officer Olsen looked up Hochstetter's Youtube channel and observed multiple videos showing Hochstetter being detained by police following police reports. Due to the circumstances of the call and the frequency of Hochstetter being detained by police, Sergeant Wilson instructed Officer Perez to seize the cell phones into evidence.*"

197. Despite this information, CHP officers shifted from treating Plaintiff as a victim to treating Plaintiff as a suspect.

## H. Plaintiff Offers Exculpatory Evidence

198. CHP officers informed Plaintiff that they suspected him of making a false call.

199. One of the CHP officers then walked around the R.V. examining it as the other CHP officers talked to Plaintiff.

200. SLOPD officers left the scene.

201. Plaintiff informed CHP officers that he had been livestreaming during the July 10, 2024 incident.

202. Plaintiff told CHP officers that his livestream would show he was live at the time of the false emergency call.

203. Plaintiff offered to show CHP officers his YouTube livestream.

204. Plaintiff offered to show CHP officers the call logs on both of his phones.

205. Plaintiff offered to show officers whom Plaintiff had called and offered to put his password in so they could investigate.

206. Plaintiff offered readily available evidence that could confirm Plaintiff had not made the false emergency call.

207. Plaintiff offered information that could be independently verified through Ventura Police Department.

208. Plaintiff offered information that could be independently verified through his livestream.

209. Plaintiff offered information that could be independently verified through the call logs on the phones themselves.

210. CHP officers did not accept Plaintiff's offer to use the phones to confirm his call logs before seizing them.

211. CHP officers instead told Plaintiff that they suspected him of making false reports to police.

212. Plaintiff alleges that CHP's refusal to consider readily available exculpatory information is relevant to the absence of probable cause and the reasonableness of the later seizure.

213. Plaintiff alleges that the availability of less intrusive investigative methods is relevant to the reasonableness of Defendants' decision to seize, retain, transfer, and search both phones.

214. If officers believed carrier call records were necessary, officers could have pursued call-detail records through lawful legal process directed to Plaintiff's cellular service provider, including records identifying outgoing and incoming calls during the relevant time period.

215. Plaintiff further alleges that the prolonged seizure and retention of both phones was unreasonable because the narrow question of whether Plaintiff placed the emergency call could have been investigated without depriving Plaintiff of both phones, livestreaming equipment, private digital data, two-factor authentication access, navigation, communication, and work tools for months.

216. CHP made no effort to ever contact Plaintiff after the seizure of the phones, sent no arrest reports, notices to appear.

217. CHP officers on scene did say if the phones were released they could be destroyed in two months if not picked up.

## I. Seizure of Plaintiff's Cellular Telephones

218. During the incident, officers located two black cellular telephones associated with Plaintiff.

219. Inside Plaintiff's recreational vehicle, a cellular telephone mounted on a tripod between the driver and passenger seats was actively recording the interaction."

220. The CHP Arrest-Investigation Report explicitly admits that Plaintiff's two black cellular telephones were discovered and seized while one was located on the ground outside the driver-side door of Plaintiff's recreational vehicle and the other on the ground inside the R.V. on the driver side.

221. The report confirms that one of the devices was actively *"located on a tripod, connected to a charger and microphone"* on the pavement at the exact moment it was seized into law enforcement custody.

222. Plaintiff alleges that seizing a phone that was structurally mounted to a tripod, complete with an external microphone and charger, proves that the individual CHP Defendants were fully aware the device was active electronic newsgathering and broadcasting equipment.

223. The physical removal of the cellular telephone from its tripod, the forced alteration of its viewing angle, and the manual termination of its recording function by officers constituted an immediate, meaningful, and unauthorized interference with Plaintiff's possessory interests in that property, independent of its subsequent long-term retention.

224. The face of the completed CHP Arrest-Investigation Report reveals that while the warrantless seizure occurred on July 10, 2024, the formal report was not finalized and reviewed by on-scene supervisor Sergeant Charles R. Wilson (ID 17477) until September 6, 2024 ("090624"), reflecting a nearly two-month delay in checking and verifying the legal justification of the property deprivation.

225. SLOPD officers removed the phone, placed it on the pavement, changed its view, turned it off, or otherwise interfered with its ability to record the police activity.

226. A second cellular telephone was located on the floor of the RV as it was on Plaintiff's lap and he was afraid to grab it as it could have been mistaken as a gun.

227. Plaintiff owned and possessed both cellular telephones.

228. The two cellular telephones were black Samsung Galaxy S24 Ultra phones.

229. Each phone had an approximate value of $1,300.

230. The total approximate value of the seized cellular telephones was $2,600.

231. Plaintiff did not consent to the seizure of his phones.

232. No warrant was presented to Plaintiff at the time the phones were seized.

233. No officer advised Plaintiff that the phones were being seized pursuant to a warrant.

234. Plaintiff had already been released from handcuffs.

235. Plaintiff had already been told he was free to go or was no longer being held as an armed suspect.

236. The RV had already been cleared.

237. No weapon had been found.

238. No firearm had been found.

239. No machine gun had been found.

240. No dangerous occupant had been found.

241. No evidence confirmed the caller's machine-gun allegation.

242. CAD entry stating "PTY HAS BEEN RELEASED" was the only entry on CAD incident report and there were no notes of an arrest.

243. The only box checked under the Misdemeanor incarceration box on The arrest/investigation report provided in CPRA requests was the other box stating, " complaint to be filed."

244. Plaintif is unaware if any complaint was ever filed and was never notified.

245. Despite those facts, CHP officers seized Plaintiff's phones.

246. Sergeant Charles R. Wilson reviewed Plaintiff's YouTube channel and observed videos showing Plaintiff being detained by police following prior police reports.

247. Plaintiff alleges that any officer reviewing the livestream or YouTube channel could see that Plaintiff was documenting police activity and was not the false caller.

248. Despite that information, Sergeant Wilson instructed Officer Perez to seize Plaintiff's cellular telephones into evidence.

249. Officer Perez took custody of Plaintiff's cellular telephones.

250. Officer Perez placed Plaintiff's cellular telephones into his patrol vehicle.

251. Officer Perez later transferred custody of the phones to Defendant Hendricks.

252. Defendant Hendricks completed a CHP 36 property receipt.

253. Plaintiff was given a copy of the CHP 36 property receipt.

254. The Property receipt said safe keeping.

## J. Protective Sweep Limits and Lack of Safety Justification for Phone Seizure

255. A protective sweep is limited to a cursory inspection for dangerous persons or weapons and lasts only as long as necessary to dispel the reasonable suspicion of danger.

256. Plaintiff alleges that any protective-sweep justification ended before CHP seized Plaintiff's phones.

257. Plaintiff had been removed from the RV.

258. Plaintiff had been detained.

259. Plaintiff had been searched or secured.

260. The RV had been cleared.

261. No machine gun had been found.

262. No firearm had been found.

263. No dangerous person had been found.

264. Plaintiff had been released from handcuffs.

265. Plaintiff had been identified as a possible swatting victim.

266. Plaintiff alleges that officers possessed no specific and articulable facts suggesting that any dangerous person remained concealed within the RV.

267. Plaintiff alleges that the seizure of his phones was not undertaken to protect officer safety.

268. Plaintiff alleges that the phone seizure was a separate investigative act occurring after the safety justification for any sweep had ended.

269. Plaintiff alleges that the seizure of his phones was unsupported by probable cause, consent, exigency, or a warrant.

## K. CHP 36 Property Receipt: "Safe Keeping" vs. "Evidence"

270. The CHP 36 property receipt issued to Plaintiff on July 10, 2024 listed two black cell phones.

271. The receipt identified Plaintiff as the person connected to the property.

272. The receipt was signed by Defendant Hendricks.

273. The receipt was dated July 10, 2024.

274. The receipt listed the location as Santa Rosa at Olive.

275. The receipt listed the violation as Penal Code section 148.3.

276. Penal Code Section 148.3 is a misdemeanor.

277. CHP officers did not witness the alleged misdemeanor.

278. The receipt provided to Plaintiff was marked "SAFE KEEPING."

279. The face of the original CHP 36 Property Receipt reveals that Defendant Hendricks checked only the "*SAFE KEEPING*" box under Section A, intentionally leaving the "*EVIDENCE*" box blank.

280. Section F of the document confirms that Defendant Mitchell Hendricks was the booking employee who executed this classification, signing the document under I.D. Number 23805 on 7/10/24.

281. Plaintiff alleges that checking only the "*SAFE KEEPING*" box constitutes a formal administrative admission by the CHP on scene that the devices were not lawfully seized as active evidence of an ongoing crime.

282. Plaintiff further alleges that the explicit listing of 148.3 PC (a misdemeanor) as the sole operative charge on the property receipt conclusively establishes that any exigent safety justification related to an active weapon or dangerous person had fully terminated before the phones were booked.

283. The receipt did not state that Plaintiff had been arrested.

284. The receipt did not have an appearance date for court

285. The receipt did not list a court house to call or to attend

286. The receipt did not have an incident number or a case number

287. CHP officer Wilson later said Plaintiff was under investigation not under arrest.

288. The receipt did not identify a warrant authorizing the initial seizure.

289. After Plaintiff later obtained records through public records requests, Plaintiff received records indicating that the same phones were treated as evidence.

290. Plaintiff alleges that the difference between the "SAFE KEEPING" classification given to Plaintiff and the later "evidence" classification is relevant to the lawfulness, justification, documentation, and credibility of the seizure.

291. Plaintiff alleges that the "SAFE KEEPING" receipt is inconsistent with later claims that the phones were seized as evidence of a crime.

292. Plaintiff alleges that the receipt was later altered by unknown Does and was not contacted about the change.

## L. Dispatcher Follow-Up and Evidence of False Report

293. At approximately 21:00 hours on July 10, 2024, Defendant Bradshaw contacted the dispatcher who took the original emergency call.

294. The CHP report specifically names San Luis Obispo Communications Center (SLOCC) Dispatcher F. Medici (ID A16659) as the operator who handled the original emergency call.

295. The dispatcher reported that the reporting party did not sound like he was driving a vehicle.

296. The dispatcher reported that there was no traffic noise in the background of the call.

297. Plaintiff had been driving for an hour leading up to the detainment.

298. The dispatcher reported that the reporting party sounded calm and collected despite claiming that a machine gun had just been pointed at him from another moving vehicle.

299. The report confirms that Dispatcher Medici explicitly warned tracking units that the anonymous reporting party did not sound like he was driving, lacked traffic noise, sounded calm and collected despite the alleged emergency and was likely providing a false representation to dispatch.

300. The dispatcher reported that, based on her training and experience, it appeared the reporting party was stationary and possibly providing a false representation of the call to dispatch.

301. The internal report confirms that Dispatcher Medici's electronic entry into the dispatch database at the time of the call specifically warned tracking units that the anonymous caller was refusing all face-to-face contact and was providing highly evasive, unverifiable excuses regarding shipping his vehicle.

302. The report logs demonstrate that this real-time assessment of caller fraud by the dispatch center was actively broadcast to and known by the responding units, during the timeline of the field investigation.

303. This information further supported Plaintiff's position that he was the victim of a false swatting call.

304. Plaintiff alleges that because this explicit fraud warning was known to law enforcement on the night of the incident, Defendant Gomez committed actionable judicial deception months later by intentionally scrubbing this dispatcher evaluation from the digital search warrant affidavit presented to the Magistrate Judge.

305. Despite this information, Plaintiff's phones remained seized.

306. Despite this information, Plaintiff's phones were not returned.

307. Despite this information, the phones were later transferred, retained, and subjected to warrant processing.

## M. Reopened CHP Incident and Follow-Up Activity

308. CHP records show that the incident was reopened on July 10, 2024.

309. CHP records show that the incident was reopened again on July 11, 2024.

310. CHP records show that the incident was reopened again on July 13, 2024.

311. CHP records show follow-up activity after the initial detention and seizure of Plaintiff's phones.

312. The reopened incident entries and follow-up activity are relevant to the seizure, booking, handling, retention, transfer, and eventual return of Plaintiff's phones.

313. Plaintiff is informed and believes that additional reports, notes, emails, logs, dispatch records, evidence records, and communications exist concerning the reopened incident and follow-up activity.

314. Initial CPRA request came back as non responsive besides all this activity and reports

## N. July 18, 2024 Internal CHP Email Circulation

315. On or about July 18, 2024, Defendant Hendricks transmitted a copy of his narrative report concerning Plaintiff and Incident No. 240710SL0110 to CHP personnel by email.

316. In that email, Defendant Hendricks stated, "Please see the attached as requested per Sergeant McMichael."

317. The email was directed to CHP employee Chris Proper and copied to Defendant Bradshaw.

318. Shortly thereafter, Chris Proper requested that Defendant Hendricks provide the narrative report in Microsoft Word format.

319. Defendant Hendricks then transmitted the narrative report in Word format as requested.

320. The internal email correspondence demonstrates that CHP personnel circulated, reviewed, and maintained narrative reports concerning Plaintiff and the July 10, 2024 incident.

321. The July 18, 2024 correspondence confirms the existence of records concerning Plaintiff, the July 10, 2024 incident, and the seizure of Plaintiff's cellular telephones.

322. The correspondence also confirms that CHP personnel continued to review and discuss the incident after Plaintiff had been released from detention.

## O. Riley v. California and Heightened Cell-Phone Privacy

323. Plaintiff's seized property was not ordinary physical evidence.

324. Plaintiff's property consisted of two Samsung Galaxy S24 Ultra cellular telephones.

325. The phones contained extensive private digital information.

COMPLAINT   23

326. That information included communications, videos, photographs, internet activity, location information, contacts, messages, applications, recordings, livestream materials, protest documentation, and other personal records.

327. Modern cellular telephones implicate heightened Fourth Amendment privacy interests because of the quantity and quality of personal digital information they contain.

328. Digital data stored on a cell phone cannot itself be used as a weapon to harm officers after the phone has been secured.

329. At the time CHP seized Plaintiff's phones, any physical threat from the phones had been eliminated.

330. At the time CHP seized Plaintiff's phones, Plaintiff had offered to show officers the call logs and livestream evidence that could demonstrate he was not the caller.

331. Plaintiff alleges that the seizure, prolonged retention, transfer, forensic processing, and search of his phones implicated heightened Fourth Amendment privacy interests.

**P. LAPD / Gomez Warrant and Continued Retention**

332. After CHP seized Plaintiff's phones, Defendant Michelle Gomez of the Los Angeles Police Department Northeast Division applied for a search warrant in Los Angeles County concerning the phones.

333. The warrant application occurred after the phones had already been seized by CHP and placed into CHP custody.

334. The warrant commanded a search of the California Highway Patrol evidence locker located at 675 California Boulevard, San Luis Obispo, California 93401.

335. The warrant identified the first seized device as a dark-colored Samsung Galaxy cellular telephone in a black "Discovery Innovation" case.

336. The warrant identified that phone as having IMEI number 259299280565230 and serial number R5CX205LN9E.

337. The warrant stated that the first phone was booked into the San Luis Obispo Area CHP office as evidence number E20240082, Item #1.

338. The warrant identified the second seized device as a dark-colored Samsung Galaxy cellular telephone in a black OtterBox case.

339. The warrant identified that phone as having IMEI number 357994257039100 and serial number R5CX12E0HEV.

COMPLAINT  24

340. The warrant stated that the second phone was booked into the San Luis Obispo Area CHP office as evidence number E20240082, Item #2.

341. The warrant sought authority to search extensive categories of digital information contained on the phones.

342. The requested categories included messages, phone numbers, contacts, location information, owner information, applications, stored media, pictures, videos, documents, maps, journals, emails, audio recordings, visual recordings, and other electronic records.

343. The warrant also sought data that might relate to locations, communications, mindset, motive, police responses, reports, or alleged criminal activity.

344. The warrant requested data from the phones for the period beginning December 1, 2023 at 0001 hours through July 10, 2024 at 2100 hours.

345. The warrant requested authority for a forensic technician to examine, duplicate, and make images or copies of the electronic media.

346. The warrant requested offsite search authorization.

347. The warrant stated that execution could require a secure facility, special equipment, and software.

348. The warrant stated that forensic processing and searching extracted data could take more than five business days and could take up to twelve months or more.

349. Plaintiff alleges that Defendant Gomez's intentional or reckless material omissions regarding the dispatcher's fraud warnings, the caller's refusal to meet with police, and Plaintiff's active livestream were necessary to the magistrate's finding of probable cause.

350. Had Defendant Gomez submitted a truthful affidavit detailing these facts, the warrant application would have been facially insufficient to establish probable cause under the standard set forth in Franks v. Delaware, 438 U.S. 154 (1978).

351. Plaintiff did not consent to the seizure, transfer, forensic imaging, duplication, or search of his phones.

352. The warrant application sought authority over the same two Samsung Galaxy S24 Ultra phones previously seized and documented on the CHP 36 property receipt.

353. The phones were later transferred from CHP custody to LAPD custody.

354. LAPD retained Plaintiff's phones for a prolonged period.

355. Plaintiff's phones were ultimately returned to Plaintiff at an LAPD evidence facility in downtown Los Angeles.

356. No apology was given.

357. Officer gomez could have gotten a court order or a subpeona for call logs.

358. Plaintiff had met with Officer Gomez weeks before trying to identify the swatter.

359. Officer Gomez claimed she was the point of contact for the protests around the scientology buildings

360. Officer Gomez was in direct contact with numerous staff at Scientology

361. Officer Gomez talked with Plaintiff knowing that he was filming the interaction live and Officer Gomez said Plaintiffs phone number out loud

362. For the following few days, Plaintiff's cell phone number was spoofed and Plaintiff would get calls from 911 dispatch and would answer the phone and it would be calling 911.

363. Plaintiff notified 911 services that his phone was being spoofed and went to LAPD Northeast division and filed a complaint against Officer Gomez for doxing Plaintiff's personal number online

364. Plaintiff reported that false calls to service were being made on 2 different occasions in the complaint with one of officer Gomez's Superiors.

365. Officer Gomez was involved in a series of arrests of Plaintiff for his protesting outside of scientology.

366. On 8 different days Plaintiff was charged with PC 415 for saying Scientology is a cult.

367. All charges on Plaintiff were dismissed.

368. Officer Gomez notified Plaintiff via email that he was charged with 16 misdemeanors.

369. When the phones were returned, Plaintiff was told by an officer that law enforcement had identified a suspect, but that suspect had not been identified to Plaintiff.

370. Plaintiff was deprived of the use, possession, privacy, recording functions, livestreaming functions, and digital contents of his phones during the period of seizure and retention.

371. Plaintiff lost access to online platforms used for protest activity for days and months because of Two Factor authentication that relied on phone text messages to access Social Media accounts that relied on the specific phones.

372. Plaintiff alleges that the later warrant process did not cure the initial warrantless seizure of Plaintiff's phones.

373. Plaintiff was not notified of his phones being seized by LAPD and was not notified that he was ever arrested.

374. Plaintiff called SLOPD asking about clarification about my phones and was advised that an officer Gomez was in possession of them in Los Angeles.

375. Plaintiff was not in Los Angeles when the phones allegedly were evidence of a crime in San Lois Obispo.

376. Plaintiff alleges that the warrant materials confirm that law enforcement sought access to broad categories of Plaintiff's private digital data after CHP had already seized the phones and after Plaintiff had already been released from detention.

377. Plaintiff alleges that representatives of the Church of Scientology communicated directly with LAPD Detective Michele Gomez regarding swatting investigations involving Plaintiff and other protesters.

378. On or about February 5, 2024, Church of Scientology Director of Security Kirsten Pedersen exchanged communications with Detective Michele Gomez concerning swatting-related investigations. Plaintiff alleges that these communications occurred before the July 10, 2024 seizure of Plaintiff's cellular telephones and are relevant to understanding the development of the investigation that later focused on Plaintiff.

379. Plaintiff further alleges that, in communications with law enforcement during early 2024, representatives of Scientology repeatedly portrayed Scientology as the victim of false reports and criminal conduct while minimizing or disregarding reports that protesters themselves were the targets of swatting incidents.

380. Plaintiff is informed and believes that these communications influenced how subsequent reports involving Plaintiff and other protesters were evaluated by law enforcement.

381. Plaintiff further alleges that Kirsten Pedersen and Scientology-affiliated entities have maintained relationships with the Los Angeles Police Department, including documented donations made to LAPD-related charitable and support organizations.

382. Plaintiff alleges that the existence and nature of those relationships are relevant to the issues of bias, influence, coordination, and preferential access alleged in this Complaint.