FILED

2026 SEP 11 PM 2:25

CLERK U.S. DISTRICT COURT CENTRAL DIST. OF CALIF.

BY:

SCOTT HOCHSTETTER
5419 Hollywood Blvd., Ste C, 137
Los Angeles, CA 90027
Theloreofdoa@gmail.com
*Pro Se*

**UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION**

| | |
|---|---|
| SCOTT THOMAS HOCHSTETTER, aka "Defender of Ants," Plaintiff,<br>v.<br>DETECTIVE MICHELLE GOMEZ, Los Angeles Police Department, Northeast Division, in her individual capacity; LIEUTENANT KEVIN J. AUSTIN, Los Angeles Police Department, in his individual capacity; OFFICER CALEB J. BRADSHAW, California Highway Patrol, in his individual capacity; BUILDING MANAGEMENT SERVICES, a private entity; CHURCH OF SCIENTOLOGY CELEBRITY CENTRE INTERNATIONAL, a private entity; CHURCH OF SCIENTOLOGY LOS ANGELES, a private entity; CHURCH OF SCIENTOLOGY WESTERN UNITED STATES, a private entity; CITY OF LOS ANGELES; CITY OF SAN LUIS OBISPO; ANTHONY R. D'AMATO JR., an individual; OFFICER BLAKE ETHERTON, San Luis Obispo Police Department, in his individual capacity; OFFICER BRIANA M. FESPERMAN, Los Angeles Police Department, in her individual capacity; SERGEANT ROSENDO GOMEZ, RETIRED, Los Angeles Police Department, in his individual capacity; SERGEANT CESAR GOMEZ, Los Angeles Police Department, in his individual capacity; DETECTIVE DOUGLASS HALL, Los Angeles Police Department, in his individual capacity; OFFICER MITCHELL D. HENDRICKS, California Highway Patrol, in his individual capacity; SENIOR LEAD | **Case No. 2:26-cv-6868-DOC-KS**<br><br>1. 1st Amendment Retaliation<br><br>2. 4th Amendment Unreasonable Seizure and Prolonged Retention of Property<br><br>3. 4th Amendment Unreasonable Search and Judicial Deception<br><br>4. Municipal Liability City of Los Angeles<br><br>5. Violation of the California Bane Act<br><br>6. Civil Conspiracy to Deprive Constitutional Rights<br><br>7. 4th Amendment Excessive Force |

| | |
|---|---|
| OFFICER ANTONIO C. HERNANDEZ, Los Angeles Police Department, Northeast Division, in his individual capacity; ODO HUBER, an individual; OFFICER CASSANDRA E. JACQUIN, Los Angeles Police Department, in her individual capacity; JENNIFER KRAUSKOPF, an individual;OFFICER LOPEZ, California Highway Patrol, first name unknown, in his individual capacity; DETECTIVE BRIAN J. MARTIN, Los Angeles Police Department, in his individual capacity; SERGEANT CHARLIE LEE McMICHAEL, California Highway Patrol, in his individual capacity; KENDRICK L MOXON, an individual sued in his individual capacity;OFFICER PHILLIP C. OLSEN, California Highway Patrol, in his individual capacity; PARKER OSMON, an individual;OPSINC SECURITY, a private business entity; KIRSTEN PEDERSEN, an individual; OFFICER FRANCISCO R. PEREZ, California Highway Patrol, in his individual capacity; OFFICER CHRIS PROPER, California Highway Patrol, in his individual capacity; OFFICER MARCO A. ROLON, Los Angeles Police Department, in his individual capacity; FRANCISCO SOSA, an individual DETECTIVE JERRY LEE TORRES, Los Angeles Police Department, in his individual capacity; OFFICER ANTHONY V. VALENZUELA, Los Angeles Police Department, Northeast Division, in his individual capacity;CAPTAIN GARY WALTERS, Los Angeles Police Department, Northeast Division, in his individual capacity; SERGEANT CHARLES R. WILSON, California Highway Patrol, in his individual capacity; JAYDEN WHEELER, a scientology guard, individual capacity; DOE 1 GRILL individual capacity; DOE 2 CEMENT WORKER individual capacity; DOE 3 PHONE, an individual; DOE 4 TRENCHCOAT; DOE 5 GIJANE; DOES 6-50, inclusive,<br><br>Defendants. | 8. 4th Amendment Unreasonable Seizure and Nonconsensual Biometric Fingerprinting<br><br>9. Municipal Liability City of San Luis Obispo<br><br>10. 1st Amendment Retaliatory Prosecution<br><br>11. 4th Amendment Malicious Prosecution<br><br>12. 1st Amendment Unconstitutional Exclusion from Traditional Public Fora and Viewpoint Discrimination<br><br>13. Intentional Infliction of Emotional Distress<br><br>14. 14th Amendment Procedural Due Process (Deprivation of Property Without Prompt Post-Seizure Hearing)<br><br>15. 14th Amendment Equal Protection (Selective Enforcement / Viewpoint Discrimination)<br><br>**DEMAND FOR JURY TRIAL** |

# FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

## I. INTRODUCTION

1. PLAINTIFF's activities as a livestreamer and Scientology protester implicated rights protected by the First, Fourth and Fourteenth Amendments to the United States Constitution and other federal and state law.

2. PLAINTIFF used public streets, sidewalks, and easements to advocate for improved treatment and compensation of Scientology workers; object to practices involving children in auditing sessions; provide information to persons seeking to leave Scientology; distribute free food; and livestream events occurring in public.

3. PLAINTIFF alleges that, over time, the boundary between the objectives of a private religious organization and governmental police authority became increasingly blurred.

4. Scientology representatives supplied recordings, accusations, and investigative material; requested meetings and enforcement; assisted investigations; and sought measures directed toward PLAINTIFF and other protesters, including an express request for something effective to get PLAINTIFF "off the streets or out of this area."

5. California's Constitution guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference" and provides that "[t]he Legislature shall make no law respecting an establishment of religion." Cal. Const. art. I, § 4.

6. PLAINTIFF alleges governmental preference and unequal treatment where Scientology's private interests and public police authority increasingly overlapped.

7. This included street and sidewalk closures, arrest threats, hundreds of calls for emergency service, private meetings with LAPD personnel, reliance upon Scientology investigative material, and decisions concerning whom to investigate, arrest, or prosecute.

8. After protesters began an encampment near Scientology properties in May 2024, planters and other obstructions were placed within public easements, including in front of private businesses unaffiliated with Scientology.

9. Although comparable obstructions elsewhere in Hollywood were removed, those surrounding Scientology properties remained for months despite City notice and more than $9,500 in fines.

10. PLAINTIFF is unaware of criminal prosecution of those responsible, yet PLAINTIFF was prosecuted for conduct involving those same planters, which he alleges should have been removed months earlier.

11. PLAINTIFF alleges that this disparate enforcement became a custom and practice of treating Scientology protesters differently from Scientology representatives and persons acting in Scientology's interests.

12. During the same period, PLAINTIFF and other protesters became victims of repeated swatting incidents producing armed police responses.

13. PLAINTIFF was repeatedly confronted at gunpoint, detained, or handcuffed and reported that he was the victim of false emergency calls.

14. Despite those reports, PLAINTIFF was later accused of making or participating in the calls himself and of improperly filming children, including allegations promoted or communicated by Scientology representatives and appearing in law-enforcement communications.

15. PLAINTIFF repeatedly sought law-enforcement assistance as a victim of attacks, threats, and swatting but alleges that meaningful investigation, prosecution, and victim assistance frequently did not follow.

16. Following an arrest, officers also searched PLAINTIFF's van, seized papers and other property, and attempted to coordinate with authorities in West Virginia concerning PLAINTIFF.

17. Law enforcement later seized two of PLAINTIFF's cellular phones without a warrant at the time of seizure while LAPD already possessed two additional phones, a computer, and other personal property.

18. A warrant was subsequently obtained to search private digital information, and the cellular phones remained in government custody for approximately eight months.

19. Several proceedings directed against PLAINTIFF and other protesters ultimately ended in their favor.

20. PLAINTIFF prevailed on an anti-SLAPP motion, defeated a request for a permanent restraining order after a two-day evidentiary hearing, and all sixteen misdemeanor charges against him were ultimately dismissed. Other protesters also prevailed in related restraining-order proceedings.

21. Taken together, PLAINTIFF alleges retaliation for protected speech and assembly, unequal treatment and selective enforcement, interference with traditional public forums, unreasonable searches and seizures, deprivation of liberty and property, unsupported prosecutions, threats and coercion, and governmental action in concert with private actors while persons associated with Scientology were treated differently.

## II. JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

23. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over PLAINTIFF's related California-law claim because it forms part of the same case or controversy as PLAINTIFF's federal claims.

24. This Court has authority to grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202 to the extent such relief is otherwise available.

25. Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to PLAINTIFF's claims occurred within this District, including the LAPD investigation, warrant application, forensic search of PLAINTIFF's cellular phones, and subsequent handling of PLAINTIFF's digital information.

## III. PARTIES

26. PLAINTIFF SCOTT THOMAS HOCHSTETTER ("PLAINTIFF") is an individual residing in Los Angeles County, California. PLAINTIFF appears pro se and is publicly known as "Defender of Ants."

27. Defendant MICHELLE GOMEZ ("GOMEZ") was, at all relevant times, a detective employed by the Los Angeles Police Department Northeast Division ("LAPD NE Div."), acting under color of state law. GOMEZ is sued in her individual capacity.

28. Defendant KEVIN J. AUSTIN ("AUSTIN") was, at all relevant times, an LAPD NE Div. lieutenant acting under color of state law. AUSTIN is sued in his individual capacity.

29. Defendant CALEB J. BRADSHAW ("BRADSHAW") was, at all relevant times, a California Highway Patrol ("CHP") officer acting under color of state law. BRADSHAW is sued in his individual capacity.

30. Defendant BUILDING MANAGEMENT SERVICES ("BMS") is a private entity that owns and manages real property associated with Scientology organizations in Los Angeles, California, including property on or near L. Ron

Hubbard Way ("LRH Way"). BMS has also been identified in CITY OF LA records as the responsible party for certain improvements and maintenance obligations concerning the public right-of-way adjoining that property.

a. Historical records identify BMS as the owner of multiple properties surrounding what is now LRH Way. In a September 30, 1996 letter, BMS's Treasurer and designated representative, Gordon Bolstad, identified BMS-owned properties on Berendo Street and adjoining properties, including 4810 Sunset Boulevard, and supported the proposed renaming of Berendo Street to LRH Way.

b. CITY OF LA records also identify BMS as the applicant and permittee for improvements within the public way at 1300–1400 LRH Way and impose maintenance obligations concerning those improvements.

31. Defendant CHURCH OF SCIENTOLOGY CELEBRITY CENTRE INTERNATIONAL ("CSCCI") is a private entity. PLAINTIFF alleges that CSCCI personnel, including security and public-affairs representatives, communicated with law-enforcement personnel concerning PLAINTIFF and other Scientology protesters, submitted reports and evidence, participated in meetings, and requested law-enforcement action, as alleged below.

32. Defendant CHURCH OF SCIENTOLOGY LOS ANGELES ("CSLA") is a private entity operating in Los Angeles, California. PLAINTIFF alleges that CSLA, including through its security personnel and Defendants HUBER and OSMON, participated in communications, reporting, and coordination with law-enforcement personnel concerning PLAINTIFF and other Scientology protesters, as alleged herein.

33. Defendant CHURCH OF SCIENTOLOGY WESTERN UNITED STATES ("CSWUS") is a private entity.

34. Defendants CSCCI, BMS, CSLA and CSWUS are referred to collectively, where appropriate, as the "SCIENTOLOGY ENTITY DEFENDANTS."

35. Defendant CITY OF LOS ANGELES ("CITY OF LA") is a municipal entity organized and existing under the laws of the State of California. The Los Angeles Police Department ("LAPD") is a department of the CITY, and the LAPD officers and supervisors identified herein were employed by the CITY during the events alleged below.

36. Defendant CITY OF SAN LUIS OBISPO ("CITY OF SLO") is a municipal entity organized and existing under the laws of the State of California. The San Luis Obispo Police Department ("SLOPD") is a department of CITY OF SLO, and the SLOPD officers and supervisors identified herein were employed by CITY OF SLO during the events alleged below.

37. Defendant ANTHONY R. D'AMATO JR. ("D'AMATO") also known online as "ZeroDarkTony" and "ZDT," is sued in his individual capacity.

38. Defendant BLAKE ETHERTON ("ETHERTON") was, at all relevant times, an officer employed by the SLOPD, acting under color of state law. ETHERTON is sued in his individual capacity.

39. Defendant BRIANA M. FESPERMAN ("FESPERMAN") was, at all relevant times, an officer employed by the LAPD and acting under color of state law. FESPERMAN is sued in her individual capacity.

40. Defendant CESAR GOMEZ ("CESAR") was, at all relevant times, a sergeant and supervisor employed by the LAPD and acting under color of state law. CESAR is sued in his individual capacity.

41. Defendant ROSENDO GOMEZ ("ROSENDO") was, at all relevant times, an LAPD sergeant acting under color of state law. ROSENDO has since retired and is sued in his individual capacity.

42. Defendant DOUGLASS HALL ("HALL") was, at all relevant times, an LAPD detective acting under color of state law. HALL is sued in his individual capacity.

43. Defendant MITCHELL D. HENDRICKS ("HENDRICKS") was, at all relevant times, a CHP officer acting under color of state law. HENDRICKS is sued in his individual capacity.

44. Defendant ANTONIO C. HERNANDEZ ("HERNANDEZ") was, at all relevant times, an LAPD NE Div. Senior Lead Officer acting under color of state law. HERNANDEZ is sued in his individual capacity.

45. Defendant ODO HUBER ("HUBER") is an individual who, at all relevant times, held a supervisory security position for CSLA. HUBER is sued in his individual capacity.

46. Defendant CASSANDRA E. JACQUIN ("JACQUIN") was, at all relevant times, an officer employed by the LAPD and acting under color of state law. JACQUIN is sued in her individual capacity.

47. Defendant JENNIFER KRAUSKOPF ("KRAUSKOPF") is an individual who, at all relevant times, was the Head of the Legal department of CSWUS and identified herself as working for the Church of Scientology, generally. KRAUSKOPF is sued in her individual capacity.

48. Defendant LOPEZ ("LOPEZ") whose first name is presently unknown to PLAINTIFF, was, at all relevant times, a CHP officer acting under color of state law. LOPEZ is sued in his individual capacity.

49. Defendant BRIAN J. MARTIN ("MARTIN") was, at all relevant times, an LAPD detective acting under color of state law. MARTIN is sued in his individual capacity.

50. Defendant CHARLIE LEE McMICHAEL ("McMICHAEL") was, at all relevant times, a CHP sergeant acting under color of state law. McMICHAEL is sued in his individual capacity.

51. Defendant KENDRICK L MOXON ("MOXON") was at all relevant times, an attorney for the Church of Scientology. MOXON is sued in his individual capacity.

52. Defendant PHILLIP C. OLSEN ("OLSEN") was, at all relevant times, a CHP officer acting under color of state law. OLSEN is sued in his individual capacity.

53. Defendant OPSINC SECURITY ("OPSINC") is a private security business. PLAINTIFF personally observed OPSINC patches on the uniforms worn by DOE 3 PHONE, FRANCISCO SOSA and DOE 5 GIJANE during the incidents with them. PLAINTIFF alleges on information and belief that these individuals were employed by OPSINC and were acting within the scope of their security assignments during the encounters described herein.

54. Defendant PARKER OSMON ("OSMON") was, at all relevant times, Security Director for CSLA. OSMON is sued in his individual capacity.

55. Defendant KIRSTEN PEDERSEN ("PEDERSEN") was, at all relevant times, Director of Security for CSCCI. PEDERSEN is sued in her individual capacity.

56. Defendant FRANCISCO R. PEREZ ("PEREZ") was, at all relevant times, a CHP officer acting under color of state law. PEREZ is sued in his individual capacity.

57. Defendant CHRIS PROPER ("PROPER") was, at all relevant times, a CHP officer acting under color of state law. PROPER is sued in his individual capacity.

58. Defendant MARCO A. ROLON ("ROLON") was, at all relevant times, an officer employed by the LAPD NE Div., acting under color of state law. ROLON is sued in his individual capacity.

59. Defendant FRANCISCO SOSA ("SOSA") allegedly served as an OPSINC security guard for Scientology during the encounters described herein and is sued individually for his own conduct.

60. Defendant JERRY LEE TORRES ("TORRES") was, at all relevant times, an LAPD detective acting under color of state law. TORRES is sued in his individual capacity.

61. Defendant ANTHONY V. VALENZUELA ("VALENZUELA") was, at all relevant times, an LAPD NE Div. officer acting under color of state law. VALENZUELA is sued in his individual capacity.

62. Defendant GARY WALTERS ("WALTERS") was, at all relevant times, a Captain and Commanding Officer of the LAPD NE Div., acting under color of state law. WALTERS has since retired from LAPD and is sued in his individual capacity.

63. Defendant JAYDEN WHEELER ("WHEELER") is an individual who worked as a Scientology security officer during the events alleged in this Complaint. WHEELER is sued in his individual capacity.

64. Defendant CHARLES R. WILSON ("WILSON") was, at all relevant times, a CHP sergeant acting under color of state law. WILSON is sued in his individual capacity.

65. Defendant DOE 1 GRILL is the presently unidentified man and is sued in his individual capacity.

66. Defendant DOE 2 CEMENT WORKER is the unidentified individual who directed a throat-cutting gesture toward PLAINTIFF on June 3, 2024, and is sued individually.

67. Defendant DOE 3 PHONE is the unidentified guard allegedly employed by OPSINC who struck PLAINTIFF's hand and cellular phone and stopped his livestream on October 10, 2024. He is sued individually.

68. Defendant DOE 4 TRENCHCOAT is the unidentified individual who followed and physically contacted PLAINTIFF on November 23, 2024. His affiliation remains unknown, and he is sued individually.

69. Defendant DOE 5 GIJANE is the unidentified guard allegedly employed by OPSINC who followed and physically contacted PLAINTIFF on November 23, 2024. This defendant is sued individually.

70. Defendants DOES 6-50 are presently unidentified persons or entities whose own conduct allegedly caused or contributed to PLAINTIFF's injuries as described below.

71. PLAINTIFF will seek leave to substitute their true names and capacities when learned through discovery.

**1. SCIENTOLOGY ENTITY DEFENDANTS**

72. Defendants CHURCH OF SCIENTOLOGY CELEBRITY CENTRE INTERNATIONAL ("CSCCI"), CHURCH OF SCIENTOLOGY LOS ANGELES ("CSLA"), BUILDING MANAGEMENT SERVICES ("BMS") and CHURCH OF SCIENTOLOGY WESTERN UNITED STATES ("CSWUS") are referred to collectively, where appropriate, as the "SCIENTOLOGY ENTITY DEFENDANTS."

73. The collective term is used for pleading convenience where the underlying law-enforcement, governmental, or contemporaneous record identifies the private participant only as "Scientology," "Church of Scientology," "Scientology security," "Scientology representatives," or "the Scientologists," without identifying the particular corporate entity involved.

74. Law-enforcement and governmental records concerning the events alleged herein repeatedly used those generalized descriptions.

75. For example, LAPD Detective TORRES described three reports concerning PLAINTIFF as reports taken "*for the Church of Scientology,*" while a West Virginia prosecutor separately recorded that "*The Scientologists*" had contacted her office concerning payment of extradition expenses.

76. LAPD operational records likewise referred generically to the "*CHURCH OF SCIENTOLOGY*" and identified Scientology security personnel and a twenty-four-hour security-control-room contact without consistently identifying the particular Scientology corporate entity associated with the communication or property.

77. Other records identify particular personnel and organizational affiliations. PEDERSEN identified herself as Director of Security for CSCCI; KRAUSKOPF is alleged herein to have acted for CSWUS; and HUBER and OSMON are alleged herein to have acted for CSLA in the communications and conduct attributed to them.

78. DOE CEMENT WORKER was working on a building owned by BMS. BMS was also identified as the cited party concerning the planters that PLAINTIFF alleges were used to prevent protesters from assembling on the easement.

79. The records further reflect recurring overlapping communications among Scientology security, legal, and other personnel concerning multiple Scientology properties, events, protesters, law-enforcement responses, meetings, evidence, criminal statutes, and requests for enforcement, frequently without the governmental participants distinguishing among the particular Scientology corporate entities involved.

80. Where the available record identifies the particular Scientology entity for which an individual acted, PLAINTIFF attributes that conduct to the identified entity.

81. Where a governmental or contemporaneous record identifies the actor only as "Scientology," "Church of Scientology," "Scientology security," or "the Scientologists," and the particular corporate principal is not identified in the presently available record, PLAINTIFF alleges in the alternative and on information and belief that the person acted as an employee, agent, representative, or authorized participant of one or more of the

SCIENTOLOGY ENTITY DEFENDANTS and within the scope of that relationship.

82. PLAINTIFF does not allege merely from the shared "Scientology" name or affiliation that CSCCI, CSLA, BMS and CSWUS are legally indistinguishable or that each entity participated in every act alleged herein.

83. Rather, liability against each SCIENTOLOGY ENTITY DEFENDANT is alleged only to the extent that the evidence establishes that the entity, through its own officers, employees, agents, policies, practices, authorization, direction, ratification where legally applicable, or joint participation with governmental actors, caused or participated in the particular wrongful conduct alleged herein.

84. Where the evidence establishes that an individual acted simultaneously or successively on behalf of more than one SCIENTOLOGY ENTITY DEFENDANT concerning the same course of conduct, PLAINTIFF alleges liability against each entity only to the extent permitted by that entity's own agency relationship, authorization, participation, or legally applicable vicarious liability.

85. PLAINTIFF presently lacks records identifying the particular corporate principal responsible for every act that governmental personnel themselves attributed only to "Scientology" or "the Scientologists," and therefore pleads the responsible SCIENTOLOGY ENTITY DEFENDANT or DEFENDANTS in the alternative where necessary.

## IV. PART ONE - FACTUAL ALLEGATIONS

### A. HISTORY

86. PLAINTIFF alleges the following historical events solely as background concerning a recurring pattern in which perceived critics or opponents of

Scientology were associated with serious criminal threats or accusations - including bomb threats and violence, and those accusations or reports resulted in, or were accompanied by, law-enforcement intervention.

87. Scientology Office of Special Affairs ("OSA") Network Orders describe investigating perceived opponents, examining possible criminal activity, publicizing information concerning them, and seeking to "remove," "paralyze," or "immobilize" persons considered attackers.

88. Network Order No. 95, "*Black Propaganda*," identifies "cult" as a hostile classification and directs Scientology to become "the classifier."

89. In the 1970s, Scientology Guardian's Office personnel engaged in schemes targeting critic Paulette Cooper, including placing bomb threats on papers bearing her fingerprints and later developing additional plans intended to make threatening communications appear attributable to her.

90. During the 2008 Project Chanology protests, Scientology publicly associated Anonymous protesters with bomb threats, death threats, vandalism, and violence.

91. During the same period, a declaration filed in later litigation alleged that a Scientology representative warned a tour-company owner that protesters chartering a bus were terrorists planning a bomb attack at LRH Way, after which LAPD was contacted and the charter was cancelled.

92. During 2009 protests outside Scientology's Golden Era Productions property at Gilman Hot Springs, a Scientology representative publicly reported dozens of bomb and death threats.

93. Scientology also sought governmental restrictions on protest activity, while law-enforcement officials acknowledged repeated calls from the Scientology property concerning demonstrators.

94. During public controversy surrounding Leah Remini and *Scientology and the Aftermath*, Scientology publicly associated criticism of the organization with threats, vandalism, harassment, bomb threats and violence.

95. On October 21, 2023, during an "Eat Predators" protest outside of Church of Scientology Celebrity Centre International ("CSCCI") in Los Angeles, LAPD officers responded to a reported firearm and detained a private security guard hired to protect the protesters, who held a license to carry the handgun, in handcuffs in the rear of a police vehicle for approximately ninety minutes.

96. Beginning in late 2023 and continuing into 2024, bomb, firearm, fire, and other high-risk emergency calls became intertwined with the developing Scientology protest movement in Los Angeles.

97. LAPD records and related incident records reflect at least twenty-one bomb-threat or bomb-related emergency calls concerning Scientology properties between January 2024 and January 2025.

98. The emergency-call problem and competing theories concerning its source existed before PLAINTIFF joined the Los Angeles protest and livestreaming community.

## B. SWATTINGS - PLAINTIFF

99. Beginning on or about January 16, 2024, after arriving in Los Angeles, PLAINTIFF engaged in public protest activity concerning Scientology.

100. His activity included speaking, displaying signs, video recording, and livestreaming from public streets, sidewalks, and other publicly accessible areas.

101. PLAINTIFF regularly used his cellular phones to livestream, communicate, record police activity, preserve evidence, document his location, and publish recordings and commentary concerning the events he observed.

102. PLAINTIFF began experiencing false or suspected-false calls for service that resulted in Code 3 responses commonly known as 'swatting' similar to those already experienced by other protesters critical of Scientology during the same period.

103. Code 3 is a priority response with sirens and lights.

104. During most of these incidents, PLAINTIFF was livestreaming and visible on camera while the false calls for service were being made.

105. Unless otherwise alleged, PLAINTIFF was not provided a victim report or Marsy's Law victim's rights card.

**1. February 11, 2024 Swatting Northeast Division LAPD**

106. On February 11, 2024, LAPD NE Div. officers responded Code 3 near LRH Way, at Scientology's Los Angeles campus.

107. At an active intersection, Officers HERNANDEZ, VALENZUELA, ROLON and others ordered PLAINTIFF at gunpoint to the ground; directed him to lie on his stomach while vehicles continued passing nearby and detained him for approximately thirty minutes.

**2. March 9, 2024 Swatting Northeast Division LAPD**

108. On March 9, 2024, a helicopter circled PLAINTIFF before LAPD officers responded Code 3 to LRH Way, with weapons drawn, ordered PLAINTIFF to his knees.

109. Officers handcuffed PLAINTIFF; searched him for weapons and demanded his identification, during which officers accused PLAINTIFF's online audience and PLAINTIFF of making the false calls for service.

**3. March 25, 2024 Swatting — Northeast Division LAPD**

110. On March 25, 2024, LAPD officers responded to a California Penal Code ("PC") § 187 murder call concerning PLAINTIFF and approached with

firearms drawn, including one officer who stood only a few feet away and pointed a handgun toward PLAINTIFF's head.

111. Officers handcuffed PLAINTIFF for approximately thirty minutes and subsequently informed him that he was the victim of a swatting call and asked whether he wished to make a victim report.

112. Despite that determination, officers kept PLAINTIFF handcuffed and used a DataWorks Plus mobile biometric device to obtain his fingerprints twice without his consent while his hands remained restrained behind his back and despite his repeated verbal objections.

113. PLAINTIFF repeatedly objected to the continued restraint and fingerprinting and stated that, if officers considered him a victim, he should not remain handcuffed while they obtained his biometric information.

114. ROSENDO arrived during the fingerprinting procedure and acted in a supervisory capacity while PLAINTIFF remained restrained.

115. PLAINTIFF alleges that ROSENDO personally observed or became aware of PLAINTIFF's verbal objections while officers continued the fingerprinting procedure.

116. PLAINTIFF alleges that he did not learn that the device was a fingerprint scanner until he reviewed video of the encounter in August 2026, which visually captured portions of the fingerprinting procedure and the device being used.

117. During the same encounter, officers informed a third-party livestreamer that PLAINTIFF had "called on himself," meaning that PLAINTIFF had made the false emergency call against himself.

118. ROSENDO also stated that officers intended to tow PLAINTIFF's van for allegedly expired registration tags, although PLAINTIFF alleges the tags were not expired.

**4. March 27, 2024 Swatting**

119. On March 27, 2024, LAPD NE Div. generated at least six calls for service at or immediately adjacent to Scientology properties near LRH Way, including three PC § 415 calls, a § 245 ADW call, a §288 molestation call, and a § 594.3 "HATE VAN" call.

120. PLAINTIFF is unaware of any swatting incident involving him on March 27, 2024 and presently possesses no information establishing that any of these calls were false emergency reports directed at him.

**5. April 4, 2024 Swatting Northeast Division LAPD**

121. On April 4, 2024, LAPD NE Div. officers including VALENZUELA again approached PLAINTIFF near the Scientology complex after receiving another report concerning a man with a gun.

122. After speaking with PLAINTIFF, the officers left the scene without detaining him, drawing their firearms or exiting their vehicles.

**6. April 14, 2024 Swatting Pasadena California**

123. On April 14, 2024, Pasadena Police Department responded to the Scientology building reported as Case No. GO PA 2024-28976 after a caller reported that two males with rifles had entered the property and that flashes were coming from the rifles.

124. Officers located PLAINTIFF protesting and livestreaming from his multicolored Chevrolet Astro van outside the property and identified him as the victim of the swatting call.

125. The caller claimed to be a Scientology security officer who had observed the alleged gunmen through surveillance video.

126. Officers referred the matter to detectives, and on April 16, 2024, Corporal #5270 of Crimes Against Persons/Violent Crimes was assigned as lead investigator.

**7. April 19, 2024 Swatting Central Division LAPD**

127. On April 19, 2024, PLAINTIFF was subjected to a swatting at Art Share in Downtown Los Angeles after LAPD Central Division ("LAPD CD Div.") officers responded Code 3 to a report concerning a man with firearms.

128. PLAINTIFF noticed officers; informed them that he believed that it was a swatting, and officers did not detain PLAINTIFF.

**8. April 23, 2024 Swatting San Francisco PD**

129. On April 23, 2024, San Francisco Police Department ("SFPD") received a report that PLAINTIFF possessed a small black 9mm handgun, recorded as Report No. PD240256047 while protesting the Scientology building in San Francisco.

130. SFPD held PLAINTIFF at gunpoint and then detained him for more than thirty minutes while he livestreamed the encounter, noting in Computer-Aided Dispatch ("CAD") Event No. SP241142769 that it was recorded as a use-of-force incident.

**9. April 25, 2024 Swatting Sacramento Guns and Grenades**

131. On April 25, 2024, Sacramento Police Department responded to CAD Call No. 2024-110446 alleging a person was pointing a firearm and had grenades at the Sacramento Scientology building.

132. PLAINTIFF alleges that, unlike several other swatting responses, Sacramento officers approached PLAINTIFF without guns drawn and asked questions; no arrest was made and no police report was written.

**10. July 6, 2024 Three Swattings In One Day**

133. On July 6, 2024, PLAINTIFF alleges that he was subjected to three separate swattings.

134. The first swatting occurred on Sunset Boulevard by Los Angeles Police Department Hollywood Division ("LAPD HW Div.") and officers removed PLAINTIFF from his recreational vehicle ("RV") at gunpoint with laser sights about his body and head, ordered him to his knees, handcuffed him, and after recognizing him they still detained him in the rear of a patrol vehicle.

135. The second swatting by LAPD occurred at Sunset Boulevard and Pacific Coast Highway and officers stated the call to service was about guns and alleged meth use and officers evaluated the circumstance and did not pull weapons on him.

136. In the third swatting that day, Los Angeles Sheriff's Department ("LASD") personnel extracted PLAINTIFF at gunpoint with laser dots about his body and head in Malibu and detained him in handcuffs for about half an hour.

137. In relation to the third swatting, former Scientologist D'AMATO, repeatedly discussed PLAINTIFF and other Scientology protesters during livestreams and admitted or represented that he contacted law-enforcement agencies and encouraged viewers to report PLAINTIFF and his associates for allegedly possessing firearms, transporting narcotics, using drugs, or engaging in other criminal activity.

138. On July 6, 2024, D'AMATO monitored PLAINTIFF's livestream in real time while encouraging viewers to contact law enforcement.

139. Immediately before the ensuing police response, D'AMATO stated that he had a feeling PLAINTIFF was going to be pulled over again and specifically identified the LASD's Malibu/Lost Hills Station as the agency that would conduct the stop.

140. Moments later, Malibu/Lost Hills deputies stopped PLAINTIFF.

**11. August 28, 2024 Swatting Seattle**

141. On August 28, 2024, Seattle Police Department ("SPD") responded to a false firearm report identifying PLAINTIFF at a Seattle bar, where officers located no weapon, bar personnel were unaware of the reported incident, and the caller refused to meet officers and disconnected.

142. Officers did not detain or point weapons at Plaintiff and recorded the event as 24-243685.

**12. August 29, 2024 Swatting Seattle**

143. On August 29, 2024, SPD received a 911 call that a man fired a rifle into the Scientology building and made a bomb threat.

144. SPD CAD identified Kade Larson as the complainant and recorded: "SAME CALLER AS 24-243685, LAST NIGHT'S SWATTING CALL."

145. Scientology personnel contacted by SPD stated that no shooting had occurred. SPD ultimately classified the incident as "Swatting", and its subsequent offense report classified the offense as false reporting.

**13. September 14, 2024 Law-Enforcement Response**

146. On September 14, 2024, CHP received a call alleging narcotics and firearms in a vehicle, followed PLAINTIFF's RV and his girlfriend's vehicle, and ultimately stopped his girlfriend.

147. D'AMATO discussed contacting highway-patrol agencies concerning PLAINTIFF's vehicles, offered a monetary reward for PLAINTIFF's arrest, and encouraged a livestreamer known as "Sheep Show" who was broadcasting PLAINTIFF's location by CB radio, to wait at a rest area and report that PLAINTIFF and his girlfriend were armed and carrying drugs.

148. D'AMATO stated in court proceedings and during livestreams that he contacted law enforcement and reported that PLAINTIFF possessed guns and drugs.

149. On November 9, 2024, D'AMATO made at least two documented calls to LAPD concerning PLAINTIFF near LRH Way, during one call, D'AMATO identified himself, stated that he was remotely watching PLAINTIFF's livestream, and accused PLAINTIFF of criminal conduct.

150. November 9 CAD and calls-for-service records reflect that LAPD communications personnel were aware D'AMATO had made numerous 911 calls and expressed concern regarding his apparent mental-health condition.

151. D'AMATO was involved in court proceedings concerning a Scientology protester who was a minor, was convicted of multiple charges arising from that conduct and was ordered by the judge not to make any swatting calls to the minor's home.

152. D'AMATO was discussed in a declaration filed by former Scientologist Claire Headley in Leah Remini's Los Angeles Superior Court case, No. 23STCV18300.

153. Headley declared that D'AMATO initially encouraged his audience to donate to the Aftermath Foundation and later encouraged them to seek refunds while accusing the organization of fraud.

154. PLAINTIFF presently has no records showing that D'AMATO was prosecuted or investigated for the September 14, 2024 call.

**14. September 18, 2024 Swatting at La Poubelle Bistro and Bar**

155. On September 18, 2024, PLAINTIFF was swatted at La Poubelle Bistro and Bar ("La Poubelle"), LAPD HW Div. officers and a helicopter responded to Code 3.

156. Officers ignored PLAINTIFF and went right to their vehicle as PLAINTIFF said, "*I know who the swatter is, it's ZDT* (D'AMATO). *Why won't you investigate these swattings?*"

**15. January 2, 2025 Swatting Pico-Union Area, Los Angeles**

157. On January 2, 2025, a swatting occurred in LAPD's Rampart Division and PLAINTIFF was again subjected to a firearm-related swatting incident in which LAPD responded to a false call to service.

158. PLAINTIFF was extracted from the RV, held at gunpoint, handcuffed for twenty minutes, and documented under Incident No. 16122.

**16. January 4, 2025 Swatting Washington D.C.**

159. On January 4, 2025, PLAINTIFF was again subjected to a swatting, Incident No. 25001894 according to Homeland Security reports, at a federal prison facility in Washington, D.C., involving a false bomb report.

160. PLAINTIFF provided MPD Homeland Security Investigator Richard Willis and Investigator Robert Watlington with a follow up email with details of the previous swattings, asking for help to solve the swattings after they searched PLAINTIFF's vehicle in the swatting Incident No. 25001894.

**17. February 11, 2025 Swatting LAPD NE Div.**

161. On February 11, 2025, PLAINTIFF attended the weekly meeting of the Los Angeles Board of Police Commissioners and met with personnel from the Office of the Inspector General to make a report concerning police conduct.

162. PLAINTIFF reported repeated swatting incidents directed against him, the lack of adequate police investigation into those incidents, and the selective acceptance and refusal of private person's arrest ("PPA") involving Scientology protesters.

163. After returning from the meeting and arriving at LRH Way, PLAINTIFF was again detained and placed in handcuffs by LAPD officers.

164. Because the detention occurred shortly after PLAINTIFF reported police conduct to the Office of the Inspector General, PLAINTIFF contemporaneously associated the two events.

165. On February 11, 2025, exactly one year after the February 11, 2024 swatting, LAPD NE Div. Officers VALENZUELA and Cassandra Roscher, Serial No. 43510, again responded to a swatting report involving PLAINTIFF in which an unidentified caller falsely claimed that PLAINTIFF had threatened the caller with a firearm.

166. VALENZUELA with guns drawn had PLAINTIFF walk backwards while extracting him from RV stating *"where have you been?"*

167. While being restrained by officers, PLAINTIFF yelled at the top of his lungs as he was aggressively handcuffed, causing the handcuffs to pinch his wrists and inflict extreme pain from the awkward positioning.

168. PLAINTIFF experienced numbness in his hands following the handcuffing that persisted for approximately nine months and continues to occur intermittently.

169. While PLAINTIFF was seated inside the police vehicle, officers handled his cellular phone and placed or touched the cellular phone against a black electronic device.

170. PLAINTIFF did not understand the purpose of the device and does not presently allege what information, if any, was obtained from or through the cellular phone as a result of its contact with the device.

171. LAPD provided PLAINTIFF with a victim report, Case No. 25023707, and a Marsy's Law victim's rights card, and classified the incident as "False Report of Emergency Services."

172. Following his February 11, 2025 report, PLAINTIFF participated in a recorded phone call follow-up with an officer from the Office of the Inspector General concerning his complaint about repeated swattings, inadequate police investigation, and the selective acceptance and refusal of PPAs.

173. PLAINTIFF also communicated by email concerning the complaint during the ensuing months.

174. Months after his initial report, PLAINTIFF received a response that he understood to convey that the review had found no wrongdoing concerning the police conduct he reported.

175. PLAINTIFF alleges that approximately one year apart, the same LAPD NE Div. officers were involved in incidents in which PLAINTIFF reported that false firearm allegations had been made against him.

176. PLAINTIFF alleges that Scientology security personnel were allowed inside the area enclosed by yellow police tape while protesters recording the scene were required to remain outside the tape.

**18. February 19, 2025 Swatting Tucson Arizona**

177. On February 19, 2025, Tucson Police Department responded to a false shots-fired report Case No. P2502190221 alleging PLAINTIFF had fired a weapon from his RV and detained him without handcuffs.

178. PLAINTIFF advised officers that he had been repeatedly "SWATTED" in multiple states and provided information for an LAPD officer working on the swatting incidents.

179. The Tucson Police Department documented the matter as a swatting call, and provided PLAINTIFF with a victim report.

## C. SWATTINGS - PROTESTERS

### 1. Zachary Ellison

180. Protester Zachary Ellison ("Ellison") reported that he was subjected to no fewer than nine suspected swatting incidents, including at least seven incidents in which he was handcuffed.

181. On or about April 2024, Ellison was at gunpoint and detained by LASD near Corral Canyon Road, involving a report of a dead body and an armed individual.

182. On or about May 2024, Ellison was swatted and detained in Rancho Palos Verdes and Palos Verdes Estates.

183. On or about June 2024, Ellison was detained at gunpoint:

  a. at the Redondo Beach Green Line Station;

  b. at the USC Galen Center by LASD; and

  c. in the Lawndale/Hawthorne area he was handcuffed and detained.

184. In June, LAPD HW Div. had Ellison at gunpoint at Gelson's near La Poubelle and in October LAPD CD Div.responded to a weapons call involving Ellison at the LA City Council Chambers.

### 2. Daniel From Salem

185. A livestreamer known as Daniel from Salem, a Scientology protester, was subjected to eight suspected swatting incidents during 2024, including incidents documented on May 18, June 4, June 27, June 28, July 2, July 3, July 8, and July 9.

### 3. Minor S.S.

186. Scientology protester and minor ("SS") was subjected to suspected swatting incidents at the 7th Street Metro Station on July 7th; on July 9, he was detained at gunpoint at the Santa Monica Pier; on July 8 and August 26, he

was subject to swatting at the CSLA Information Center; and he was also subjected to swatting incidents at his residence.

187. On or about January 23 2024, protester SS was detained at gunpoint by LAPD NE Div. officers with Jasiah Adler ("Adler") while PLAINTIFF protested the officers' continued detention of both individuals after the officers had determined that neither possessed a weapon yet still had them handcuffed.

188. D'AMATO was also the subject of Los Angeles County Restraining Order proceedings arising from his conduct toward protester SS.

189. The minor was subjected to numerous swatting calls at the SS's residence and the Court ordered D'AMATO to cease causing or participating in further swatting calls directed at the minor's residence, after which the recurring swatting calls ceased.

190. D'AMATO was subsequently charged in Los Angeles County Superior Court Case No. 24CJCM07073-01 with approximately 26 misdemeanor counts arising from alleged stalking and violations of the minor's restraining order in the case against SS.

**4. Protesters**

191. A Scientology protester named Luna was subjected to suspected swatting incidents at the Scientology property in the City of Ventura ("Ventura") on January 23, 2024 and on February 2, 2024.

192. Scientology protester Jessica Palmadesa was swatted in Hollywood Hills on March 4, 2024, involving helicopters, and was detained at gunpoint with two other Scientology protesters; was swatted at the Los Angeles City Council meeting on March 25, 2024; and at Slab City on May 26, 2024.

193. Two people were detained at the CSLA Information Center on April 1, 2024, a protester was swatted at the Scientology building in Buffalo, New York on

July 6, 2024; and swattings also occurred at Portland, Austin, and Chicago Scientology buildings with protesters being detained at each location.

## D. FALSE ATTRIBUTION OF SWATTINGS TO PLAINTIFF

194. As false emergency reports and armed police responses continued, LAPD personnel increasingly attributed the calls to PLAINTIFF, his viewers, or other anti-Scientology protesters, progressing from claims that they were "generating calls" to statements that PLAINTIFF had called police on himself, that his viewers were responsible, and that he was involved in swatting or false police reports.

195. At the same time, LAPD possessed information showing that PLAINTIFF had repeatedly been the subject of false emergency reports in which the reported threats were not found.

### 1. February 16

196. On February 16, 2024, during the police response to the incident involving PLAINTIFF, a supervising LAPD sergeant stated that PLAINTIFF was part of a group that had been "calling every night" and "generating calls."

197. The statement was made during the police response while officers were discussing the circumstances surrounding PLAINTIFF and the reported calls for service.

### 2. February 20

198. On February 20, 2024, LAPD issued News Release NR24067 publicly identifying PLAINTIFF and two other Scientology protesters who had been arrested on February 16, 2024.

199. LAPD characterized the protesters' conduct as "*planned, organized, and coordinated*" and further alleged that "*tear-gas canisters had been distributed*

*for purposeful use in confronting and baiting others into physical altercations.*"

200. The following day, February 21, 2024, the Los Angeles Times published statements supplied by Church of Scientology spokesperson Karin Pouw concerning the same group of Scientology protesters.

201. Karin Pouw characterized the protesters as a "*hate group*" and alleged that "*the protesters have called in bomb and fire threats*," claiming that such calls had cost taxpayers hundreds of thousands of dollars and disrupted public services and places of worship.

**3. March 9**

202. As alleged above, during the March 9, 2024 armed response, an LAPD NE Div. officer stated during a livestream that PLAINTIFF had "*Apparently he called on himself.*" When the livestreamer disputed that assertion, the officer responded, "*I'm letting you know today, he called.*" The livestreamer then sought clarification, asking, "*He called on himself, you are saying?*" The officer replied, "*Today.*"

**4. March 25**

203. On March 25, 2024, the accusation became specific to PLAINTIFF when an LAPD officer informed PLAINTIFF, "*It's your viewers that's calling,*" referring to the emergency calls that had prompted the police response.

204. PLAINTIFF immediately denied the accusation and challenged the officer to prove that PLAINTIFF or his viewers had made the calls.

205. An LAPD officer informed a livestreamer known as Nerd Report, who had hundreds of viewers, that PLAINTIFF was calling in the swattings himself.

**5. April 23**

206. On April 23, 2024, SFPD contacted LAPD HW Div. Detective Rand, who described PLAINTIFF as having "*a lot of run-ins*;" referenced alleged weapons; felony vandalism; false police reports; tear gas/OC spray; and provided that Scientology's security director had additional information concerning PLAINTIFF.

207. PLAINTIFF had not been charged or convicted of narcotics offenses, gun offenses, felony vandalism, or making false police reports. A separate LAPD tear-gas allegation was rejected for prosecution, and no criminal complaint was filed against PLAINTIFF based on that allegation.

208. Scientology also provided SFPD a one-page flyer containing PLAINTIFF's photographs, identifying him as a professional "activist," and "very aggressive."

## E. SWATTING NOTIFICATIONS ON CAD FOR SCIENTOLOGY

209. LAPD CAD and Incident Recall records contained standing "Premise Hazard" or "Special Instructions" for Church of Scientology locations.

210. The Premise Hazard system provides dispatchers and responding officers with location-specific information when handling calls for service.

211. A February 16, 2024 Incident Recall contained special instructions for the CSCCI locations at 5930 Franklin Avenue, 1830 North Bronson Avenue, and 1825 North Bronson Avenue.

212. The instructions identified James Richardson ("Richardson") as the CSCCI's "Property Security Director," provided a telephone number for Scientology's "24/7 Security Control Room," and instructed: "DUE TO RECENT SWATTING THREATS, HAVE A SUPERVISOR RESPOND."

213. The Incident Recall reflects that the Premise Hazard information was automatically checked when the February 16 incident was created and was subsequently viewed by LAPD personnel while the incident remained active.

214. The special instructions were attributed to LAPD Captain III Raymond Valois, Serial No. 30129.

215. Other CAD and Incident Recall records similarly identified OSMON, Scientology's Security Director, as a security contact in connection with calls for service and police responses involving Scientology locations from 2024 through 2026.

## F. CUMULATIVE PSYCHOLOGICAL EFFECTS OF REPEATED SWATTING

216. PLAINTIFF alleges that the repeated false emergency reports and resulting armed law-enforcement responses caused substantial fear, anxiety, emotional distress, heightened vigilance, sleep disturbance, and continuing apprehension that another false emergency report could result in another armed police response.

217. These effects were cumulative and occurred against the backdrop of repeated incidents in which PLAINTIFF was confronted by armed officers, detained, or handcuffed following false or suspected false emergency reports.

218. PLAINTIFF further alleges that the repeated nature of these incidents affected his sense of safety during ordinary activities, public appearances, protest activity, and livestreaming, including a continuing fear that another false emergency report could result in an armed police response.

## G. DISMISSED CHARGES

### 1. PPA Battery Arrest; Subsequent Conspiracy and Tear-Gas Investigation

219. On February 16, 2024, PLAINTIFF was initially taken into custody pursuant to a PPA for alleged PC § 242 battery.

220. After that arrest, LAPD developed a separate felony theory involving PC § 182 conspiracy and the alleged unlawful use of tear gas and advised officers to rearrest PLAINTIFF while he was in custody.

221. The following morning, LAPD Detective Patrick Aluotto ("Aluotto") obtained a warrant authorizing seizure of PLAINTIFF's two cellular phones ("FEBRUARY PHONES").

222. In his probable-cause statement, Aluotto described Scientology protesters as "*yelling at, blocking the path of and generally harassing customers,*" repeatedly filming and livestreaming persons entering or leaving La Poubelle, and "*conspiring to escalate their protest into violent encounters culminating in the unlawful use of pepper spray.*"

223. He asserted that PLAINTIFF's FEBRUARY PHONES likely contained unpublished videos, texts, direct messages, and other communications supporting that theory.

224. The warrant expressly provided that the FEBRUARY PHONES were "to be seized and not searched" and that a subsequent CalECPA warrant would be required to search their contents.

225. Contemporaneous LAPD reporting also acknowledged that LAPD HW Div. had received "a series of radio calls" concerning the protest area, "many" of which had been determined to be swatting calls requiring substantial police and fire responses, street closures, and detentions.

226. Officer Ricardo Salazar's report nevertheless also characterized protesters as engaging in continuing verbal harassment, livestreaming confrontations, and threatening to publish identifying information concerning persons associated with the area.

227. The February 17 warrant also authorized a search of PLAINTIFF's van for weapons and other specified evidence the day before Aluotto had attempted to open the locked vehicle door the previous evening.

228. LAPD subsequently searched the van, located no weapons, but seized a computer, a pair of black socks and one paper concerning PLAINTIFF's West Virginia probation from papers and personal records stored beneath his bed.

229. PLAINTIFF's black socks were returned.

230. PLAINTIFF's FEBRUARY PHONES were taken from his person when he was arrested on February 16, 2024

231. Although the initial charges of PC 183 were rejected by the District Attorney, the cellular phones and computer remained in custody of the LAPD.

232. That probation information later became the subject of communications involving LAPD, Scientology representatives, and West Virginia prosecutors.

233. After the Los Angeles County District Attorney rejected the felony conspiracy prosecution, PLAINTIFF was released after spending six days in custody.

234. PLAINTIFF went to LAPD HW Div. on or about February 21 seeking return of his cellular phones and was informed he would have to wait one year.

235. PLAINTIFF made two additional attempts to recover the cellular phones and was again informed that he had to wait one year.

236. PLAINTIFF was also informed that HALL was the only detective with whom he could speak concerning the property; one such inquiry was recorded as Incident No. 4576.

237. Although PLAINTIFF made numerous attempts at LAPD HW Div. to talk to detectives about his FEBRUARY PHONES and being a victim of crimes, no officer allotted any time to discuss with PLAINTIFF about apprehending any of the suspects or getting his cellular phones back.

238. The February 16–17 arrest, search, and seizure are the subject of separate litigation, and PLAINTIFF does not seek to duplicate those claims here.

239. They are alleged only as chronological background concerning LAPD's classification of Scientology protesters, knowledge of repeated swatting calls, investigative use of livestreaming and electronic evidence, seizure of PLAINTIFF's devices, and later use of information obtained during the vehicle search.

**2. Misdemeanors Case No. 25CJCM00751**

240. The following incidents concern the investigation and prosecution that ultimately resulted in sixteen misdemeanor charges against PLAINTIFF arising from the Scientology protest activity, including two arrests for PPAs on May 5 and May 25, 2024, one by LAPD NE Div. and the other by LAPD HW Div. during which PLAINTIFF was handcuffed and transported to the relevant police division jails.

241. The charges arose from eight dates between March 8 and May 25, 2024, during which PLAINTIFF was protesting, speaking through amplification at times, recording, and livestreaming in areas surrounding Scientology properties.

242. During this period, Scientology security personnel repeatedly reported PLAINTIFF to LAPD, characterized his anti-Scientology speech as "hate," "harassment," or disruption of religious activity, supplied videos, witnesses, incident summaries, and other evidence, and repeatedly sought arrest or prosecution of PLAINTIFF.

243. On February 6, 2025, the LACA filed *People v. Hochstetter*, Case No. 25CJCM00751, charging sixteen misdemeanors arising from eight of these incidents, consisting of one PC § 415(2) charge and one Los Angeles Municipal Code ("LAMC") § 41.57(a) charge for each date.

244. PLAINTIFF was arraigned on March 21, 2025, on sixteen charges, all of which were ultimately dismissed in the interest of justice on May 13, 2026.

**a. March 8**

245. On or about March 8, 2024 at approx 2100 hrs, Scientology security guard Supervisor HUBER alleged that PLAINTIFF had, on twelve prior occasions, driven through the area displaying the words "Scientology is a cult" on the side of PLAINTIFF's van.

246. HUBER further alleged that, at approximately 2120 hours, PLAINTIFF faced Scientology and used a bullhorn for approximately ten minutes, yelling "Scientology" together with unspecified "numerous obscenities."

247. According to HUBER, approximately fifty parishioners gathered inside the chapel at 5930 Franklin Avenue were forced to end their meeting early because of PLAINTIFF's amplified speech.

248. HUBER characterized PLAINTIFF's conduct as an intentional effort to disturb a religious service based on PLAINTIFF's location, his statements concerning Scientology and what HUBER described as the *"ongoing hate"* displayed on PLAINTIFF's van.

249. PLAINTIFF alleges that his presence in the area was connected to his nightly pickets across the street at La Poubelle.

**b. March 9**

250. On or about March 9, 2024, HUBER again reported that PLAINTIFF had circled the area on twelve occasions while displaying the words "Scientology is a cult" on the side of PLAINTIFF's van.

251. HUBER further reported that PLAINTIFF used an amplified device to state "Scientology supports human trafficking and rape-repeatedly", again characterizing PLAINTIFF's message as "hate."

252. HUBER claimed that approximately twenty parishioners participating in a religious study session were disturbed and were required to close their windows, turn on air-conditioning and move to another part of the building.

253. No independent statements from the allegedly disturbed parishioners were obtained. No Scientology video and no body-worn camera footage documented the reported incident.

**c. March 12**

254. On or about March 12, 2024, HUBER again reported that Scientology was conducting spiritual counseling services and theology studies.

255. HUBER alleged that PLAINTIFF parked his van displaying the words "Scientology is a cult" and provided a bullhorn to another protester at the restaurant, La Poubelle.

256. HUBER further alleged that the protester "violently yelled" the statements "Scientology is a cult" and "stop Scientology human trafficking" in an effort to disturb the religious services across the street.

257. HUBER also alleged that a seventy-year-old woman who was seeking religious counseling was awakened by the amplified speech.

258. The March 12, 2024 incident was not charged by the LACA.

**d. March 16**

259. On or about March 17, 2024, HUBER reported at the front desk of LAPD NE Div. that a religious convention had been held on March 16, 2024, inside the Scientology chapel.

260. HUBER alleged that PLAINTIFF stood at the intersection of LRH Way and Fountain Avenue and repeatedly used a megaphone to call Scientology a "cult."

261. An LAPD officer took HUBER's report. Supervisor ROSENDO and TORRES approved the report.

**e. March 18**

262. On March 18, 2024, a Scientology security guard called 911 and reported that PLAINTIFF had been "*doing this for months*" and was "*attacking Scientology basically.*"

263. Approximately sixteen minutes later, the security guard called again and repeated the characterization that PLAINTIFF was "*just attacking Scientology.*"

264. Another Scientology security guard reported that PLAINTIFF was interrupting church services, had allegedly "*been trespassed twice,*" wore a shirt stating "*Es un Culto,*" and was yelling at passing cars.

265. LAPD officers initially responded to a reported violation of PC § 415.

266. HUBER then asserted that PLAINTIFF was violating PC § 302 by disturbing a religious gathering.

267. The responding officer remarked that PC § 302 was not the basis of the original call.

268. The officer then clarified that HUBER was referring to Scientology "auditing," which HUBER confirmed. The officer thereafter took a report for an alleged violation of PC § 302.

269. According to the report, the officer stated that PLAINTIFF used a megaphone to protest Scientology by repeatedly saying "Scientology is a cult" for approximately twenty minutes, allegedly interrupting private counseling and consultation sessions.

270. AUSTIN and TORRES approved the report, designated Case No. 24001170.

**f. April 19**

271. On April 19, 2024, at approximately 4:52 p.m., HUBER called 911 concerning PLAINTIFF's use of a megaphone while identifying himself as "Kyle."

272. HUBER, using the name, "Kyle" stated that there was "*an ongoing investigation on this guy,*" that PLAINTIFF had allegedly violated PC § 302 "numerous times," and that PLAINTIFF had been shouting "hate speech" and referring to Scientology as a "cult."

273. LAPD initially investigated the matter as a PC § 415 call concerning a man standing on a public sidewalk, speaking loudly through a megaphone and possessing a van containing alleged "graffiti."

274. HUBER alleged that PLAINTIFF was causing a disruption inside the Church's hotel facilities.

275. PLAINTIFF alleges that body-worn camera footage identifies "Kyle," the 911 caller as HUBER. Upon the caller's arrival, officers asked for "*Kyle*", and then addressed him as "Odo."

276. The body-worn camera footage further records HUBER explaining that Scientology security personnel did not use their real names when calling 911 because, according to HUBER, their names were being displayed on the display screen of the police cars.

277. The footage identifies HUBER as the person who used the name 'Kyle' during the 911 call.

278. The body-worn camera footage further records an officer stating that he had previously dealt with PLAINTIFF during an incident involving an alleged rifle and grenade.

279. HUBER responded, "*swatting?*" The officer stated that PLAINTIFF had been "*really nice*" and that officers had been advised PLAINTIFF possessed a rifle.

280. Supervising Officer Patton, Serial No. 38960, and TORRES approved the report, which was recorded as Incident No. PD2404190003711 and Case No. 24005620.

**g. April 20**

281. On April 20, 2024, LAPD officers prepared an investigative Report RMS No. 24005943 concerning PLAINTIFF's protest activity.

282. HUBER and another Scientology security guard discussed with an LAPD officer efforts to build a case against PLAINTIFF including communications with the Head of Security at CSCCI, PEDERSEN.

283. Scientology security guard Jackson Friend alleged that PLAINTIFF had taken a food-drive sign from a public street pole and was using a megaphone nearby.

284. Friend stated, *"We're trying to get him slammed for 302."*

285. The officer stated that LAPD supervision had sent officers an email concerning PC § 302 and asked whether Scientology personnel were working with the Major Crimes Division *"to try to build a huge case?"*

286. Friend responded that Major Crimes personnel had visited during the prior week, that Scientology possessed additional evidence, and that Major Crimes had instructed Scientology personnel to continue making reports concerning alleged violations of PC § 302.

287. Friend then asked whether officers could *"hit him up on the 302 as well."*

288. The officer responded that *"he had to personally witness the conduct supporting the alleged violation."* Friend then asked whether he could nevertheless file a complaint concerning the alleged violation.

289. The officer contacted another officer who had previously taken a PC § 302 report involving a megaphone.

290. The officer asked about the requirements for identifying a victim and whether a security guard could qualify as the victim.

291. He was advised that the alleged conduct had to occur during a religious event or service.

292. The officer stated that Major Crimes was "building a case" and explained that accumulating additional reports could make the investigation larger.

293. The officer discussed the possibility of a PPA for the alleged theft of a food-drive sign but stated that PLAINTIFF would likely be released shortly after arrest.

294. Friend stated that he wanted PLAINTIFF to be arrested.

295. The officer cautioned that Major Crimes was allegedly building a larger case and advised that additional evidence and reports be forwarded to Major Crimes rather than pursuing an isolated misdemeanor.

296. Friend responded that "*fifty reports on the guy, should be sufficient to make the matter significant.*"

297. The officer subsequently obtained a statement from a Scientology parishioner who wished to make a complaint against PLAINTIFF and described being upset by the noise and by what she characterized as false information PLAINTIFF was spreading.

298. The officer again communicated with PEDERSEN regarding the incident by telephone.

299. The officer stated that Scientology was in direct contact with Major Crimes, while he was not, and repeated his understanding that Major Crimes was attempting to build a larger case.

300. He further stated that individual reports could be forwarded to Major Crimes to assist in building that larger case.

301. PLAINTIFF alleges that the food-drive sign at issue was affixed to a public streetlight pole, that LAPD identified LAMC § 28.04 as the provision concerning signs on public streetlights, and that during Scientology protests

between December 2023 and July 2024 he personally observed numerous other signs affixed to public streetlights in the same area that remained posted.

302. PLAINTIFF further alleges that many signs were removed by Scientology security personnel without prosecution.

303. The April 20, 2024 incident was not charged as a misdemeanor, a theft, or violation of PC § 302.

**h. May 5**

304. On or about May 5, 2024, at approximately 12:53 p.m., Scientology security guard Jackson Friend called 911 to report alleged "mass civil disobedience" on LRH Way and requested that his name not be broadcast.

305. At approximately 2:28 p.m., a person calling from 4810 W Sunset Boulevard who identified herself as being in charge of religious services for Scientology (the "May 5 Caller") called 911 and reported that a person outside was using a megaphone and disturbing classroom services.

306. When dispatch asked for a description, the May 5 Caller stated, "*No, I can't see him. I can't see him out the window. I can only hear him.*"

307. Within approximately eight minutes, a second call was made to 911 from the same location by a person who identified herself as working at the church, reporting the same alleged conduct.

308. During that call, dispatch advised that someone from that location had already called and the caller stated that it was her first call and that she had not been directed to call.

309. At approximately 2:58 p.m., Officer Juei Chien, Serial No. 45042, arrived and contacted Jackson Friend.

310. Body-worn camera footage records Officer Chien stating, "*And so far it's only been him with the megaphone,*" and after consulting his supervisor, Officer Chien declined to arrest PLAINTIFF.

311. After Jackson Friend requested a supervisor, ROSENDO arrived, and stated, "*Alright, if you want to do a PPA, that's fine. We'll do a PPA*" and accepted a PPA under PC § 302 for DR No. 241107931.

312. During the investigation, officers interviewed the May 5 Caller as a witness regarding alleged disruption of religious services, despite the May 5 caller's prior statement during the 911 call that she could not visually observe or identify the person using the megaphone.

313. The LAPD report attributed to PLAINTIFF statements including "*we can get you help,*" "*we can get you out of the Sea Org program*," and "*Scientology is a cult.*"

314. Officers thereafter approached PLAINTIFF and requested that he sign a notice to appear for an alleged violation of PC § 302.

315. PLAINTIFF declined to sign the notice to appear and was arrested and transported to LAPD NE Div.

**i. May 6**

316. On May 6, 2024, Scientology personnel made repeated calls to 911 concerning PLAINTIFF and other Scientology protesters near 1308 LRH Way.

317. At approximately 5:44 p.m., a Scientology security guard called 911 to report PLAINTIFF's vehicle, described the writing on it as "*Scientology is a cult,*" and characterized the vehicle as having "*hate speech all over it.*"

318. Approximately one minute later, Scientology security guard Jackson Friend, separately called 911, identified PLAINTIFF by name, stated he was protesting Scientology, referenced PLAINTIFF's arrest the previous day, and informed dispatch that PLAINTIFF had a "*history of violence.*"

319. Throughout the evening, additional 911 calls described PLAINTIFF and other protesters as disrupting religious services and urged LAPD to respond.

320. One caller who identified himself as armed security for Scientology, informed a LAPD supervisor that PLAINTIFF's conduct violated PC §§ 302, 415 and applicable LAMC provisions, urged an increased-priority response, supplied PLAINTIFF's name, criminal history information and reference to his prior arrest.

321. When LAPD officers arrived, Scientology security sought another PPA under PC § 302 and identified a female Scientology minister as the alleged victim.

322. The minister stated that she had been providing spiritual counseling when she heard amplified speech for several minutes, but she did not see the speaker and could not identify PLAINTIFF.

323. Scientology security nevertheless identified PLAINTIFF, provided video, and sought his arrest, with one representative stating that they wanted to conduct a PPA of PLAINTIFF under PC § 302 and that the security guard would sign the PPA.

324. MOXON and KRAUSKOPF both participated in helping the alleged victim make her claims.

325. Body-worn camera footage showed officers questioning whether PC § 302 was satisfied. The officer stated, "*I don't want to do a PPA for this,*" and "*Why are we arresting this guy?*" and questioned whether the alleged victim could identify PLAINTIFF.

326. Officers also discussed whether individual spiritual counseling constituted an "assemblage of people" engaged in religious worship for purposes of PC § 302, with the body-worn camera recording reflecting officers distinguishing counseling from an assemblage for worship.

327. Despite officers' doubts, Scientology security continued to press for PLAINTIFF's arrest and supplied additional video and paperwork.

328. During the same recording, a Scientology representative stated, "*I'm just trying to get him arrested*" while officers continued attempting to determine whether the elements of PC § 302 were satisfied.

329. After PLAINTIFF left the area, officers stated that they intended to locate, detain and arrest him and as they were looking for PLAINTIFF it could be heard "*He's at Lexington. We're going to go detain him so we can arrest him.*"

330. Officers then drove through the surrounding neighborhood searching for PLAINTIFF's multicolored Chevrolet Astro van but PLAINTIFF was not located, was not arrested on May 6, and faced no prosecution under PC § 302 for the incident tracked as RMS No. 24009034.

**j. May 25**

331. On May 25, 2024, PLAINTIFF was engaged in protest activity concerning La Poubelle, a restaurant located at 5907 Franklin Avenue, in connection with its association with Scientology. PLAINTIFF was standing and protesting on the public sidewalks adjacent to the restaurant.

332. At approximately 6:41 p.m., Scientology security officer Aaron Nicolarson ("Nicolarson") called 911 and reported that PLAINTIFF was intentionally disrupting a Scientology service and described the matter as a "*302 disturbance*" under PC § 302.

333. Nicolarson called 911 again at approximately 7:22 p.m., reported that PLAINTIFF remained outside, and again stated that Scientology services were occurring.

334. LAPD officers arrived with paperwork printed from a lawyer's website concerning PC § 302 and met with Nicolarson, Scientology Security Chief for the CSCCI and LAPD Clergy Richardson.

335. Nicolarson provided a video of PLAINTIFF and stated, "*This whole thing is about Scientology,*" explaining that PLAINTIFF could be heard repeatedly saying "*Scientology.*"

336. Officers interviewed Scientology members who reported hearing PLAINTIFF during Scientology activities. At least one witness acknowledged that she had not seen PLAINTIFF and had heard only loud noise for approximately ten minutes, without hearing anything else.

337. LAPD instructed Scientology personnel concerning the need for witnesses who were willing to testify, explaining that if witnesses did not appear, PLAINTIFF could be released and return to the same location.

338. Nicolarson responded that Scientology wanted to "*make sure that it counts.*"

339. Richardson stated to the officer "*If you want to, I can let you pop your head in there and you'll see our service if you like.*"

340. The officer's body-worn camera shows Richardson escorting the officer to an enclosed, insulated structure inside a pavilion tent. Richardson opened the door and gestured, "*That's a service going on right now.*"

341. The body-worn camera footage shows a video playing that featured David Miscavige, the Leader of Scientology.

342. Audio from the recording included the words, "*all of the now organisation Executive Course graduates, all of the now Flag Executive Briefing Course graduates...*".

343. Richardson stated, "*That's a service going on right now... That's a recording from—*" The officer then asked, "*And they were here?*", seeking to determine whether the persons allegedly disturbed were present.

344. Richardson answered "*Yeah... Well, the people that were upstairs doing a smaller service were the ones that were disturbed. We had to put up all this stuff to keep him from disturbing the larger one as people were... But the*

*people that were in the smaller service...these people, were the ones that were being... like the service was ended as soon as the bullhorning was going on."*

345. The officer asked, "*And these folks were from the earlier service?*" Richardson affirmed, "*You got it.*"

346. The officer queried, "*Anyone from this service?*" Richardson answered, "*I don't know yet because it's still going, I'd have to interview people.*"

347. Nicolarson thereafter signed the PPA paperwork and was advised by Officer Rizea that Nicolarson was the person placing PLAINTIFF under arrest and would be required to appear in court concerning the arrest.

348. During this investigation, multiple 911 calls were being made by an unidentified caller ("swatter") reporting that a man in a multicolored van was calling him a homophobic slur and pointing a firearm at him near La Poubelle.

349. The calls were categorized as "PC § 245, assault with a deadly weapon."

350. LAPD officers did not respond Code 3 to La Poubelle.

351. Instead, they continued their discussions with Scientology security personnel and members.

352. Body-worn camera footage shows that, before contacting PLAINTIFF, LAPD officers discussed with Scientology security how PLAINTIFF's arrest would be carried out.

353. LAPD HW Div. Officer Chavez directed the group to approach PLAINTIFF, immediately turn him around, place his hands behind his back, place him in a patrol vehicle, and leave without discussing the basis for the detention with PLAINTIFF at the scene.

354. Chavez continued, "*The last thing we want to do is to get surrounded with these clowns over here.*"

355. PLAINTIFF alleges that the statement referred to the Scientology protesters who were present near PLAINTIFF.

356. Officers stated, "*scoop him up and let's get out of here.*"

357. Before approaching PLAINTIFF, officers also discussed PLAINTIFF's livestream. Body-worn camera audio recorded an officer stating, "*whichever one of us goes and grabs him first, if you get the phone, like on your side or my side first, hand it back to them so they can turn it off.*"

358. Officers then effected PLAINTIFF's arrest and, during the arrest, aggressively grabbed PLAINTIFF's genital area on two occasions, causing PLAINTIFF to yell out in pain.

359. During the arrest, PLAINTIFF continued his protest activity concerning Scientology and repeatedly expressed his opinion that, "*Scientology is a cult.*"

360. LAPD officers pushed two protesters, resulting in one experiencing chest pains and calling for an ambulance.

361. LAPD officers did not collect or preserve any evidence from any protesters at the scene.

362. Referring to the 911 call reporting a violation of PC § 245, Sergeant Mejia stated on body-worn camera that the matter would be addressed after PLAINTIFF was taken into custody and characterized the calls as "*probably going to be just these swatting calls.*"

363. PLAINTIFF was transported to LAPD HW Div. and booked following a PPA under PC § 837.

364. The booking documentation identified PC § 302 in connection with the arrest.

365. Following PLAINTIFF's arrest, officers spoke with La Poubelle owner Francoise Koster ("Koster") and informed her that PLAINTIFF had been arrested under PC § 302 and that the arrest could be used in connection with her effort to obtain a restraining order against PLAINTIFF.

366. During that interaction, Koster stated that she played amplified music outside La Poubelle so that livestreamers could be subjected to copyright enforcement.

367. PLAINTIFF further alleges that amplified music referred to as"Flag" was also played at the nearby CSCCI before officers arrived.

368. PLAINTIFF had previously received YouTube copyright claims or strikes from Scientology arising from "Flag" music audible in the background of his livestreams while he was engaged in Scientology protest activity.

369. PLAINTIFF discloses that claims arising from the February 16, 2024 arrest and certain claims arising from the May 25, 2024 arrest are presently being litigated in *Hochstetter v. City of Los Angeles, et al.*, Case No. 2:26-cv-01630-DOC-KS.

370. PLAINTIFF does not seek in this action to duplicate any claim already asserted in that separate action.

371. This Complaint separately asserts a Fourth Amendment excessive-force claim arising from physical force allegedly used against PLAINTIFF during the May 25, 2024 arrest, including the alleged grabbing of PLAINTIFF's genital area on two occasions. That excessive-force claim was not asserted in Case No. 2:26-cv-01630-DOC-KS and is pleaded independently in this action.

**k. Disturbing a Religious Meeting**

372. PLAINTIFF alleges that Scientology representatives described activities at the CSCCI as "religious services." Scientology's own materials describe its regular activities as including courses, training, auditing, recorded lectures, and other services conducted throughout the week, and state that parishioners make donations in connection with auditing and training services.

373. The May 5, 2024 calls for service records two Scientology representatives using this terminology in communications with LAPD. At approximately 2:28 p.m., a representative identifying herself as being "*in charge of the religious services*" at 4810 Sunset Boulevard reported that PLAINTIFF was disturbing the "*classroom services.*" At approximately 2:36 p.m., another Scientology

employee reported to LAPD that people using megaphones were "*disturbing the church services*" and disrupting "*our church services.*"

374. During the May 25, 2024 incident, Richardson, the Chief of Security at the CSCCI and an LAPD Clergy Council member, was wearing a religious collar and referred to the activity at the CSCCI as a "service." Richardson stated that signs identifying a service were placed around the property when a service was occurring and removed when it stopped. Richardson invited Sergeant Mejia to enter and observe the activity, where a recorded lecture could be heard. Richardson also stated that other people were still participating in other services. Later, when PLAINTIFF's arrest was discussed, an LAPD officer stated that PLAINTIFF was being arrested for "*disturbing a religious service*" at the CSCCI.

375. On May 30 and June 6, 2024, PLAINTIFF appeared at the Clara Shortridge Foltz Criminal Justice Center concerning his May 5 and May 25 arrests for alleged violations of PC § 302.

376. On both occasions, no case had been filed and PLAINTIFF's name did not appear on the court docket.

377. The court clerk issued PLAINTIFF Certificates/Proofs of Appearance confirming his appearances and that no charges were pending.

## H. FAILURE TO INVESTIGATE

378. On March 14, 2024, LAPD HW Div. Captain Craig Heredia publicly stated at a Hollywood Community Police Advisory Board meeting that LAPD Major Crimes personnel monitor social media to anticipate protest activity and use that information in planning law-enforcement responses. During the same period, LAPD personnel were reviewing PLAINTIFF's Scientology-related livestreams and online activity.

379. On March 14, 2024, HALL gave an official Hollywood CPAB presentation concerning First Amendment protesters and "street auditors."

380. HALL acknowledged that the overwhelming majority of offensive speech is constitutionally protected, that filming in places where there is no expectation of privacy is lawful, and that unwanted physical touching constitutes battery.

381. HALL also discussed PPAs and expressly described "swatting" as the intentional use of false emergency reports to generate an armed police response.

382. The repeated false emergency calls directed at PLAINTIFF closely tracked PLAINTIFF's movements, locations, and activities as they were being broadcast during his public livestreams.

383. The callers repeatedly referenced PLAINTIFF's location or activities while that information was visible or disclosed on his livestreams.

384. The false emergency calls occurred while PLAINTIFF was livestreaming, and the callers repeatedly possessed contemporaneous information concerning PLAINTIFF's location and activities that was visible or disclosed during those broadcasts.

385. The relevant livestreams occurred on YouTube during identifiable time periods corresponding to the false emergency calls, while PLAINTIFF's location and activities were being broadcast in real time.

386. The false emergency calls likewise occurred at identifiable times documented in law-enforcement call and dispatch records.

387. Law-enforcement records and recordings reflected that persons, including D'AMATO, were remotely monitoring PLAINTIFF's livestreams while contacting law enforcement or encouraging others to contact law enforcement concerning PLAINTIFF.

**1. Plaintiff as Victim**

388. PLAINTIFF had repeatedly reported physical attacks, threats, and the taking of his property during Scientology protest activity.

389. On February 22, Incident No. 240222005605, PLAINTIFF was hit in the head with a purse by a patron of La Poubelle.

390. On February 23, Incident No. 240606519, a man stole PLAINTIFF's cellular phone, fled the area and was arrested but there was no follow-up.

391. On February 24, Incident No. 24022400001975, PLAINTIFF had his cellular phone hit out of his hand outside La Poubelle.

392. On March 9, Incident No. 240525003584, PLAINTIFF was pushed into the street by a patron of La Poubelle.

393. On April 17, in connection with Incident No. 24041700005242, PLAINTIFF's cellular phone was taken from him. When PLAINTIFF stood up, he was pushed into his table, causing the table to break, and was then punched in the eye, resulting in a black eye.

**a. May 10 - Strike Out Against Drugs Incident**

394. On or about May 10, 2024, PLAINTIFF livestreamed and engaged in Scientology-related protest activity on LRH Way while distributing free food from a public sidewalk. PLAINTIFF made the food available to unhoused persons, protesters, former Scientologists, Scientologists, and other members of the community.

395. On information and belief, David Sanchez is the founder of 'Strike Out Against Drugs', a nonprofit that uses materials from the 'Foundation for a Drug Free World', a program sponsored by Scientology and conducts joint outreach with Scientology, Los Angeles and has had its work featured on the Scientology Network.

396. On that same date, David Sanchez arrived with several other men and parked in the Scientology parking lot adjacent to the AOLA building on LRH Way. A bus displaying Strike Out Against Drugs graphics was also present in the lot.

397. Sanchez, DOE 1 GRILL, and one other man crossed LRH Way, obtained food from the Scientology café, and observed PLAINTIFF and other protesters preparing and distributing food.

398. DOE 1 GRILL approached PLAINTIFF's food-distribution area and made contact with PLAINTIFF's table and grill, causing the equipment to tip over, spilling food and damaging the grease pan. DOE 1 GRILL continued walking without stopping, while three other men took positions nearby and stared at PLAINTIFF.

399. PLAINTIFF called 911 multiple times regarding the incident. LAPD did not respond to PLAINTIFF's location for more than an hour. During that period, PLAINTIFF experienced a panic attack requiring an ambulance response.

400. Another protester followed the men after they left PLAINTIFF's location and reported that a glass bottle had been thrown at him. LAPD took a report concerning that incident. The vehicle associated with the men remained parked in the Scientology parking lot.

401. LAPD neither conducted any follow-up investigation nor later recontacted PLAINTIFF concerning his report.

402. PLAINTIFF subsequently reviewed publicly available Strike Out Against Drugs social-media pages and observed numerous photographs depicting Sanchez with LAPD officers at various locations and events. PLAINTIFF also observed Sanchez depicted on Scientology-affiliated social media pages.

403. During the May 21, 2024 interview with GOMEZ, PLAINTIFF sought to report the incident with David Sanchez and several other men near LRH Way.

404. GOMEZ treated PLAINTIFF as a reporting party, requested unedited video of the incident, offered to provide an Evidence.com upload link, and discussed

assembling video and other evidence for submission as an investigative case package.

405. PLAINTIFF identified Sanchez during the interview. GOMEZ responded by asking whether Sanchez was *"the bald guy with the mustache."*

406. PLAINTIFF described the May 10, 2024 incident and stated that he believed Sanchez and the accompanying men had intentionally intimidated him while PLAINTIFF was engaged in protest and food-distribution activity.

**b. Tire Slashing, Property Damage, and D'AMATO's Bounty**

407. On January 5, 2025, tires belonging to PLAINTIFF's girlfriend's tires were slashed. Video footage captured an individual known online as "LVC" approaching the vehicle and slashing the tires.

408. On a separate date presently unknown to PLAINTIFF, the tires of PLAINTIFF's own vehicle were also slashed.

409. Sometime before these incidents, D'AMATO publicly offered a fifty-dollar ($50) reward, or "bounty," for the slashing of PLAINTIFF's tires.

410. D'AMATO subsequently livestreamed the aftermath of the tire-slashing incidents, including PLAINTIFF's girlfriend's reaction to the slashing of the tires belonging to her vehicle and PLAINTIFF's vehicle.

411. During the relevant period, LVC was also communicating through or commenting on D'AMATO's livestream channel.

412. PLAINTIFF alleges, however, that D'AMATO's prior public offer of money for the slashing of PLAINTIFF's tires, followed by actual tire-slashing incidents affecting PLAINTIFF and his girlfriend, caused PLAINTIFF reasonably to fear that persons monitoring or participating in D'AMATO's broadcasts could act upon his statements or offers and physically damage PLAINTIFF's or his girlfriend's property.

413. These incidents occurred against the backdrop of D'AMATO's repeated discussion of PLAINTIFF's location, encouragement of law-enforcement contacts concerning PLAINTIFF, accusations involving firearms and drugs, and other conduct alleged above.

414. The combination of repeated armed police encounters, threats against PLAINTIFF's property, the actual slashing of tires, and D'AMATO's public statements caused PLAINTIFF fear, anxiety, heightened vigilance, emotional distress, and concern that additional persons could locate PLAINTIFF or damage his vehicle while he was protesting, traveling, or livestreaming.

**2. Protesters as Victims**

415. During the same period in which PLAINTIFF was engaged in sustained anti-Scientology protest activity, other protesters repeatedly reported assaults, batteries, threats, interference with cellular phones, and other alleged criminal conduct occurring near Scientology facilities, La Poubelle, and related protest locations.

416. In some incidents, LAPD officers refused requested PPAs or declined to take enforcement action; in others, suspects were arrested but no charges were ultimately filed; and in still others, protesters reported criminal conduct without any arrest being made, no investigations and no follow up reports.

417. PLAINTIFF does not assert the constitutional or other legal rights of the protesters identified in this section and does not seek damages or other relief on their behalf.

**a. Refused PPAs**

418. On December 4, 2023, a protester was arrested following a PPA by a Scientology security guard after the protester allegedly brushed against the security guard while dancing, and shortly afterwards LAPD NE Div. Officer

White refused a request for a PPA against Mr Godinez after he struck a protester's cellular phone and hand.

a. Mr. Godinez is mentioned later when his daughter attempted to run away from Scientology buildings.

419. On February 9, 2024, a protester was struck in the chest by an employee of La Poubelle, and LAPD officers refused to permit a PPA.

420. On March 9, 2024, one protester was pushed and another suffered a broken nose after being pushed twice, spat on in the face, and then punched on his nose.

421. LAPD HW Div. officers refused to file a PPA.

422. On February 24, 2024, a cigarette was thrown at a protester, and LAPD refused the requested PPA.

423. On December 7, 2024, a protester was struck about his body by Scientology Security John Christian Manfre, the LAPD officers refused to take a PPA and the protester went to the hospital.

**<u>b. Suspect Arrested but No Charges</u>**

424. On January 5, 2024, a protester was spat upon, resulting in an arrest but no criminal charges.

425. On January 19, a protester was hit with a cane and had a dog released upon him. When the protester sought to pursue charges, he was instead arrested for felony stalking and subsequently released without charges.

426. On February 2, 2024, Jolane Rae Lentz struck a protester's hand and cellular phone and was arrested.

427. The protester was not permitted to record at the police station and was threatened with arrest.

428. Lentz's husband, Greg, was later cc'd on an email from Captain Heredia concerning PLAINTIFF's intention to protest in front of the bar, in which Greg is the owner of the market next door.

429. On February 22, 2024, a lit cigarette was thrown at a protester by a La Poubelle patron who was arrested.

430. On or about June 20, 2024 on LRH Way, Lidio Rainaldi, a Scientologist, struck a protester.

431. After approximately an hour and a half of waiting for LAPD officers to interview Rainaldi, officers took Rainaldi into custody and removed him from the location in a police car that exited through the Scientology garage.

432. Based upon information and belief, Rainaldi was not prosecuted.

**c. No Action**

433. On February 4, 2024, a protester was sucker-punched while alone at the CSLA building.

   a. He was seen on his livestream when a man approached demanding "*let me have your phone*" - before attacking him.

   b. The protester lost a tooth, with his eye red and cheekbone swollen, he was transferred by ambulance to the emergency room.

434. On February 13, 2024, a protester's cellular phone was struck, and another protester was pushed by an LAPD officer.

   a. LAPD took a battery report from the person who struck the cellular phone with his hand, and the suspect also filed a report alleging that he had been pepper-sprayed by Daniel Villeda Gonzalez ("Villeda").

435. On April 19, 2024, a man struck a protester near a Scientology facility and then entered Scientology property.

436. No arrest was made after Scientology security guards refused police entry onto the property.

437. On July 20, 2024, while protesting in front of La Poubelle, protester SS was struck by an airsoft-gun pellet.

### 3. Follow-up Investigations

#### a. February 20

438. On February 20, 2024, LAPD Detective HALL conducted a follow-up investigation concerning the February 14 and February 16, 2024 incidents involving PLAINTIFF and Scientology-related complaints.

439. HALL characterized the protesters as "social media live-streamers" and described their conduct as an "aggressive form of Civil Harassment," while investigating the February incidents for potential criminal violations.

440. HALL documented the protesters' battery allegations as cross-complaints, but those allegations were not pursued.

#### b. March 14

441. On March 14, 2024, LAPD Senior Lead Officer Heather Mata and Annabelle Eubank prepared a hate crime report for disturbance of a religious gathering with Scientology being a victim for March 8, 9 and 12; DR No. 240600705, No. 240600706 and No. 240600704.

442. The report associated the protesters with civil harassment, false reporting of emergencies, violent crime, and property crime because of religious bias, hate group affiliation, criminal-street-gang affiliation and hate speech.

#### c. March 16

443. On March 16, 2024, LAPD Detective HALL conducted a follow-up investigation concerning incidents on March 8, March 9, and March 12.

444. HALL wrote in his report that suspect Hochstetter intentionally disturbed an assemblage of people assembled for a house of worship with profane discourse and unnecessary noise in violation of PC § 302.

445. HALL reported that PLAINTIFF had a single prior arrest for conspiracy to use pepper spray.

**d. April 20**

446. On April 20, 2024, LAPD Detective HALL completed a follow-up investigation arising from the February 14 and February 16, 2024 incidents at La Poubelle.

447. HALL's investigation included review of multiple videos and video clips obtained from social media and uploaded to Evidence.com concerning the February 14 and February 16 incidents.

448. HALL reported that approximately 25 protesters were present during the February 16, 2024 incident and identified multiple alleged offenses arising from the incident, including aggravated assault, unlawful use of pepper spray, and false imprisonment.

449. HALL further reported that multiple protesters possessed pepper spray during the protest and characterized the conduct as an unlawful assembly under PC § 408.

**e. May 20**

450. On May 20, 2024, GOMEZ conducted a follow-up investigation report for DR No. 24-1107931 concerning incidents on May 8, May 9, and April 20, 2024.

451. GOMEZ stated that antagonism toward Scientology had increased and that a group of livestreamers had been livestreaming encounters with Scientology members and police.

452. GOMEZ's report was reviewed and approved by LAPD Detective III Michael Ventura ("Detective Ventura").

453. GOMEZ stated that the livestreamers are using an aggressive form of civil harassment combined with livestreaming technology to target Scientology members, and that the social media livestreamers invoke their First Amendment right to protest to justify their aggressive actions.

**<u>f. June 4</u>**

454. TORRES submitted a follow-up report for Case No. 24001170, the March 16, March 18, and April 19 investigations to the LACA for filing consideration.

455. TORRES characterized the Scientology protesters as engaging in an "aggressive form of civil harassment" and wrote that the livestreamers "*exploit First Amendment rights of protest to justify this activity.*"

456. TORRES relied extensively on information supplied by Scientology security.

457. PEDERSEN supplied TORRES with 99 surveillance videos or clips.

458. PEDERSEN later provided TORRES with unsworn written statements from Reverend Michael Parodi, Reverend Jason Maifeld, Minister Bonnie Steele and Director of Counseling, Brandon Allender, alleging that PLAINTIFF had disturbed their counseling sessions.

459. In reviewing PLAINTIFF's own livestream, TORRES further stated that he believed PLAINTIFF demonstrated "some consciousness of guilt" and intended to disrupt Scientology's activities before submitting the investigation for prosecution.

**<u>g. February 03, 2025</u>**

460. On February 3, 2025 LAPD did a Follow-Up Investigation, DR No. 24-1107931, signed by GOMEZ Serial No. 34514 and produced in Case No. 25CJCM00751 where GOMEZ stated "*I am in charge of handling all*

*Scientology related reports handled by the Northeast Division for the church location at 4810 W. Sunset Blvd,*" and was approved by Supervisor Detective III Matthew W. Eddy.

461. GOMEZ stated that she requested "*as much information as possible*" from HUBER regarding PLAINTIFF and HUBER provided a list of incidents, including those handled by the LAPD HW Div., to fulfill GOMEZ's request for an overview of "*the amount of problems that Scott has caused, and police resources used to handle these cases.*"

462. GOMEZ remained involved in misdemeanor investigations and communicated with the LACA concerning PLAINTIFF, noting that PLAINTIFF requested all contact be made by email and GOMEZ later emailed PLAINTIFF and informed him of the sixteen misdemeanors.

463. GOMEZ stated that PLAINTIFF had been arrested for PC § 245 ADW based on the alleged unlawful use of pepper spray, although the Los Angeles County District Attorney had rejected the matter for prosecution and no accusatory pleading was filed.

**h. February 6, 2025**

464. On February 6, 2025, the LACA filed *People v. Hochstetter*, Case No. 25CJCM00751, charging sixteen misdemeanors arising from eight dates: March 8, March 9, March 16, March 18, April 19, May 5, May 6, and May 25, 2024, with each date resulting in one PC § 415(2) count and one LAMC § 41.57(a) count.

465. PLAINTIFF alleges that all sixteen misdemeanor charges were dismissed in the interest of justice on May 13, 2026.

466. PLAINTIFF was subject to a criminal stay-away order barring him from coming within 100 yards of Scientology buildings for over one year, which prevented him from protesting at those locations during that period.

**4. Report of Swattings with GOMEZ**

467. During a May 21, 2024 interview at LAPD NE Div., PLAINTIFF informed GOMEZ that an LAPD officer had advised PLAINTIFF that he was a swatting victim.

468. PLAINTIFF stated that he had been repeatedly subjected to swatting and armed police responses and that his livestreams documented those encounters.

469. PLAINTIFF was also reporting separate assaults, batteries, thefts, threats, and interference with his property arising during his anti-Scientology protest activity.

470. GOMEZ stated that she handled Scientology-related matters and described herself as an investigator of facts who "*can't take sides*."

471. PLAINTIFF also advised GOMEZ that he had experienced approximately nine suspected swatting incidents and had repeatedly been confronted by responding officers with firearms as a result of false emergency reports.

472. During the interview, PLAINTIFF advised GOMEZ that he was recording.

473. During the recorded interview, GOMEZ audibly stated PLAINTIFF's cellular telephone number while PLAINTIFF was livestreaming.

**5. Spoofing**

474. Beginning on or about May 22, 2024, PLAINTIFF began receiving telephone events in which his cellular number was connected to 911 despite PLAINTIFF stating to dispatchers that he had not initiated the calls.

475. On or about May 24, 2024, PLAINTIFF experienced additional such calls and repeatedly advised 911 dispatchers that his telephone number was being spoofed and that he had not placed the calls.

476. On May 25, 2024, PLAINTIFF experienced additional incidents in which his telephone number was associated with calls that PLAINTIFF stated he had not

initiated. PLAINTIFF was livestreaming during at least two of those incidents and recorded another.

477. PLAINTIFF's livestreams and recording provided contemporaneous evidence of the events occurring during and surrounding these incidents.

478. PLAINTIFF discussed on his livestreams with his audience that someone was spoofing his telephone number and that PLAINTIFF had numerous conversations about the spoofing as he felt it was a waste of police resources.

## I. PUBLIC SIDEWALK RESTRICTIONS OF PROTESTERS

### 1. Sidewalk Closure Communications Before May 29th

479. On September 22, 2023, Scientology security representative HUBER provided LAPD advance notice of a demonstration scheduled for the following day at LRH Way, including the demonstration flyer and scheduled time and route.

   a. The following morning, LAPD NE Div. Captain WALTERS responded to HUBER and stated, "*Feel free to call on us anytime,*" while copying additional LAPD personnel and Scientology representative OSMON.

480. On January 5, 2024, Jennifer KRAUSKOPF emailed Cuauhtémoc "Temo" Llanes ("Llanes") concerning protests at Scientology events and enforcement of street and sidewalk closures.

   a. She sought a means to keep private parishioner and public community events "peaceful and free of distraction," complaining that protesters used bullhorns and disrupted religious services.

   b. Describing a New Year's Eve event on LRH Way, KRAUSKOPF stated that protesters remained on the street and sidewalk despite the street closure.

   c. She reported that a responding LAPD officer pointed out the permit language: "*The closure, when granted, will be for the exclusion of vehicles only. The public at large may not be denied access to any*

*portion of any street except in cases of an emergency." Although she argued that protesters were unlawfully disrupting a church service, officers told her they could do no more than speak with them."*

d. KRAUSKOPF asked "under what circumstances sidewalk closures could be enforced" when challenged by protesters. She stated that Scientology could barricade private events and "hire LAPD specifically to assist with security and enforcement," but that public community events could not similarly be restricted to selected persons.

e. She described enforcement as "much more tricky" when protesters asserted public-access rights and complained of discrimination when asked to leave.

f. KRAUSKOPF rejected another CITY OF LA employee's suggestion to "wait them out," stating that protesters had visited a Scientology location "every single day, including holidays, for the past 2-3 months" and remained for "3-4 hours every day."

481. On January 12, 2024, KRAUSKOPF contacted Adena Hopenstand ("Hopenstand"), Deputy City Attorney for the CITY OF LA, concerning what KRAUSKOPF described as issues relating to "*the enforcement of street and sidewalk closures for our church events.*"

a. KRAUSKOPF stated that Llanes had discussed the matter with Hopenstand and had "*gotten some determinations made on this.*"

b. KRAUSKOPF requested a written response so that she could "*share it with others and we can plan accordingly.*"

c. Hopenstand responded that she understood KRAUSKOPF had asked CITY OF LA Bureau of Street Services ("BSS") about "*excluding members of the public, including possible demonstrators or unpermitted protestors,*" from a special event for which Scientology had obtained, or

was in the process of obtaining, a permit to conduct the event in the public right-of-way.

d. Hopenstand advised KRAUSKOPF that any trespass enforcement applicable to private property did not apply to the public right-of-way: "*To the extent there may be trespass enforcement associated with private property or other enforcement rights associated with right of entry to private property, that same enforcement does not exist in the public right-of-way or areas open to the public.*"

e. Hopenstand further advised that the special events permit application made clear that "*the public must still be able to access the street (except for emergencies).*"

f. Hopenstand explained that the permittee was required to "*restrict[] the use of the closed public street to the specific purpose for which the closure is approved and for complying with all terms and conditions of the permit.*"

g. With respect to protesters, Hopenstand advised that if a demonstration was unpermitted, Scientology could attempt to engage LAPD, but that, absent an actual legal violation and subject to LAPD's enforcement discretion, "*there is no way to issue a prior restraint.*"

h. Hopenstand further advised that, if Scientology employed additional or private security, Scientology could consult those contractors regarding recommendations for use and control of the space, but that such use and control had to remain "*consistent with the terms of the special event permit.*"

i. Llanes of the CITY OF LA Department of Public Works was copied on Hopenstand's January 12, 2024 response.

482. On January 29, 2024, KRAUSKOPF emailed Llanes regarding LRH Way.

a. KRAUSKOPF identified herself in the communication as being "from the Church of Scientology."

b. KRAUSKOPF expressly stated: "*I am looking into how to privatize L. Ron Hubbard Way.*"

483. On January 31, 2024, KRAUSKOPF again contacted Llanes regarding the "sidewalk closure issue."

a. KRAUSKOPF stated that Scientology's attorney had contacted Deputy City Attorney Hopenstand and that further communication with Hopenstand was expected.

b. KRAUSKOPF asked Llanes whether he had received a response from the LACA's office concerning "a specific ordinance concerning the closing of sidewalks," stating that the ordinances previously cited were "not particularly clear on this point."

c. KRAUSKOPF also asked Llanes whether he knew of permits issued without the "exclusion of vehicles only" clause and requested copies of such permits, specifically referring to events such as the Academy Awards and other red-carpet events.

d. KRAUSKOPF further reported that Scientology had held an event the preceding Saturday involving a sidewalk and curb-lane closure, but that LAPD "would not do anything to enforce it due to the vehicle clause on the permit."

e. KRAUSKOPF stated that this "resulted in severe harassment of some of our parishioners," and explained that she was seeking to resolve the issue to avoid similar incidents at future Scientology events.

484. On February 2, 2024, Llanes informed KRAUSKOPF that he had received a response from the LACA's office regarding the "vehicles only" language in the special event permits.

a. Llanes stated that the language used in all permits, including the two sentences stating, "The closure, when granted, will be for the exclusion of vehicles only."

b. The public at large may not be denied access to any portion of any street except in cases of an emergency, had been established when the CITY OF LA's special event permitting process was first created and that "all permits have the same conditions."

c. Llanes further stated that changing the language would indicate that the CITY OF LA was treating permits differently, which he characterized as unfair, and that such a change "could bring all permits ever issued into question."

d. Llanes stated that the LACA's office was therefore "not willing to do" so.

e. Llanes also stated that "LAPD will take action only if they perceive a safety concern" and that "each officer and LAPD branch has the authority to use discretion of when that safety boundary has been breached."

f. He additionally suggested that vacating the street might be an option, although he noted that a street vacation was an engineering process and could be subject to conditions.

g. KRAUSKOPF responded that she was not seeking to have Scientology's permits treated differently from other permittees and clarified that she was suggesting the removal of the language for "any permit that includes a sidewalk closure."

h. She stated that she would work with Scientology's attorney to contact Hopenstand and asked Llanes how she could locate the law or ordinance upon which the "vehicles only" language was originally

based, stating that this would be helpful to understand why the language appeared on the permits.

i. Llanes responded that the LACA had advised that *"all permits have the same conditions"* and that *"[a]ltering the verbiage would indicate that we are treating permits differently, which would be unfair."*

485. On March 16, 2024, OSMON, identifying himself as Security Director for CSLA, emailed WALTERS concerning Scientology's upcoming March 31 Easter Festival and copied HERNANDEZ, Janet Weiland ("Weiland"), HUBER, KRAUSKOPF, and LAPD Officer Genevieve Bravo.

a. OSMON advised that Scientology expected thousands of attendees, was seeking a permit and approximately eight LAPD officers plus a sergeant for the event, and requested advance coordination with LAPD NE Div. concerning anticipated protesters, police responses, and *"action taken ahead of time."*

b. In the same communication, OSMON specifically identified PLAINTIFF, complained that PLAINTIFF had used a megaphone for approximately four hours that day, stated that Scientology had placed more than eight calls to LAPD concerning him, and complained that it had taken approximately four and one-half hours for an LAPD unit to respond.

486. On March 30, 2024, OSMON emailed LAPD Sergeant Rivas and copied Captain Japhet Hom, WALTERS, Sergeant Brian Corwin ("Corwin"), Sergeant Jonathan Gutierrez ("Gutierrez"), HERNANDEZ, KRAUSKOPF, Weiland and other personnel.

a. OSMON thanked Rivas for meeting with him concerning an upcoming Scientology event and stated that Rivas had discussed connecting him with Sergeant Gutierrez so that they could *"coordinate on the protesters arriving."*

b. OSMON stated that the protesters were the same group concerning whom Scientology and LAPD had previously "met about in person" and represented that the group had generated "*close to 100 police reports with LAPD between us and Hollywood.*"

c. In the same email chain, Sergeant Corwin stated that he had separately met with Sergeant Gutierrez concerning the upcoming event and that Gutierrez would meet with Scientology representatives.

d. In the same email chain, OSMON described a person planning to wear a bunny suit and distribute anti-Scientology pamphlets in eggs to children, then asserted that "*this person has an alleged history of inappropriately filming children.*"

e. PLAINTIFF was the person who appeared in the bunny costume for Easter and alleges that OSMON's description referred to him.

f. PLAINTIFF has never been charged with a criminal offense involving inappropriate filming of children.

g. OSMON's email did not identify any specific incident, criminal charge, or supporting evidence for the asserted history.

487. On March 31, 2024 WALTERS emailed AUSTIN concerning the Scientology Easter event and WALTERS directed that west-side patrol units conduct extra patrol, suggested contact with Sergeant Gutierrez, and requested continuing updates concerning the event.

a. AUSTIN responded that Gutierrez was at the location and had moved the protest crowd across Fountain Avenue and reported that the protesters had calmed down following that movement.

b. A subsequent message in the same email chain described the continuing livestream protest as a nonconfrontational gathering at the northeast corner of Fountain Avenue and LRH Way.

488. On April 1, 2024, OSMON emailed LAPD Sergeants Corwin and Rivas and copied HERNANDEZ, Captains Japhet Hom and WALTERS, HUBER, KRAUSKOPF, Weiland and other LAPD and Scientology personnel.

a. OSMON thanked LAPD for its assistance during the Easter event, stated that Sergeant Gutierrez and his officers had "*put order into a very disorderly scene,*" and wrote that the event "*would have not been possible without their help.*"

b. Later that day, KRAUSKOPF separately thanked Corwin and stated that other LAPD personnel had been "*really helpful.*"

c. LAPD Sergeant Corwin thanked Scientology representatives for their feedback, stated that their comments would assist LAPD in planning future events, and advised that the Scientology email would be attached to a commendation for the responding officers.

489. On April 18, 2024, after consulting LAPD, Llanes denied Scientology's request to close additional sidewalks, stating that LAPD considered closing sidewalks opposite the event "*overburdensome for freedom of speech,*" that doing so would be an "*overreach,*" and that the CITY OF LA had to consider "*the rights of all individuals to free speech and access to public spaces.*"

a. Defendant OSMON was copied on the email.

490. On April 23, 2024, BSS Chief Investigator David Rivera informed KRAUSKOPF: "*We will not issue permits for closures that do not directly impact your event,*" and questioned whether Scientology should receive street closures where "*a majority of your events occur on private property.*"

491. On April 29, 2024, KRAUSKOPF advised LAPD Sergeant Corwin that additional "antagonists" were expected and requested consultation concerning how many officers would be needed for an upcoming Scientology event and enforcement of street closures.

a. Corwin thereafter advised KRAUSKOPF that he had pulled the permit and would begin planning for the upcoming event.

**2. Plaintiff Removed From Sidewalks**

492. Throughout 2024, while PLAINTIFF was protesting and livestreaming concerning Scientology, PLAINTIFF was repeatedly directed away from public sidewalks, public easements, and event areas, or threatened with arrest if he refused to leave.

493. Throughout this time frame, LAPD, in coordination with SCIENTOLOGY ENTITY DEFENDANTS, inaccurately presented requirements of the special events permit to the public, including the PLAINTIFF. This includes citing the need to be continuously moving on public right-of-ways during the permit, the inability for the public to be stationary during this same time, and using non-BSS terms such as hard and soft closures.

494. At the end of May, LAPD officers and SCIENTOLOGY ENTITY DEFENDANTS agreed to shut down numerous public roads including LRH Way at the CSLA, CSWUS, BMS and Tamarind and Yucca Roads at CSCCI as well as public sidewalks.

**3. Convoy and Encampment**

495. PLAINTIFF's Scientology protest activity included livestreaming, criticism of Scientology, distribution of free food to unhoused persons and other community members, and use of public streets, sidewalks, curbs, and easement areas near Scientology properties.

**a. May 29, 2024**

496. On May 29, 2024, Sgt. Brian Corwin emailed KRAUSKOPF, with OSMON copied, concerning the planned closure of the sidewalks for a Scientology event;

a. Corwin stated that "*he had recently met with his command concerning the upcoming event and that concerns had been raised about recent incidents involving protesters and complaints against officers.*"

b. "*I know we discussed how the sidewalks were going to be blocked off for your event, and you advised that you were going to use 'A' frames. We would like you to utilize scrim/privacy fence or bike rails for the closure of the sidewalks during your event.*"

c. KRAUSKOPF responded "*Please let me know if there are any other points we should coordinate on. Thank you*" with OSMON copied.

d. Sgt. Corwin further stated, "*Based on the amount of closures that are requested on the BSS permit additional security personnel would be needed... for each entry/exit area and/or each closure point.*"

**b. May 31, 2024**

497. On May 31, 2024, KRAUSKOPF responded;

a. "*I was not able to work out bike rack barricades... However, we will have an additional 8 of our own staff who will be assisting with security, mainly at the public entrance points.*"

b. "*We have also put up privacy 'walls' along the entire length of the parking lot on Sunset Boulevard, as well as the length of the parking lot of Catalina St.*"

498. On May 31, KRAUSKOPF emailed Llanes and OSMON was copied concerning the effect of this language:

a. "*There is one issue which is arising again, relating to the wording of the permit where it states that the closure is applied only to vehicles,*"

b. *"The agitators are using this specifically to violate the permit and harass our members;"* and

c. "*One of the officers today flat out refused to enforce the permit due to this wording. Despite attempts at reasoning with him and that vehicles would not be on a sidewalk, this did not resolve.*"

d. KRAUSKOPF acknowledged that members of the public could use the sidewalk: "*The officers who responded did tell them that they could pass through on the sidewalk, which we are not arguing. We are not trying to deny the public right of way.*"

499. On May 31, 2024, PLAINTIFF attempted to drive onto LRH Way during a Scientology event because he had observed other vehicles using the roadway and did not believe a valid street-closure permit then prohibited his access.

500. Scientology security personnel confronted PLAINTIFF concerning access to the roadway.

501. Other people and a temporary barrier stood between PLAINTIFF's vehicle and WHEELER.

502. After several minutes of discussion concerning whether a valid closure was then in effect, PLAINTIFF not being able to access the public street drove in another direction.

503. WHEELER later alleged that PLAINTIFF used his van to frighten or threaten him, and Attorney MOXON presented that account in support of WHEELER's restraining-order request.

504. PLAINTIFF denies attempting or expressly or implicitly threatening to run over WHEELER or anyone else.

505. He was attempting to access the public roadway and disputed the asserted closure.

506. PLAINTIFF possessed a ticket to the May 31 event. WHEELER did not ask whether PLAINTIFF had a ticket.

507. PLAINTIFF observed other community members being permitted access to streets and sidewalks without being accused of trespassing.

**c. June 1, 2024**

508. On June 1, 2024, PLAINTIFF began a continuous Scientology protest and community-outreach encampment in the public-right-of-way area near Fountain Avenue and LRH Way between the public sidewalk and the public road in the public easement.

509. Protesters maintained a continuing presence, including sleeping at the location, livestreaming, engaging in expressive activity, and providing food and other assistance to members of the community.

510. PLAINTIFF maintained equipment and supplies supporting those activities.

511. The encampment intensified the existing dispute concerning Scientology security personnel's restrictions on protesters' use of the surrounding public streets, sidewalks, curbs, and easement areas.

512. The Scientology buildings blasted music from their speakers without any citations for amplified music and ran sprinklers for hours flooding the area that the protesters were occupying.

513. On June 1, 2024, LAPD Sergeant Juan Lobo ("Lobo") placed protester Michael under arrest during the encampment.

514. Throughout this interaction, LAPD officers continuously walked back and forth on the public sidewalk, which remained outside the restricted event area.

515. The incident was filmed and the footage shows Lobo pushing Michael, after which Michael made a small push-back.

516. After Michael made a small push-back, Lobo grabbed him and swung Michael around and another officer tried to stop Lobo by motioning with her hands.

517. Michael subsequently stated that Lobo's push forced him onto his hip, that he heard a "pop," and that he immediately experienced severe pain.

518. Michael was charged with a felony and negotiations with the LACA resulted in an undisclosed agreement for him not to protest for a year and the city would not pursue charges. PLAINTIFF has attempted to locate records of the arrest and court proceedings but have not found the records.

**d. June 2, 2024**

519. On June 2, 2024, numerous LAPD officers approached PLAINTIFF and stated that the permit covered the south sidewalk and that everything on the easement had to be moved across Fountain Avenue.

520. PLAINTIFF was occupying the easement rather than the sidewalk itself, disputed the asserted restriction, and refused the demands.

521. LAPD officers threatened to arrest a protester after Scientology alleged that the individual had damaged a sprinkler head. The protester had placed a box over the sprinkler to prevent water from damaging nearby property of protesters.

522. On June 2, 2024, at approximately 1:04 p.m., Richardson emailed LAPD Deputy Chief Michael Oreb ("Oreb") under the subject "HELP REQUEST." Richardson identified himself as Security Chief of the Church of Scientology Celebrity Centre International, a LAPD Community-Police Advisory Board member, and a LAPD Clergy Council member.

   a. He referred to Oreb's earlier invitation to contact him when assistance was needed and requested urgent intervention.

   b. Richardson characterized the people outside the church as a "mob," accused them of pretending to be homeless, obstructing access, and disrupting religious services, and asserted that a participant had attacked Sergeant Lobo the preceding night.

   c. He also referenced reports against the group's alleged leader and a video animation depicting violence against Scientologists.

d. These were Richardson's allegations.

e. Richardson requested: "*We need the Police to get this mob away from our Church doors and steps.*"

f. He asserted that PC § 302 applied, complained that protesters were misusing the First Amendment, and contrasted the situation with earlier years when he said a restraining order would have been readily obtainable.

g. He stated that Scientology had already supplied substantial information to the LAPD NE Div. and requested guidance on enforcement that same day.

h. Oreb replied to Richardson, copied Japhet Hom and WALTERS and stated that he would arrange a meeting to discuss the issues.

i. Richardson requested a meeting the following day, stating that a growing number of concerned people were standing before him.

j. WALTERS directed officers to schedule a meeting involving Richardson, WALTERS, AUSTIN, and Oreb, suggesting Tuesday or later and directing staff to check Oreb's availability.

k. At approximately 6:53 p.m., WALTERS added that one of the staff members and Sergeant Travis Jones of Central Bureau special events should also attend.

523. As it became dark, Scientology maintenance personnel installed plastic netting in the east Scientology campus easement at Catalina Avenue, between the sidewalk and street.

524. At approximately 11:27 p.m., LAPD Detective Detective Ventura sent an email titled "Scientology" to Japhet Hom, WALTERS, AUSTIN, and copied Leopoldo Rey, Cesar Rivas, and GOMEZ.

a. Detective Ventura reported: "*Scientology security is claiming that they are doing 'maintenance' and attempting to block out protesters by*

*installing construction stakes and plastic contractors netting in the sidewalk area adjacent to their property.*"

b. Detective Ventura reported that; protesters asserted "*Scientology was interfering with their rights to gather and protest by denying access to the public right-of-way.*"

c. "*Scientology is now claiming the protesters are vandalizing their property by pulling up the stakes and tearing down the netting*"

d. "*I shared my opinion to keep the peace and to advise Scientology that they cannot obstruct public access with their stakes and netting and any obstruction of a sidewalk, street or curb, can only be done with the express permission and permitting by the Bureau of Street Services.*"

e. "*Any obstructions of the public space without such a permit would be illegal.*"

**e. June 3, 2024**

525. At 12:29 a.m. on June 3, 2024, in response to email titled "Scientology," WALTERS replied, "Copy." His reply was addressed to Detective Ventura, Hom, and AUSTIN, with Rey, Rivas, and GOMEZ copied.

526. On June 3, a resident reported to the Los Angeles Fire Department ("LAFD"): "*On L Ron Hubbard Way the Scientologist have completely blocked the road... How can anyone block a street and all sidewalks? Yesterday we saw a resident who could not get out.*"

527. During the morning, while continuing his protest near LRH Way, PLAINTIFF became involved in a dispute concerning a tent in the easement and cement work being performed in the basement of the building associated with BMS. PLAINTIFF was protesting in the easement area that officers had directed protesters to use the preceding day.

528. PLAINTIFF did not observe a posted permit authorizing the concrete work and requested to see one.

529. Based on the absence of a posted permit, he believed the work was unpermitted.

530. During that exchange, DOE 2 CEMENT WORKER placed a finger to his mouth, motioning for PLAINTIFF to be quiet, and then directed a throat-cutting gesture toward him.

531. The worker was physically nearby and appeared capable of carrying out the threatened violence. PLAINTIFF understood the combined gestures as a threat intended to stop or limit his protest, recording, and questioning, and feared for his safety.

532. A police report was made concerning the incident on another day.

533. Officers, including ROSENDO, responded in connection with Incident No. 0950.

534. ROSENDO appeared in a LAPD vehicle but did not approach or speak with PLAINTIFF.

535. Scientology security guards approached and stood immediately beside PLAINTIFF in the easement, then accused him of striking them.

536. PLAINTIFF denies striking the guards. He recorded the encounter and left because, following the accusations and ROSENDO's appearance, he feared being arrested.

**<u>i. June 3 Restraining Order WHEELER</u>**

537. On June 3, Jayden WHEELER, represented by MOXON, filed *Wheeler v. Hochstetter*, Los Angeles County Superior Court Case No. 24STRO03846, and obtained a temporary civil-harassment restraining order against PLAINTIFF.

538. The court record confirms that the temporary order took effect on June 3, 2024.

539. A private process server attempted to serve PLAINTIFF with the restraining order.

540. Detective Ventura, whom PLAINTIFF had observed working security for the Scientology event, came outside the event area and assisted the process server in attempting to serve the restraining order.

541. PLAINTIFF had not previously seen the restraining order. Detective Ventura presented the order to PLAINTIFF and stated that PLAINTIFF would be arrested if he returned.

542. PLAINTIFF alleges that the restraining order was invoked to prevent him from remaining near his ongoing protest and food-distribution activity.

543. In connection with the evidentiary hearing, MOXON filed or submitted a public document identifying the addresses of both of PLAINTIFF's sisters, neither of whom was involved in the restraining-order proceeding, while omitting the addresses of the witnesses MOXON intended to call. PLAINTIFF perceived the disclosure of his sisters' addresses, in these circumstances, as threatening and intimidating.

544. MOXON did not call any of the witnesses at the evidentiary hearing that were present at the alleged vehicular threats.

545. On October 7, 2024, following a two-day evidentiary hearing, the Court denied WHEELER's request for a permanent restraining order and dissolved the temporary order.

546. The Court found that the principal disputes concerned Scientology security personnel's control of access to public streets and sidewalks.

547. The Court found that PLAINTIFF's conduct was directed toward Scientology as an institution rather than WHEELER individually.

548. On a March 31, 2024 encounter on LRH Way, PLAINTIFF alleges that a man threatened to kill him while swinging a bicycle-lock cable at him.

549. WHEELER characterized the encounter as PLAINTIFF mistreating the dog by kicking rocks toward the dog.

550. Regarding the dog encounter, the Court identified material differences between WHEELER's written allegations and his testimony at the evidentiary hearing.

551. WHEELER acknowledged that he observed only part of the encounter and that the dog's owner may have been advancing on PLAINTIFF.

552. The Court found no evidence presented at the hearing supporting WHEELER's allegation that PLAINTIFF had tormented the dog.

553. Regarding the May 31 vehicle encounter, the Court credited PLAINTIFF's account that he was attempting to access the public roadway and had never expressly or implicitly threatened to run anyone over.

554. The Court noted that surveillance cameras covered the vehicle encounter, but WHEELER had not sought or presented any corroborating surveillance footage despite numerous cameras filming PLAINTIFF's every move

555. The Court drew an adverse inference from the absence of such evidence and further noted that no one called the police during the encounter.

556. The Court expressly stated that PLAINTIFF should have been permitted to access the street.

557. Responding to the May 31, 2024 video evidence of the incident between the Scientology security personnel and PLAINTIFF the Court's minute order credited PLAINTIFF's testimony that the excerpt omitted approximately forty seconds of the preceding dispute concerning the existence of a valid closure permit and accusations of trespassing.

558. During the omitted interaction, multiple security personnel, including WHEELER, surrounded and confronted PLAINTIFF.

559. The Court stated that PLAINTIFF's account of the omitted interaction was not effectively refuted and that WHEELER's counsel did not dispute that the video had been edited.

560. The Court found that the omission of this context, without clearly identifying the excerpt as edited, raised concerns regarding the credibility of WHEELER's presentation.

561. PLAINTIFF does not presently identify the person who edited the video.

562. The Court further found that PLAINTIFF correctly understood he was not trespassing because the permitted street closure had not yet begun.

563. It credited his testimony that other community members were permitted access without accusations of trespassing, which WHEELER admitted.

564. The Court also credited PLAINTIFF's testimony that he had tickets to the March 31 and May 31 events and that WHEELER had not asked whether he possessed a ticket.

565. In filings supporting WHEELER's petition, MOXON relied on statements attributed to David Comer ("Comer"), known online as "86 GOP," concerning killing MOXON and burning Scientology's property.

566. MOXON characterized Comer as PLAINTIFF's financier, principal, agent, or co-conspirator and sought to connect Comer's alleged statements to PLAINTIFF and the memorandum filed on June 27, 2024, characterized PLAINTIFF as being "in some sort of conspiracy to kill his lawyer."

567. Other filings discussed the alleged threat to burn the church and relied on those assertions to support WHEELER's claimed fear and request for protection.

568. Although MOXON stated that Comer's statements were threatening, upon information and belief, MOXON never filed a police report about the alleged death threats or arson threats.

569. PLAINTIFF alleges that his livestream was exposing statements by Mr. Comer that could be interpreted as threats and that PLAINTIFF no longer wanted to be associated with him.

570. PLAINTIFF believed at the time that Comer was working for Scientology and had made large donations to the protest to influence and control it.

571. When PLAINTIFF realized that he was trying to control the protests and made those statements he immediately separated from Comer.

572. MOXON took PLAINTIFFs statements and altered them to make it appear that PLAINTIFF was involved with conspiracy to murder MOXON.

573. The Court excluded the third-party threat statements, finding an insufficient legal or factual basis to attribute them to PLAINTIFF. It credited his testimony that he did not adopt those statements, promptly disavowed them, and subsequently ceased contact with the third party.

**f. June 4, 2024**

574. On June 4, 2024, Villeda was present at the encampment while PLAINTIFF was unable to be at the location due to the 100-yard stay-away order issued against PLAINTIFF the previous night.

575. On June 4, 2024, Scientologist Phillip Campus with a Scientology minister and Scientology Attorney MOXON filed a civil-harassment petition against Villeda, *Campus v. Villeda Gonzalez*, Los Angeles County Superior Court Case No. 24STRO03920, and obtained a temporary restraining order arising in substantial part from a March 9 arrest mentioned below.

576. The June 4 order therefore followed the March 9 incident in which Villeda had been arrested after Phillip Campus identified him to LAPD, was detained for multiple nights, and ultimately released without criminal charges.

577. PLAINTIFF alleges that the WHEELER and Phillip Campus proceedings arose to stop the protests that were occurring at the Scientology buildings.

**i. June 4th Communications with West Virginia**

578. Following PLAINTIFF's February 17, 2024 arrest, LAPD personnel searched PLAINTIFF's vehicle and removed paperwork concerning PLAINTIFF's West Virginia probation from among his personal papers.

579. On February 18, 2024, an email concerning PLAINTIFF stated that LAPD HERNANDEZ was seeking PLAINTIFF's probation-officer number and related probation information and had suggested that West Virginia authorities be notified of PLAINTIFF's Los Angeles arrest.

580. On May 31, 2024, PEDERSEN emailed GOMEZ under the subject "Scott Hochstetter" and stated that they were working with a West Virginia prosecutor concerning an asserted violation of PLAINTIFF's probation.

   a. PEDERSEN urgently requested the case numbers for four matters that she stated GOMEZ had identified as receiving immediate attention from the LACA: one LAPD NE Div. matter, one Major Crimes matter, and two LAPD HW Div. matters.

   b. PEDERSEN asked GOMEZ to provide the numbers or advise how she could obtain them that morning.

   c. The copied recipients included HALL, Craig Heredia, Calvin You, Roger Allen, AUSTIN, MOXON, Heather Mata, and additional recipients.

581. On June 4, 2024, TORRES communicated directly with West Virginia Prosecutor Garrett Robertson ("Robertson") and transmitted his follow-up report together with what TORRES described as "*the three police reports that were taken against Scott Hochstetter for the Church of Scientology.*"

   a. The materials transmitted by TORRES included reports concerning incidents that were later included in the Los Angeles misdemeanor

prosecution filed against PLAINTIFF on February 6, 2025, approximately eight months later.

582. On June 4, 2024, TORRES emailed PEDERSEN under the subject "RE: Hochstetter," copying HALL, and reported that he had spoken with Robertson and emailed him copies of reports concerning PLAINTIFF.

a. TORRES informed PEDERSEN that Robertson had indicated he could file a probation violation based on the reports but wanted to see a filing sheet from the LACA's office first.

b. TORRES further reported that he had contacted a Deputy City Attorney concerning the filing status and had been advised that the matter remained under supervisory review.

c. TORRES informed PEDERSEN: "*Once I receive a filing determination, I will advise Robertson so we can proceed with the probation violation as well.*"

583. In a separate June 4, 2024 email sent to GOMEZ under the subject "Hochstetter," PEDERSEN identified Robertson as the West Virginia prosecutor and this communication separately provided GOMEZ with the identity of the prosecutor involved in the probation matter.

584. On June 4, 2024, West Virginia Prosecutor Catie Delligatti forwarded the governmental email chain and wrote: "*The Scientologists called and offered to pay our cost of extradition if we revoke his probation...*"

585. On June 4, 2024, PEDERSEN emailed HALL under the subject "Hochstetter," copying TORRES and Michael Rippe.

a. PEDERSEN identified Robertson as the West Virginia prosecutor, stated that TORRES was in contact with him, and represented that Robertson was awaiting information from LAPD that day so he could proceed with filing for probation revocation.

b. PEDERSEN also supplied Robertson's contact information.

586. PLAINTIFF's suffered a revocation of probation hearing after West Virginia Prosecutors acknowledged that the charges got rejected by the District Attorney and the February 17, 2024 California arrest was not prosecuted.

587. PLAINTIFF was released from custody, and no accusatory pleading was filed charging him with any offense arising from the arrest.

588. Nevertheless, the February 17 incident was referred to as an arrest in communications transmitted to West Virginia authorities concerning possible action against PLAINTIFF's probation.

589. PLAINTIFF's probation was not revoked after his Lawyer argued that PLAINTIFF was not arrested.

590. The Court agreed and PLAINTIFF successfully completed his probation that resulted from protests in Washington D.C.

**g. June 5, 2024**

591. On June 5, 2024, PEDERSEN emailed TORRES, copied GOMEZ and others, and stated: "*Hochstetter is planning his 'retaliation' so I really have to get something effective done to get him off the streets or out of this area.*"

592. PLAINTIFF alleges that the successive restrictions on himself and Villeda disrupted their ability to maintain the protest and supervise its equipment.

593. Other protesters maintained the supplies until their eventual removal, after which the planter installation prevented use of the cleared area.

**h. June 7, 2024**

594. On June 7, 2024, BSS Investigator Marin was present on LRH Way at approximately 11:45 a.m., photographed the area, and spoke with Scientology representative KRAUSKOPF concerning pallets of sand lining both sidewalks of LRH Way.

595. The records describe more than 1,000 one-pound bags of sand.

596. Marin informed KRAUSKOPF that a building-materials permit was required for materials placed within the public right-of-way and issued Notice of Violation No. 083115.

**i. Email Communications After June 7, 2024**

597. On June 13, LAPD Officers De La Torre and Cota documented an incident involving the vehicle-only language: "challenging vehicle only permit, told them they cant walk on sidewalk due to permit."

598. On June 15, LAPD Officer Tejado appeared on a protester's livestream at LRH Way stating that he didn't "have the authority to demand Scientology provide or produce a permit to LAPD."

599. On June 17, KRAUSKOPF sent an email to Llanes that LAPD could not enforce the permit against pedestrians because of the permit's vehicle-only language:

a. "*Despite this clear ordinance, the LAPD has informed us that they are unable to enforce the permit due to language within the permit that states, 'The closure, when granted will be for the exclusion of vehicles only...'*"

b. KRAUSKOPF asked BSS for direction on how to "*effectively enforce the permit.*"

600. On June 19, KRAUSKOPF characterized pedestrians who entered the permitted area as "*paid agitators*" and complained to Gonzalez that their rights were taking precedence: "*Despite having fully permitted street and sidewalk closures, the 'rights' of paid agitators have seemingly taken precedence.*"

a. KRAUSKOPF further stated that the permit language allowed members of the public to pass through the event space:

b. "*Due to the fact that every street closure permit includes language stating that the public at large may not be denied access... this has been recently interpreted to mean that anyone can pass through a permitted eventspace even with the clear intention of disrupting it.*"

601. On June 29, KRAUSKOPF contacted Llanes regarding "*some ideas we have on how to make the permit more enforceable and less problematic for BSS, LAPD and us.*"

a. KRAUSKOPF stated that she planned to meet with Llanes or the appropriate CITY OF LA representative the following Monday to present those ideas.

b. She asked Llanes to direct her to the appropriate person, if he was not the proper person, to address the issue and specifically requested assistance in reaching someone who could review what Scientology had developed.

602. On July 16, KRAUSKOPF emailed Llanes, "*We had a meeting with CD13 yesterday*" and that she had an idea that "*may be a simple way to resolve the permit wording.*"

603. On July 16, under the subject "Street Closure Permits," KRAUSKOPF via email thanked Hector Vega of Los Angeles City Council District 13 for meeting with her and Olivia the previous day.

a. The email copied an address identifying Olivia M. and another Scientology-associated recipient. KRAUSKOPF's contemporaneous account places the meeting on July 15, 2024.

b. KRAUSKOPF asked Vega to alert her to issues or concerns involving LRH Way so that Scientology representatives could address them.

c. KRAUSKOPF further stated that, as requested, she would follow up with Vega in two weeks concerning the possibility of adding language

to street-closure permits clarifying that the permits were to be enforced in accordance with relevant LAMC and PC provisions.

604. In October 2024, BSS imposed additional restrictions on the Scientology permits and stated:

a. "*After a thorough review, our Department has determined that certain restrictions and conditions must be imposed on this permit and all future permit requests*;"

b. "1. *Both sidewalks are to be open and accessible to the public, and signs are to be posted on the sidewalks stating that the sidewalk is open to the public*;"

c. "*2. The closures can only occur from Friday to Monday, and all public right-of-way obstructions must be removed when the permit is inactive*."

605. In an internal October 2024 communication, BSS stated:

a. "*We met with the CA and CD13 regarding the events. We agreed to add more restrictions to future permits and to have an investigator attend more events as resources allow to verify compliance. We also are requiring them to post signs that say the sidewalks are open to pedestrians*."

**j. Anti-SLAPP**

606. On February 25, 2024, the day of the PPA arrest LAPD HW Div. officers advised Koster that PLAINTIFF's arrest would help her restraining-order case.

607. On June 25, 2024, in *Francoise Koster v. Scott Hochstetter*, Los Angeles County Superior Court Case No. 24STRO01357, the Court granted PLAINTIFF's special motion to strike under California Code of Civil Procedure section 425.16.

608. The Court recognized PLAINTIFF's assertion that he was exercising his First Amendment rights by protesting Koster's alleged support of convicted rapist

Danny Masterson and concluded that Scientology and the related protest controversy involved matters of public interest.

609. The Court further determined that the evidence was insufficient to establish that PLAINTIFF committed unlawful violence, made a credible threat of violence, or engaged in the knowing and willful course of conduct required for the requested civil-harassment relief.

**k . Protesters Denied Access to Sidewalk**

610. PLAINTIFF alleges that restrictions on public sidewalk access surrounding Scientology events were not limited to PLAINTIFF and were also imposed upon other persons known to be protesters of the abuses of Scientology.

611. Before these incidents, CITY OF LA and LAPD personnel were already aware that restricting protesters from public sidewalks violated not only First Amendment rights, but also the CITY OF LA issued special event permit requirements.

612. On or about June 8, 2024, Protester Audit LA had been informed by a LAPD officer that she could not return until approximately 10:00 p.m.

613. On or about June 10, 2024, a video by livestreamer Confident Chris showed that protester Aja was informed she was "*not allowed to walk up the street.*"

614. On or about June 11, 2024, contemporaneous livestream notes further record statements that officers had informed Aja that they had "*a list of you all.*"

615. PLAINTIFF alleges these repeated incidents involving different protesters, dates, officers, and event configurations as evidence of notice and a recurring enforcement practice rather than a single mistaken interpretation of one permit.

**I. Permits Not Following The City Guidelines**

616. Based upon information and belief, Plaintiff alleges that the requirements for permits for events and street closings were not followed on numerous occasions including fees not paid in a timely manner, and the proper residential and commercial notifications for street closure

**J. PLANTERS**

617. On June 7, 2024, after the items from the protesters were removed from the easement, twelve planters were installed in the easement where the protesters were formerly occupying.

618. After the initial twelve planters, the planters grew to approximately 250 large wooden planter boxes along sidewalk, curb, and easement areas surrounding Scientology and adjoining properties, including areas not owned by Scientology, a single-family residence and privately owned salon.

619. On June 12, 2024, Marin returned and observed that the sandbags remained on the street and sidewalk. KRAUSKOPF stated that Scientology had applied for a building-materials permit, and Marin informed her that the materials could not remain there without a valid CITY OF LA permit.

   a. Marin also questioned KRAUSKOPF concerning planters surrounding LRH Way, Fountain Avenue, and Sunset Boulevard. After consulting his supervisor, Marin informed KRAUSKOPF that Scientology was required to "Cease & desist" and immediately remove the planters.

   b. When KRAUSKOPF asked why the planters were treated differently from tents, Marin explained that Scientology, as the property owner, was responsible for not blocking the sidewalks.

   c. BSS then issued Notice of Violation No. 083117 concerning the sandbags and planters.

620. On June 25, 2024 Marin returned to the Scientology location, found its planters still present, and issued an Administrative Citation.

621. On July 24, Deputy City Attorney Darren Martinez directed CITY OF LA personnel to cancel two Administrative Citations and reissue them, preserving the original dates, to what the CITY OF LA identified as the "correct party."

622. A December 10, 2024 Administrative Citation Enforcement notice concerning Citation No. IE0021241 was addressed to BUILDING MANAGEMENT SERVICES, care of Jeanne M. Reynolds, and stated that the addressee had requested an administrative hearing concerning the citation.

   a. The accompanying ACE email transmitted the hearing materials to William Delvac and KRAUSKOPF, further identifying BMS as a party to the administrative enforcement dispute concerning the planter installation.

623. On August 1, 2024, Marin again photographed the planter areas and informed KRAUSKOPF he had returned because of a "new complaint."

624. On October 20, 2024 the Department of Sanitation responded to a complaint described as involving "100 planters" on Fountain Avenue.

625. On October 31, 2024, BSS issued Notice No. 090706 to KRAUSKOPF identifying planters obstructing sidewalks along Fountain Avenue and LRH Way and requiring five feet of clearance from a fire hydrant.

626. On November 25, 2024, BSS issued Notice No. 086750 to BMS, care of Jeanne M. Reynolds, directing immediate removal of sidewalk-obstructing barrels, wires, and tree decorations at 1415 North LRH Way.

627. On December 10, 2024, Attorney William Delvac emailed Ted Jordan and Kevin James of the LACA's Office, copied MOXON, concerning the planter citations and administrative appeals identified as involving BMS.

a. Delvac described the citations as primarily concerning "*the Church's installation of planters due to exigent circumstances to protect the Church and its members from harassment by Church opponents*."

b. Marin later stated that, after compliance was not obtained, he initiated a criminal filing with the LACA office on September 19 and that, as of January 21, 2025, no Revocable Permit covered the Scientology planter installation.

628. On January 16, 2025, CITY OF LA Council staff questioned why the related service request appeared closed while the planters remained.

a. Marin responded that the matter had become an ongoing LACA case and that attorneys for the responsible party were communicating with that office.

629. PLAINTIFF alleges that many structures characterized as planters contained dead or dying vegetation, including dead plants in separate pots placed or buried within tightly packed fill that remained substantially intact when exterior boards were removed during the December 20 incident.

630. PLAINTIFF alleges based on bodycam footage that HUBER called the planters "community planters," while officers questioned why they had been placed across the street from Scientology property.

631. On February 27, 2025, Certified Access Specialist Tony Guichard, CASp No. 1125, evaluated West Sunset Boulevard, LRH Way, Fountain Avenue, and North Catalina Street. Finding 11 stated that on LRH Way "*planter boxes have been installed on the entire sidewalk without a path of travel between them to cross the street or to be dropped off*," and recommended lower vegetation with a CITY OF LA permit.

a. Finding 18 stated that the Fountain Avenue planters were too high and too close to the CITY OF LA curb, interfered with vehicle-door access

for persons with and without disabilities, and failed to provide a forty-eight-inch minimum path of travel.

632. On March 6, 2025, MOXON emailed Deputy City Attorney Gabrielle Taylor under the subject "File No. H4CJ01232 - Church of Scientology (Building Management Services)."

a. MOXON described the matter as involving citations for planters placed at the street edge along the sidewalk on LRH Way.

b. He connected the dispute to what he characterized as "a hate group trying to set up an encampment on the campus" and referred to the group's "ringleader" as recently charged with sixteen counts by the LACA.

c. MOXON represented that Scientology had removed the planters involved in the appeals during the preceding three weeks and requested a meeting to resolve the matter and related proceedings.

d. Taylor responded that she was glad the "non-permitted planters" had been removed and stated that an inspector would confirm removal.

e. The correspondence was subsequently circulated among Deputy City Attorney Darren Martinez and BSS personnel.

633. Marin reported that the planters on LRH Way and Fountain Avenue had been removed, while approximately ten remained on New Hampshire Avenue.

634. On November 22, 2025, BSS issued Notices Nos. 34101 and 34103 to KRAUSKOPF and BMS for noncompliance with event Permit No. 20251812, expressly stating: "Both sidewalks are to remain open and accessible to the public."

#### 1. Selective Enforcement of Planters

635. During the same month, other Hollywood businesses maintained unpermitted sidewalk planters to stop the unhoused from sleeping on the sidewalks in front of their businesses.

636. CITY OF LA personnel posted removal notices on or about June 21 on unpermitted sidewalk planters.

    a. NBC Los Angeles reported on June 23 that the CITY OF LA would remove the planters the next morning if they remained and that a permit was required.

    b. CITY OF LA crews removed the planters on June 24.

637. CITY OF LA issued the same violations to KRAUSKOPF and then to BMS yet the City did not remove the planters.

### K. FURTHER INCIDENTS OF SELECTIVE ENFORCEMENT

#### 1. October 4 - Magic Castle Assault and LAPD Response

638. On October 4, 2024, while PLAINTIFF was engaged in Scientology-related protest activity outside the Magic Castle, a private individual confronted PLAINTIFF and other protesters while carrying and swinging a tube sock containing a hard object.

639. The individual struck PLAINTIFF's table with the object, damaging the table, then took and threw PLAINTIFF's megaphone.

640. PLAINTIFF reported the incident to responding LAPD officers, advised that the encounter had been recorded, offered to show the video, and requested a PPA concerning the attacker's conduct.

641. The recording reflects officers acknowledging allegations of vandalism and battery.

642. Rather than arresting the individual based upon PLAINTIFF's complaint, officers advised PLAINTIFF that the individual was also claiming battery and that, if each pursued a PPA against the other, both could be taken to jail.

643. PLAINTIFF repeatedly advised officers that the video showed he had not battered the individual.

644. The individual was not arrested on PLAINTIFF's complaint and was instead escorted away from the area by officers.

**2. October 10 - Striking of Cellular Phone and Taking Cellular Phone**

645. On October 10, 2024, while PLAINTIFF was protesting Scientology near 4810 Sunset Boulevard, a private security guard designated as DOE 3 PHONE physically confronted PLAINTIFF and slapped PLAINTIFF'S hand and cellular phone, causing the cellular phone to land on Scientology's private property. PLAINTIFF alleges that DOE 3 PHONE was employed by OPSINC and was performing security duties at that location.

646. DOE 3 PHONE took control of the cellular phone, stopped PLAINTIFF's livestream, and refused to return the cellular phone when requested. This conduct interrupted PLAINTIFF's recording and broadcasting of the encounter.

647. PLAINTIFF left the location and called 911. He requested that responding LAPD officers accept a PPA arising from the incident, but officers did not effectuate the requested arrest.

648. Officers initially informed PLAINTIFF that they had obtained information from the guard. PLAINTIFF was subsequently informed that the guard had left and that officers did not know his name or the name of his security company. When PLAINTIFF questioned these inconsistent explanations, ROSENDO responded, "*I'm not playing your games*," and left the scene.

649. PLAINTIFF subsequently reported the incident through the LAPD NE Div. and submitted video evidence through the electronic portal provided for the investigation. PLAINTIFF received no follow-up investigative communications and alleges on information and belief that no arrest resulted from his report.

650. PLAINTIFF observed an OPSINC patch on DOE 3 PHONE's uniform during protests.

### 3. October 13, 2024 — ROLON Public-Sidewalk Exclusion

651. On October 13, 2024, PLAINTIFF was livestreaming and protesting Scientology during a permitted public event near 4810 Sunset Boulevard and LRH Way.

652. ROLON informed PLAINTIFF that the event was a private party and that PLAINTIFF was not permitted to remain.

653. PLAINTIFF disputed that assertion, stated that he was standing on a public street and sidewalk, and requested the permit or other authority restricting his access.

654. ROLON responded that they were "not playing this," directed PLAINTIFF to another location, and informed him, in substance, "You're going over there," while DOE 4 TRENCHCOAT and SOSA stood behind them.

655. ROLON then physically attempted to move PLAINTIFF.

656. PLAINTIFF informed ROLON not to touch him and repeatedly stepped backward as ROLON advanced toward him, displayed or removed his baton, and continued directing him away.

657. During the encounter, PLAINTIFF stated, "Es Una Secta," which PLAINTIFF understands to mean "It's a cult." ROLON responded, "*See, that's exactly why they don't want you here.*"

658. PLAINTIFF alleges that ROLON's statement directly connected the exclusion to PLAINTIFF's anti-Scientology speech.

659. As PLAINTIFF continued attempting to create distance, ROLON again made physical contact with PLAINTIFF's hand, and another officer also touched PLAINTIFF.

660. ROLON threatened to arrest PLAINTIFF for trespassing, acknowledged that PLAINTIFF was engaged in protest activity, and directed him to another location where he could protest.

661. When PLAINTIFF asked whether he was trespassing while standing on a public sidewalk, ROLON answered yes and claimed the area was private property.

662. PLAINTIFF pointed out a posted sign stating that the sidewalk remained open to through traffic.

663. Despite that notice, ROLON continued directing PLAINTIFF away and stated that PLAINTIFF was disturbing the peace.

664. DOE 4 TRENCHCOAT and SOSA continued assisting officers to remove PLAINTIFF by standing behind them and moving with them as they moved PLAINTIFF off of the public street.

665. PLAINTIFF alleges that he did not attack ROLON or another person, did not attempt to flee, and repeatedly stepped backward while ROLON advanced toward him.

666. LAPD Supervisor Galaxya De Anda arrived, and PLAINTIFF reported that ROLON had physically touched him twice, displayed his baton, and threatened him with arrest while PLAINTIFF was standing on a public street or sidewalk and protesting Scientology.

667. PLAINTIFF requested to make a formal complaint, and LAPD thereafter took Complaint Intake No. 2968 concerning the incident.

### 4. November 17, 2024 Officers Force PLAINTIFF From LRH Way

668. On November 17, 2024, CSLA advertised and conducted a "Holly Jolly Holiday Hangout" on LRH Way.

669. PLAINTIFF possessed a general-admission ticket for the event.

670. After PLAINTIFF entered LRH Way, Scientology security guards, some of them armed, directed him to leave and began following him up and down the sidewalk.

671. PLAINTIFF did not observe readily identifiable law-enforcement credentials, security-company identification, or other insignia identifying the man's authority.

672. PLAINTIFF alleges that the armed man threatened him with arrest under PC § 415 based upon PLAINTIFF's speech and conduct during the confrontation.

673. LAPD Officers JACQUIN and FESPERMAN subsequently confronted PLAINTIFF and threatened to arrest him for violating PC § 415 if he did not leave the public sidewalk and street.

674. PLAINTIFF advised that he had a ticket to the event and that it was a public road and sidewalk.

675. PLAINTIFF left the area after JACQUIN and FESPERMAN threatened PLAINTIFF with arrest.

### 5. November 23, 2024 - Scientology Security Trespasses PLAINTIFF

676. On November 23, 2024, while PLAINTIFF was livestreaming and protesting Scientology near LRH Way, an individual acting as security personnel for scientology repeatedly directed him away from portions of the public sidewalk and represented that the sidewalk was closed.

677. PLAINTIFF repeatedly requested to see the permit or other authorization supporting that restriction.

678. PLAINTIFF observed other members of the public being permitted to use portions of the same sidewalk from which he was being excluded.

679. PALINTIFF objected to being directed away while others were allowed to pass.

680. During the encounter, SOSA, DOE 4 TRENCHCOAT, and DOE 5 GIJANE followed PLAINTIFF along the public sidewalk.

681. Each made physical contact with PLAINTIFF while directing him away from the public street and sidewalk.

682. The recordings capture PLAINTIFF repeatedly instructing the individuals not to touch him and stating that he intended to make a battery complaint.

683. PLAINTIFF alleges on information and belief that SOSA and DOE 5 GIJANE were employed by OPSINC and were performing security duties that included directing pedestrian access at the location.

684. PLAINTIFF does not presently know DOE 4 TRENCHCOAT's employer or affiliation.

685. PLAINTIFF observed OPSINC patches on the uniforms worn by SOSA and DOE 5 GIJANE.

**6. December 14, 2024 PLAINTIFF Trespassed From Public Street**

686. On December 14, 2024, PLAINTIFF livestreamed while protesting Scientology during a permitted event in the vicinity of the Shrine Auditorium. LAPD personnel assigned to the event included Sergeant CESAR, Officer Nicholas Wren, Officer Ramon Zepeda, and other officers.

687. PLAINTIFF repeatedly requested to inspect the CITY OF LA-issued permit establishing the precise street and sidewalk closures.

688. The material shown to PLAINTIFF appeared to identify itself as application information.

689. PLAINTIFF repeatedly advised the officers that he was requesting the actual issued permit and its terms.

690. During the encounter, CESAR advised PLAINTIFF that once LAPD received the relevant permit or work-order number, *"that's what we work off and that's good enough for us,"* while declining or being unable to provide PLAINTIFF with the completed permit he requested.

691. LAPD personnel gave differing statements concerning the scope of the closure.

692. Officers informed PLAINTIFF at different times that particular sidewalks were open, that other sidewalks were closed, that an alley should be open, and that they did not know the precise scope or timing of portions of the closure.

693. Officer Zepeda expressly acknowledged uncertainty concerning portions of the closure while attempting to determine where PLAINTIFF could walk under the asserted closure.

694. At the same time, PLAINTIFF observed numerous other pedestrians using sidewalks and areas from which PLAINTIFF was being directed away.

695. PLAINTIFF repeatedly asked why those persons were permitted to pass while he, who was openly protesting and recording, was threatened with trespass enforcement.

696. CESAR advised PLAINTIFF that if Scientology security warned PLAINTIFF to leave and pursued a PPA for trespass, LAPD could enforce that arrest.

697. During the recorded encounter, PLAINTIFF was eventually given a trespass warning and directed away from the area while continuing to contest whether the public sidewalk was included within the asserted hard closure.

### 7. Complaints About Sidewalk and Street Closures

698. PLAINTIFF alleges that senior BSS officials internally characterized complaints submitted by an individual critical of Scientology.

699. The individual had been involved in numerous CPRA requests and related inquiries concerning special-event permits, street-closure permits, required approvals, and other records associated with events conducted at or around Scientology properties.

700. Through those public-record requests and related review of CITY OF LA records, the complainant raised specific questions concerning whether required permits, approvals, or supporting documentation were missing from particular events and whether certain street-closure or special-event permits should have been issued under the applicable permitting requirements.

701. The complainant also raised issues concerning whether the conditions represented to the CITY OF LA in connection with permit applications corresponded with the manner in which the affected public streets and sidewalks were actually being used.

702. The permitting records contained conditions governing public access to the affected streets and the requirements for valid special-event authorization.

703. Among other things, permits in the produced record repeatedly stated that the public at large could not be denied access to the affected street except in an emergency and that failure to obtain or provide all necessary permits could affect the validity of the special-event authorization.

704. On or about May 28, 2024, BSS Chief Gary Harris communicated internally concerning complaints submitted by this individual. Harris characterized the individual's Scientology-related complaints as "baseless," expressly referenced the complainant's opposition to Scientology, and stated that LAPD was aware of the complaints and had chosen to ignore them.

## L. ARRESTS AND PROSECUTIONS OF PROTESTERS

705. The incidents described in this section involve other individuals who participated in Scientology protest activity during the same period as PLAINTIFF.

706. PLAINTIFF does not assert the constitutional or other legal rights of those individuals, does not seek damages or other relief on their behalf, and does not plead their arrests, prosecutions, or restraining-order proceedings as independent causes of action in this case.

### 1. Protesters Arrested

#### a. January 19 - Aaron Smith-Levin Arrested

707. On January 19, 2024, anti-Scientology protester Aaron Smith-Levin ("Smith-Levin") was involved in a physical confrontation with Patrick Perry ("Perry") near 6724 Hollywood Boulevard, adjacent to a Scientology facility.

708. Smith-Levin reported that Perry had attacked him with a cane and used his dog against him.

709. Video of the confrontation records Perry stating, *"I will fucking kill you."*

710. During LAPD's response, Officer Tim Talman advised Smith-Levin that he would "more than likely" be arrested for felony stalking.

711. Smith-Levin immediately understood the warning to mean that if he sought Perry's arrest, LAPD would arrest Smith-Levin for felony stalking, and stated that understanding to the officer on the recorded livestream.

712. Smith-Levin and Perry were thereafter detained while LAPD investigated the incident.

713. Perry was booked on suspicion of battery and Smith-Levin was arrested and handcuffed to a metal bench in the LAPD HW Div. for about four hours

714. LAPD likewise publicly stated that only one person was arrested for battery.

### b. February 16 - Jasiah, Daniel, Cameron Arrested

**I. Jasiah Adler**

715. On February 16, 2024, LAPD arrested anti-Scientology protester Jasiah Adler ("Adler") outside La Poubelle based upon Perry's accusation that Adler had made criminal threats during an earlier encounter involving Perry and his dog.

716. During the February 16 arrest, officers informed protesters at the scene that Adler's arrest had nothing to do with the Scientology protests. Adler later reported, however, that Detective Aluotto informed him in connection with the arrest, "this is what happens when you protest Scientology."

717. Adler was thereafter subjected to felony prosecution based upon Perry's criminal-threat allegation.

718. During the pendency of that case, an additional misdemeanor charge arose from a separate encounter behind the CSLA Information Center in which PLAINTIFF alleges another individual swung at Adler, after which Adler responded physically, leaving Adler simultaneously defending both felony and misdemeanor criminal charges.

719. PLAINTIFF alleges that Adler remained subject to the felony prosecution for approximately one year before the matter was dismissed following a probable-cause hearing.

**ii. Daniel Villeda Gonzalez**

720. On February 14, 2024, a protester's cellular phone was struck and the protester responded by spraying pepper spray.

721. A battery report was taken, and HALL prepared a follow-up report on February 20, 2024.

722. On February 16, 2024, a patron from La Poubelle struck a cellular phone away from a protester's hand twice and as a result was pepper sprayed by

Villeda .

723. For both this day and the February 14, 2024 incident, Villeda was arrested for conspiracy to possess tear gas.

724. He was processed and never charged with any crimes.

**iii. Cameron Ivone**

725. On February 16, 2024, a La Poubelle patron knocked a cellular phone from protester Cameron Ivone ("Ivone"), causing approximately $100 in damage, then grabbed and pushed Ivone into a vehicle.

726. Ivone filed a police report on March 3, 2024.

727. In follow-up reports dated February 20 and April 20, HALL described the protesters as the "Squirrel Squad," "social media live-streamers" who were "antagonistic towards the Church and subsequently La Poubelle," and characterized their conduct as "an aggressive form of Civil Harassment" intended "to permanently clos[e] it down," including sidewalk livestreaming, verbal harassment of customers, employees, and security, and threats to post customers online as "rapists" or "rape supporters," which HALL called "social intimidation."

728. HALL also characterized the February 16 protest as an "Unlawful Assembly" and stated that PLAINTIFF participated in an unlawful assembly under PC § 408.

729. Contemporaneous body-worn camera, however, records Detective Aluotto stating at approximately 11:39, *"I don't want to call an unlawful assembly or anything like that."*

730. HALL further attributed to Aluotto the view that protesters "conspired to provoke violence" so they could pepper-spray anyone who touched their recording devices and claim "self-defense," citing, "Why didn't you pepper-spray her?" and "We're supposed to be pepper-spraying any assaults!"

731. HALL also stated that protesters "vastly outnumber[ed]" unarmed victims who "did not pose any risk," that self-defense was not "immediate or imminent," that the pepper-spraying was "significantly disproportionate," and that protesters "made no attempt to avoid confrontation" but instead provoked and pursued victims, citing, "Danny got him again!"

**c. March 9 - Villeda Arrest for Attempted Robbery**

732. On March 9, 2024, during the same period in which PLAINTIFF was subjected to an armed swatting response near the Scientology complex, protester Villeda was involved in an encounter with Scientologist Phillip Campus ("Campus") involving Campus' electric scooter.

733. LAPD personnel, including ROSENDO, responded, and Villeda was arrested for alleged attempted robbery following Campus's identification of him after Villeda called 911 to report that Campus ran his scooter into Villeda.

734. Villeda was taken to a nearby park after the arrest and Villeda remained in custody for multiple nights before being advised that no criminal charges would be filed.

735. In later civil-harassment proceedings arising in part from the same March 9 encounter, the Los Angeles County Superior Court reviewed multiple videos and found that Campus moved suddenly toward Villeda with the scooter and that Villeda grabbed the scooter pole defensively to redirect it away from his body.

736. The Court found Villeda substantially more credible than Campus.

**d. May 7 - Denver Jay Arrested for PC § 302**

737. On or about May 7, 2024, during a Scientology protest at LRH Way and Fountain Avenue, a livestreamer known as Denver Jay was arrested by LAPD pursuant to a PPA alleging a violation of PC § 302 requested by Scientology.

738. Approximately six LAPD officers responded to the scene. During the incident, Denver Jay's eye was injured and he was scratched.

739. After ticketing his vehicle shortly before he was arrested, three officers came back on scene and wrote or attempted to write another ticket.

740. No charges were filed against Denver Jay regarding the crime.

**e. June 16 - Prosecution of Enri Marini**

741. In *People v. Enri Marini*, Los Angeles County Superior Court Case No. 24CJCM03837-01, June 16, 2024 was identified as the offense and arrest date, and Marini was prosecuted for misdemeanor PC § 594(a) vandalism and § 602(o) trespass.

742. On or about June 16, 2024, Enri Marini ("Marini") removed netting secured with stakes that had been placed along the public-facing easement near Fountain Avenue and LRH Way.

743. PLAINTIFF personally observed that the netting occupied an area used by protesters and impeded their use of the easement, and alleges it was intended, at least in part, to discourage protesters from remaining there.

744. Protester Marini removed portions of the netting, pulled the securing stakes and rolled up the netting.

745. LAPD investigated Marini for vandalism, then later for trespass. During the June contacts with LAPD officers, PLAINTIFF and other protesters questioned whether Scientology possessed a permit or other CITY OF LA authorization for the netting and stakes.

746. Officers did not produce or independently verify such authorization at the scene and gave differing explanations, at times stating that Scientology was authorized to place the netting and, during another contact, characterizing the netting as CITY OF LA property.

747. PLAINTIFF alleges that Officer Ismael Peinado, Serial No. 40873, was an investigator involved in this incident.

748. On May 1, 2025, the PC § 594(a) vandalism charge was dismissed as part of a plea negotiation, and Marini entered a nolo contendere plea to the remaining PC § 602(o) trespass count.

**f. October 4 - Campus Restraining Order Denied**

749. On October 4, 2024, following a three-day evidentiary hearing, the Los Angeles County Superior Court denied Campus's request for a permanent civil-harassment restraining order against Villeda, dissolved the June 4 temporary order, and dismissed the case.

750. The Court found Villeda substantially more credible than Campus, identified material inconsistencies between Campus's sworn allegations, testimony, and the video evidence, found no substantiated stalking or threat of violence, and determined that Campus had failed to establish prohibited harassment.

## M. COMMUNICATIONS WITH SCIENTOLOGY

751. On November 20, 2023, correspondence involving LAPD personnel, hospital security officials, CITY OF LA representatives, and Scientology security concerned an ongoing initiative expressly titled "Safety & Security Initiatives/Tri-Hospital+Church of Scientology Partnership."

   a. The following day, Scientology security representative HUBER thanked the participants for "continuing this partnership with all of us" and confirmed his availability for the next proposed meeting.

752. On December 18, 2023, Scientology Legal Department representative KRAUSKOPF contacted LAPD Officer Paris Pineda ("Pineda") seeking assistance concerning a police-records check for an individual in another country.

a. On December 19, Pineda responded that he was unsure whether the records check could be completed without fingerprints, and KRAUSKOPF then asked Pineda whom she should contact or what LAPD unit could assist, stating that the matter was "kinda important."

753. On December 29, 2023, Scientology Legal Department representative KRAUSKOPF contacted HALL and referenced "I met you at the station in November."

754. On January 30, 2024, Scientology security official PEDERSEN provided LAFD Deputy Chief Richard Fields with a list of recent swatting calls involving Scientology properties and requested that the locations be flagged to reduce responses to malicious false calls.

a. PEDERSEN stated that Scientology was already working with LAPD HW Div., LAPD NE Div., and Major Crimes concerning recent threats that Scientology believed were associated with the same group.

b. Fields forwarded the information to LAFD command personnel for "appropriate handling at the dispatch level" Later that morning, PEDERSEN provided additional information concerning Scientology protesters and their livestream activity in connection with an LAFD response.

755. Separately that day, Scientology representative KRAUSKOPF who had previously contacted LAPD Officer Pineda seeking LAPD assistance, sought guidance from Pineda concerning what security personnel could do about protesters.

a. Pineda advised that persons physically present had "a right to protest" so long as they had not committed crimes or created a public-safety issue.

756. HUBER emailed Detective GOMEZ following a telephone conversation and identified the LAPD HW Div. detective handling related incidents, stating, "Please let me know if you need anything else"

a. PEDERSEN and OSMON were copied on the email.

757. On February 16, 2024, Janet Weiland, Public Affairs for CSCCI, emailed WALTERS and Japhet Hom, copied OSMON and KRAUSKOPF, and requested an expedited meeting concerning what she described as "a situation at the Church."

a. Weiland stated that LAPD officers had "repeatedly been called out to handle aspects of it," that she possessed "further data" she wanted to provide, and that she had met several days earlier with Richard Tefank, Executive Director of the Los Angeles Board of Police Commissioners, who informed her that Scientology representatives should meet with the captains of their LAPD division.

b. Weiland offered to meet LAPD command personnel at the station or at the Scientology property across from Kaiser Hospital so that the captains could "see for yourselves what is happening." OSMON and KRAUSKOPF were copied on the communication.

c. Captain Hom forwarded Weiland's meeting request to Lieutenant Michael Soliman of LAPD NE Div. Soliman ("Soliman") responded, "Got it."

758. On or about February 23, 2024, KRAUSKOPF communicated with WALTERS and SOLIMAN concerning anticipated protesters on LRH Way and proposed enforcement under PC §§§ 302, 415, and 647(j).

a. She initially described services as occurring daily from 9:00 a.m. to 10:00 p.m.

b. WALTERS requested actual service times, explaining that counseling sessions would be difficult to pass through LACA scrutiny and that he wanted accuracy in enforcement.

c. KRAUSKOPF then identified four service periods—9:00 a.m.–noon, 1:00–3:30 p.m., 3:45–6:00 p.m., and 7:00–10:00 p.m.—and stated these were separate from counseling sessions.

d. WALTERS replied, "Yes thank you, I appreciate the specifics."

e. KRAUSKOPF requested a police unit and supervisor for the anticipated gathering and advised that such gatherings often brought swatting calls to police or firefighters, asking that the Watch Commander be notified.

759. On February 25, KRAUSKOPF reported to Soliman, WALTERS, and HERNANDEZ that approximately thirty-five protesters had attended and that there had been "one swatting call to LAFD."

a. On February 26, Soliman responded to KRAUSKOPF, again copying WALTERS and HERNANDEZ, and acknowledged the weekend's events.

760. On February 26, KRAUSKOPF, identifying herself as a member of Scientology's Legal Department, separately contacted LAPD Detective William Acosta regarding Reference No. 240604459, copied HUBER, and stated that Scientology was "*very interested to provide any information necessary.*"

761. On March 18, Olivia McDuff of CSCCI's Public Affairs Office contacted LAPD Board of Police Commissioners President Erroll Southers to arrange a meeting and tour of Scientology's facilities.

a. After McDuff followed up in May, Southers forwarded the correspondence to LAPD personnel Sarah Bell and instructed her to "handle" the matter.

b. Bell responded, "Will do, it's on my list."

762. On April 2, LAPD HW Div. Commanding Officer Craig Heredia advised La Poubelle owner Koster across the street from CSCCI that officers would conduct "directed patrol" near her restaurant and that information concerning PLAINTIFF's anticipated presence had already been shared with the supervisor and officers.

a. Heredia separately forwarded the communication concerning PLAINTIFF to HALL and other LAPD HW Div. personnel.

763. On April 17, PEDERSEN emailed TORRES, copying HALL, and advised that they would be met at Scientology's 4810 Sunset Boulevard building, where a conference room would be made available for a meeting.

764. That afternoon, OSMON thanked Corwin and other LAPD officers for their assistance at prior events and stated that he looked forward to continuing to work with them.

a. HERNANDEZ, Weiland and HUBER were copied on the correspondence.

765. Minutes later, OSMON emailed Senior Lead Officers Rivas and HERNANDEZ, copied LAPD command personnel, PEDERSEN, HUBER, and others, and urgently requested a meeting concerning PLAINTIFF.

a. OSMON characterized PLAINTIFF's proposed protest involving unhoused persons on LRH Way as "harassment," stating that PLAINTIFF was "not exercising his First Amendment," and asked LAPD and the Captains to "please get this dealt with."

766. On May 1, OSMON emailed Senior Lead Officers HERNANDEZ and Rivas, copied LAPD NE Div. command personnel, PEDERSEN, HUBER, Scientology Attorney MOXON, and others.

a. OSMON identified PLAINTIFF by name, complained about his protest encampment and megaphone activity, stated that "something needs to

be done about this from Northeast," and requested a meeting with LAPD Captains because "[t]his cannot continue."

767. In separate communications concerning Scientology's May 4 event, LAPD Sergeant Corwin advised KRAUSKOPF and OSMON that LAPD was selecting and assigning officers and would ensure that the event received "the proper attention."

   a. KRAUSKOPF responded that Scientology had "successfully worked with" several LAPD sergeants on recent events, including personnel from LAPD NE Div. and LAPD HW Div.

768. On May 6, LAPD Sergeant Sean Dempsey advised LAPD NE Div. command personnel that Sergeant Patton reported that Scientology had called police numerous times during the preceding weekend and that a Scientology representative planned to appear at LAPD NE Div. that day and expected a meeting with the captains.

769. On May 8, in an email concerning PLAINTIFF related matters, GOMEZ advised a recipient, while copying PEDERSEN, that she was attempting to identify her contact at the LACA's office so she could "streamline the cases" and determine "what exactly is needed for each filing."

   a. On May 8, at 1:39 p.m., PEDERSEN subsequently advised GOMEZ via email that the person in the LACA's office who was already aware of PLAINTIFF was "Supervisor Martinez", stating: "he is the person in the CA's office aware of Hochstetter."

770. On May 9, LAPD Operations Central Bureau–Special Events circulated an operational assessment for a Scientology event at 4810 West Sunset Boulevard to LAPD NE Div. command and supervisory personnel.

771. On May 14, 2024, MOXON emailed GOMEZ under the subject "Contact information," copied a recipient identified as Parker. MOXON wrote: "Thanks very much for speaking to us today."

a. MOXON advised that GOMEZ could contact him or Parker for information she wanted or needed, supplied contact information, and stated that he could be reached on his cellular phone after business hours.

772. On May 20, Scientology representative KRAUSKOPF thanked LAPD personnel for their handling of a recent event, stating that Sergeant Rowland had addressed issues involving protesters and that the "agitators seem to have gotten the point."

a. LAPD Sergeant Evan Martinez responded and stated, "Talk to you on the next one."

773. On May 24, KRAUSKOPF specifically identified PLAINTIFF to Officer Corwin of the LAPD, copied OSMON and supplied information concerning PLAINTIFF's anticipated protest activity.

a. KRAUSKOPF requested that assigned officers be briefed concerning PALINTIFF, and requested coordination concerning how Scientology and LAPD could address the activity "on the ground."

774. On May 30, Senior Lead Officer HERNANDEZ sent an email concerning the "Church of Scientology and the protesters involved" to CITY OF LA personnel, including representatives of the Los Angeles City Council, LACA, civil-rights agencies, and LAPD NE Div. command personnel.

a. HERNANDEZ stated that LAPD had conducted "many discussions with Scientology regarding what is and is not allowed and what options they have available" and had also conducted "many internal discussions on how to deal with the situation while not infringing on either parties protected first amendment rights."

b. HERNANDEZ described LAPD's actions concerning the protesters as including reports for theft, disturbing the peace, robbery, disturbing a

religious meeting, amplified-device use, and "swatting," as well as an arrest for disturbing a religious meeting.

c. HERNANDEZ stated that LAPD understood "the frustrations felt by the Church" and asked for patience while the matters proceeded through the court system.

d. HERNANDEZ further stated that LAPD was required to remain "neutral and unbiased," but advised the recipients to have audio, video, and other evidence available for responding officers, emphasized the willingness of persons to testify and make PPA where applicable, and provided information concerning obtaining restraining orders.

e. HERNANDEZ stated that the restraining-order information had already been provided to Scientology representatives Weiland and OSMON.

775. Later that day, PEDERSEN contacted Lieutenant AUSTIN following a prior discussion and requested contact information for Captain Hom's adjutant.

a. AUSTIN provided the information and stated that he had updated Captain Hom concerning the matter they had discussed.

776. On May 29, Scientology Attorney MOXON directly emailed Los Angeles Deputy City Attorney Mark Salz concerning PLAINTIFF.

a. MOXON advised Salz: "Your name was provided by Det. Gomez, LAPD Northeast, as the D/City Attorney on the several cases presented regarding Scott Hochstetter."

b. MOXON further stated that he represented "the Church of Scientology and some of the victims in these matters" and requested direct communication with Salz concerning the cases involving PLAINTIFF.

c. The following morning, Salz forwarded MOXON's communication internally within the LACA's office with the notation, "More. Scientology attorney."

777. Separately, on May 31, PEDERSEN emailed HALL, copied Captain Heredia, and used the subject line "Hochstetter," and wrote, "Det. Hall, PLEASE call me. Or have someone call me."

778. On June 4, HALL directly responded to PEDERSEN and advised that he planned to attend a meeting that day at 1:00 p.m.

779. HALL asked whether PEDERSEN needed information before the meeting or preferred to discuss matters there.

780. On June 5, PEDERSEN advised GOMEZ: "I have found a much clearer video angle of that incident you needed footage of. I will bring it to the station tomorrow."

781. Also on June 6, PEDERSEN wrote in an email that "one of the main Detectives I am working with is Det. Michelle Gomez of the Northeast Division."

   a. PEDERSEN further stated that Scientology had been advised to gather information requested by the LACA and that she wanted to ensure the LACA had the evidence needed so that "effective actions can be taken urgently."

782. On June 7, 2024, at approximately 5:15 p.m., PEDERSEN sent an email to "Kevin James," copying GOMEZ and another recipient identified as "Tony."

   a. PEDERSEN identified GOMEZ as one of the principal detectives with whom she was working, stating: "One of the main Detectives I am working with is Det. Michelle Gomez of the Northeast Division. I have copied her on this email."

   b. PEDERSEN characterized persons engaged in activity against Scientology as "social media stalkers and cyber-terrorist types" and stated that the activity had resulted in arrests, dozens of calls to LAPD, and dozens of police reports.

c. PEDERSEN stated that she had been advised that the Deputy City Attorney handling the matter needed additional information and that she had been directed to reach out.

d. She described her objective as ensuring that all necessary evidence had been provided so that the LACA's office could take urgent action against persons she called "these criminals."

e. PEDERSEN further wrote that "*we, as the victim, and the Police, need assistance to get these cases pushed through so that something is done in the real world to stop the harassment.*" She concluded that request by stating: "Thus Janet's request for your assistance."

783. PLAINTIFF understands the reference to "Janet" to mean Scientology representative Janet Weiland. The email expressly invoked Janet's request for the recipient's assistance in advancing the matters described by PEDERSEN.

784. The email documents PEDERSEN's solicitation of assistance concerning pending investigative and prosecutorial matters while copying GOMEZ. PEDERSEN's characterization of the police as sharing her request is alleged as PEDERSEN's statement; the email does not itself establish that GOMEZ adopted that characterization.

785. On June 10, PEDERSEN emailed GOMEZ and TORRES, stating:"*We need to coordinate our evidence so that the prosecutors have everything they need to file charges against Hochstetter. Please let me know when you can meet.*"

786. On June 12, TORRES forwarded PEDERSEN's communication to LAPD Major Crimes command staff and wrote: "Scientology is pushing hard on this guy. We need to make sure our i's are dotted."

787. On September 23, a neighborhood resident, Natalie Hale, emailed Scientology representatives, including Weiland, and copied CITY OF LA personnel concerning amplified sound from outdoor Scientology events. Hale stated that Scientology's use of a subwoofer caused vibrations inside neighboring

residences and that neighbors had repeatedly been required to call "the noise police."

788. On October 21, Scientology representative Weiland directly contacted Senior Lead Officers HERNANDEZ and Rivas seeking their assistance in arranging an LAPD speaker for a "Drug-Free World and Strike Out Against Drugs Heroes of LA" banquet scheduled for November 3.

789. Strike Out Against Drugs was the same organization associated with David Sanchez, whom PLAINTIFF had previously identified to LAPD in connection with the May 10, 2024 incident in which PLAINTIFF's food-distribution table and grill were knocked over during his protest activity by DOE 1 GRILL PLAINTIFF had subsequently reported that incident to LAPD and identified Sanchez during his May 21 interview with GOMEZ

790. On November 14, while PLAINTIFF was near LRH Way, approximately three LAPD units responded and Senior Lead Officer HERNANDEZ personally contacted PLAINTIFF and questioned why his vehicle was parked in a red zone.

791. PLAINTIFF alleges he and others made numerous calls to parking enforcement and LAPD refused to show up and stated that it was parking enforcement that handled parking infractions.

792. PLAINTIFF's livestream depicts multiple officers present, including an officer standing outside a patrol vehicle holding a baton.

793. On November 27, MOXON sent an email with the subject "Hochstetter threat to disrupt the Christmas Parade" to Kevin James at a CITY OF LA email address and copied an LAPD email address.

794. MOXON claimed that statements made by PLAINTIFF during a November 21, 2024 YouTube livestream demonstrated an intention to disrupt the December 1, 2024 Hollywood Christmas Parade and "cause property damage and potential injury."

795. PLAINTIFF alleges that he never made such claims.

796. MOXON further advised the CITY OF LA and LAPD recipients that there had been "numerous criminal complaints" concerning PLAINTIFF during the preceding nine months with LAPD HW Div. and LAPD NE Div.

797. On March 18, 2025, after *People v. Hochstetter* had been filed and while the prosecution remained pending, Scientology Attorney MOXON directly emailed HALL under the subject line "People v. Hochstetter" and asked HALL to call him "at your earliest convenience."

798. On March 19, 2025, MOXON again emailed HALL under the same subject line and again requested direct telephone communication.

799. In June 2025, Scientology representative KRAUSKOPF wrote to the Los Angeles Board of Police Commissioners seeking cancellation or restriction of a permit for a June 15 protest at the Scientology campus.

a. She characterized the protesters as a "hate group" and "professional agitators" and requested that the CITY OF LA either cancel the permit or limit the protest to the Sunset Boulevard side of the campus.

b. KRAUSKOPF also stated that LAPD had previously indicated that a supervisor and patrol officers would be available for the protest.

## N. COMPLAINTS

### 1. Complaint - September 19, 2024

800. On or about September 19, 2024, PLAINTIFF made a complaint at LAPD NE Div. concerning GOMEZ's public disclosure of PLAINTIFF's telephone number during a livestreamed interview and PLAINTIFF's subsequent concern that his number had been spoofed or misused in connection with false emergency calls.

801. That same day, LAPD Sergeant Albert Hoang, Serial No. 41327, confirmed in writing to PLAINTIFF that Complaint No. 24-003263 had been generated concerning PLAINTIFF's complaints.

802. During the filing of that complaint, PLAINTIFF also discussed D'AMATO and informed LAPD personnel about D'AMATO's repeated public statements concerning contacting law enforcement about PLAINTIFF, including allegations involving firearms, drugs, and PLAINTIFF's vehicles.

803. On October 23, 2024, PLAINTIFF and other anti-Scientology protesters were at Los Angeles City Hall in connection with CITY OF LA proceedings and protest-related criminal matters.

804. One of the protesters present with PLAINTIFF, Marini, had been subjected to a felony prosecution arising from allegations that Marini destroyed or damaged a CITY OF LA-owned barricade during anti-Scientology protest activity.

805. PLAINTIFF alleges that the case was initially prosecuted as a felony based upon the alleged destruction of CITY OF LA property. During trial, however, the prosecution changed the charge and/or factual theory upon which the prosecution was proceeding.

806. PLAINTIFF alleges this incident as part of the broader factual history concerning criminal enforcement directed toward persons associated with the anti-Scientology protest movement. PLAINTIFF does not presently allege the precise nature of the replacement charge or amended theory beyond what is established by the corresponding trial record.

807. During the October 23 livestream, PLAINTIFF and those accompanying him discussed the pending prosecutions involving anti-Scientology protesters while PLAINTIFF attempted to obtain records concerning his own cases from the CITY OF LA Attorney's Office. The surviving recording expressly

references Marini as facing charges concerning destruction of public or Scientology-associated property.

808. PLAINTIFF sought records concerning multiple PC § 302 prosecutions or proposed prosecutions arising from his own anti-Scientology protest activity. When the LACA personnel declined to provide the requested assistance, LAPD officers were summoned.

809. An LAPD supervisor, Sergeant Mark Campbell, Serial No. 31278, ultimately informed PLAINTIFF that he was being trespassed from the public building and ordered PLAINTIFF to leave under threat of arrest.

810. PLAINTIFF repeatedly advised the officers that he also intended to return to a public governmental meeting being held in the building.

811. The responding supervisor nevertheless directed PLAINTIFF to leave the building and confirmed that the direction was being given under threat of arrest.

812. A higher-ranking LAPD lieutenant later investigated the circumstances, assisted PLAINTIFF concerning the records-request procedure, and expressly informed PLAINTIFF that he was not trespassed from City Hall.

## O. GIRLS ESCAPE SCIENTOLOGY - November 03, 2024

813. On or about November 3, 2024, PLAINTIFF, while livestreaming, documented an incident in which a 13-year-old girl attempted to leave the Scientology building on LRH Way and ran to a nearby multiplex apartment building out of sight of Scientology security cameras.

814. A man stated on scene that the girl asked for help; informed the neighbors not to call the police because her father worked with the LAPD; that LAPD had a special division for Scientology; and that both the girls tried to leave but one was grabbed by security.

815. The neighbors called 911.

816. The neighbor on a livestream also stated that numerous Scientology security guards approached in vehicles and attempted to retrieve the minor child from the apartment but neighbors refused.

817. Officers, including VALENZUELA, were dispatched to the address as well as the father of the minor child, - who had previously attended Scientology events and struck the hand and phone of a protester in December 2023 - where the LAPD officers ultimately refused to accept a PPA.

818. PLAINTIFF contacted 911 and requested that a female officer, a supervisor, and a representative from the Department of Child and Family Services respond.

819. The requested response did not occur. The child was instead taken to LAPD NE Div. and later returned to her father after the protesters had left the area.

820. As PLAINTIFF and two other protesters were leaving, VALENZUELA said to nearby residents that "*Protesters were threatening to kill a cop*."

821. A complaint was made by one of the protesters on scene for these allegations by VALENZUELA.

822. The statement was captured on video. Before VALENZUELA made the statement, PLAINTIFF had called 911 requesting police assistance, a female officer, a supervisor, and a representative from the Department of Child and Family Services concerning the minor child.

823. PLAINTIFF thereafter went to LAPD NE Div. and filed complaints concerning the officers' handling of the incident.

824. After PLAINTIFF suffered a panic attack at the LAPD NE Div., an ambulance arrived on the scene, at which point an LAPD officer entered the emergency vehicle to question whether PLAINTIFF should be placed on a Section 5150 psychiatric hold.

## P. FELONIES FILED AGAINST PLAINTIFF ON MARCH 3, 2025

825. On February 28, 2025, LAPD NE Div. investigator Ismael Peinado executed a six-count Felony Complaint for Arrest Warrant DR No. 241112081 against PLAINTIFF.

826. The incident underlying criminal Count One remains part of PLAINTIFF's pending state felony prosecution and is also the subject of separate federal civil litigation in *Hochstetter v. City of Los Angeles*, et al., Case No. 2:26-cv-01630-DOC-KS.

827. Counts Seven thru Eleven are not part of Case No. 2:26-cv-01630

**1. PC §245(a)(4) Count 1**

828. Count One charged PLAINTIFF with felony PC § 245(a)(4), arising from the February 16, 2024 incident outside La Poubelle involving Jordan Rollolazo.

829. PLAINTIFF does not seek in this action to duplicate claims concerning the February 16, 2024 arrest that are already asserted in Case No. 2:26-cv-01630-DOC-KS and a current criminal case at Clara Shortridge Courthouse.

**2. PC § 594.3(b) Counts 2–6.**

830. Counts Two through Six of the original felony complaint charged PLAINTIFF with felony violations of PC § 594.3(b), vandalism of religious property, arising from alleged incidents dated October 14, November 8, November 9, November 11, and December 20, 2024.

831. Each of Counts Two through Six further alleged that the offense constituted a hate crime within the meaning of PC §422.55.

832. The property allegations concerned wooden planter boxes for which PLAINTIFF alleges no Revocable Permit had been issued, a food-drive sign

attached to a public street pole, and a wreath placed on a tree within the public right of way.

**3. Preliminary Hearing**

833. On August 4, 2025, in the first part of the preliminary hearing, the prosecutor advised the Court that the November 8 date, the CITY OF LA barricade, was a typographical error and sought amendment by interlineation to November 9, 2024, making two of the charges on the same day.

834. Following oral argument by the parties, the matter was submitted.

835. At PLAINTIFF's August 8, 2025, preliminary hearing, the Los Angeles County Superior Court expressly found that the planters, food-drive sign, and wreath did not fall within PC § 594.3(b) and stated that "there's planters on a city-owned sidewalk," that the wreath was on a tree on a CITY OF LA-owned sidewalk, and that the sign was on a pole belonging to the CITY OF LA.

836. The Court therefore did not hold PLAINTIFF to answer on original Counts Two through Six under PC § 594.3(b) and dismissed the charges.

837. The prosecution instead sought amendment to conform to proof under PC § 422.6(b). The Court permitted the amendment and held PLAINTIFF to answer on five felony PC § 422.6(b) charges, renumbered Counts 7 through 1

**4. Barricade Investigation**

838. On November 8, 2024, LAPD investigated PLAINTIFF for allegedly damaging an A-frame barricade being used during a temporary Scientology event on LRH Way.

839. LAPD records identified CSWUS as the victim, characterized the barricade as property belonging to Scientology, and identified approximately $90 in alleged damage.

840. The CITY OF LA-issued event permit, however, required barricades used for the temporary street closure to be returned following the event and provided that the event sponsor would be charged $35 for each barricade not returned.

**5. PC § 422.6(b) 5 New Felony Charges 7-11**

841. On August 22, 2025, as presently charged, Count 7 concerns the October 14, 2024 wheat-paste and planter incident; Count 8 concerns the November 9, 2024 cutting of planter straps or bands; Count 9 concerns the November 9, 2024 food-drive sign; Count 10 concerns the November 11, 2024 wreath; and Count 11 concerns the December 20, 2024 planter incident.

842. Counts 7 through 11 remain part of the pending state felony prosecution but are not claims being litigated in Case No. 2:26-cv-01630-DOC-KS.

843. PLAINTIFF alleges the prosecution of Counts 7 through 11 separately in this action only to the extent expressly set forth in the Causes of Action below.

**6. COUNT 9 Food-Drive Sign**

844. On April 20, 2024, Scientology security reported that PLAINTIFF had taken one or more self-made food-drive signs from public streetlight poles.

845. LAPD Officer Jonathan Lai ("Lai"), Serial No. 39647, investigated under RMS No. 24005943.

846. Lai's body-worn camera records discussion over whether to make an immediate PPA or document the incident for Major Crimes.

847. Lai repeatedly described the conduct as misdemeanor PC § 484 theft, explained that an immediate arrest would likely result only in processing and release, and stated that Major Crimes was building "*a bigger deal*" and that separate arrests would be "*piecemeal.*"

848. When Scientology personnel argued that the sign gave officers a basis to contact PLAINTIFF, Lai responded, "*that's just a misdemeanor.*"

849. He later informed Scientology security director PEDERSEN it was "*a misdemeanor 484 theft for the signs*" and proposed forwarding the report to Major Crimes.

850. The discussion reflected that Scientology was already communicating with Major Crimes, possessed additional evidence, and had been instructed to continue making reports concerning PLAINTIFF.

851. The signs were described as self-made food-drive signs worth approximately $20 each, or about $40 to $50 total. LAPD took the report but did not arrest or charge PLAINTIFF for the April 20 incident.

852. At the preliminary hearing, the Superior Court found that the sign involved in the criminal case had been attached to a CITY OF LA-owned pole.

853. PLAINTIFF also observed numerous signs on public streetlights and poles during the protests and alleged Scientology security personnel removed signs from public poles without comparable prosecution.

**7. COUNT 10 Wreath**

854. Count 10 concerns a Christmas wreath placed by Scientology on a tree along LRH Way on November 11, 2024, and PLAINTIFF alleges that he removed the Christmas wreath from a tree located on the sidewalk right of way, and further alleges that receipts produced in criminal discovery identified replacement ornaments costing approximately $0.89 each.

855. On December 2, 2024, BSS Investigator Jovanny Marin ("Marin") advised that the wreaths and lights installed by Scientology on CITY OF LA trees constituted obstructions requiring removal, and Marin directed that a CITY OF LA Notice of Violation issue requiring immediate removal of the identified obstructions.

856. KRAUSKOPF responded that Scientology decorated the street every year and that the decorations had not previously been treated as a problem.

857. At the preliminary hearing, the Superior Court determined that the wreath involved in the criminal case was located on a tree situated on a CITY OF LA-owned sidewalk. The prosecution thereafter amended the corresponding charge to Count 10 under PC § 422.6(b).

**8. COUNT 7 Wheat Paste Flyers - October 14, 2024**

858. On October 14, 2024, PLAINTIFF allegedly pasted anti-Scientology flyers onto approximately fifteen planters near LRH Way and Fountain Avenue using wheat paste.

859. LACA records obtained via CPRA records show that this charge was listed under "Rejects" described expressly as: "Vandalism - pasting flyers to CS' planters using washable paste, a misdemeanor," Reference No. R5CJ21450.

860. LAPD thereafter documented the matter as Case No. 24073402, Incident No. 24101400003417. The prosecution later charged the incident under PC § 594.3(b).

861. After the Court declined to hold PLAINTIFF to answer under § 594.3(b), the prosecution sought, and the Court permitted, amendment under PC § 422.6(b).

862. A prosecution witness testified that the flyers contained statements including "Scientology is a cult," criticism of Scientology personnel, and a notice concerning alleged human trafficking and at the preliminary hearing, testimony established that the planters were located along the public sidewalk.

**9. COUNT 8 Straps Cut on Planters - November 9, 2024**

863. Count 8 arises from a separate November 9, 2024 incident involving metal bands or straps placed around wooden planter boxes, and the prosecution witness testified that the straps helped hold the sides of the wooden planter structures together and alleged that PLAINTIFF cut those straps.

864. This allegation replaced the November 8 barricade allegation during the preliminary-hearing amendment process.

**10. COUNT 11 Planters Dismantled From Public Easement**

865. Count 11 stated that PLAINTIFF cut straps on planter boxes along Fountain Avenue, used a hammer against portions of the wooden structures, and removed boards from several planters.

## V. PART TWO: FACTUAL ALLEGATIONS

### A. VENTURA, CALIFORNIA SWATTING

866. On July 9, 2024, the night before the San Luis Obispo incident, Ventura Police Department ("VPD") responded to another firearm allegation involving PLAINTIFF near a Scientology facility and detained PLAINTIFF at gunpoint.

867. VPD officers reviewed PLAINTIFF's contemporaneous livestream and found the firearm allegation unsubstantiated, and released him.

### B. MISSIONS AND PCH

868. On July 10, 2024, PLAINTIFF was operating his older-model white Dodge RV in San Luis Obispo while traveling and livestreaming.

869. PLAINTIFF was livestreaming his drive northbound from the historic mission located south of San Luis Obispo toward the mission located in San Luis Obispo. During this drive, PLAINTIFF observed multiple law enforcement vehicles with emergency lights and sirens activated.

870. Based on prior events, PLAINTIFF believed he was the target of another false emergency report.

871. In an effort to conceal his physical location, he accidentally pushed the off button and thus ended his livestream. Because his location may be known, he decided to alter his route.

872. Within minutes of the prior livestream, PLAINTIFF initiated a new livestream to record any potential interaction with law enforcement.

## C. CALL TO SERVICE

873. At approximately 3:56 p.m., SLOPD and CHP received a report for Incident No. 240710SL0110 concerning PLAINTIFF's RV.

874. The reporting party claimed that a bearded white male driver had pointed what appeared to be a "*machine gun*" from the vehicle.

875. The event was initially classified as a reckless-driving matter and was thereafter changed to a PC § 417 brandishing incident.

876. The reporting party claimed to be driving a white McLaren, and the Incident Detail Report ("CAD") for Incident No. 240710SL0110 expressly recorded that information.

877. At approximately 4:01 p.m., the CAD recorded that the reporting party was "REFUSING TO MEET OFCR." Dispatch directed the reporting party to meet law enforcement at either the CHP-SLO office or the SLO Police Department, but the reporting party declined and ultimately disconnected.

878. At approximately 5:28:04 p.m., CHP CAD Comment [82] recorded a second anonymous caller who alleged that PLAINTIFF had placed the swatting call himself while livestreaming and had said to a mutual friend that he had "just swatted again," urged the friend to get on the livestream, and said, "Donate money so others will too."

879. The allegation was recorded in CHP Incident Detail Report No. 240710SL0110 as information supplied by an anonymous caller. The caller

further alleged that PLAINTIFF had engaged in similar conduct in Ventura the preceding day, was violent, and possessed methamphetamine or cocaine.

## D. SAN LUIS OBISPO POLICE DEPARTMENT ("SLOPD")

880. At approximately 4:22 p.m., SLOPD officers conducted a felony stop of PLAINTIFF's RV near Santa Rosa Street and Olive Street.

881. PLAINTIFF alleges that he had observed law-enforcement activity behind him and voluntarily pulled into a parking area because he believed another swatting event might be occurring and considered an off-road location safer for everyone involved.

882. PLAINTIFF alleges that he did not observe emergency lights activated before he entered the parking area of the officer who was behind him although PLAINTIFF had observed other officers driving Code 3 with lights on earlier.

883. SLOPD officers ordered PLAINTIFF from the RV at gunpoint.

884. PLAINTIFF alleges that officers pointed long guns and handguns at him, and targeted his body with laser sights.

### 1. Arrest

885. PLAINTIFF complied with all officer commands, was placed in handcuffs, and was placed in the backseat of an SLOPD patrol vehicle.

886. At approximately 4:27 p.m., the CAD recorded: "*DRVR DETAINED HAVE UNITS REDUCE.*"

887. PLAINTIFF advised SLOPD officers that the incident was a swatting and that he had been swatted repeatedly. He specifically informed the officers that a similar incident occurred the previous night in Ventura.

888. On July 10, 2024 at 4:32 p.m., the CAD states: "*S1 INQ W/VTCC // INVOLVED ADV THIS HAPPENED YESTERDAY // POSS SWATTING.*"

889. Then at 4:35 p.m., the CAD states: "*1039 VTCC NO INCIDENTS LIKE THIS THEY CAN RECALL.*"

890. At approximately 4:38 p.m., the CAD states: "*ATC RP AUTOMATED MSG "THE NUMBER YOU ARE TRYING TO CALL IS NOT IN SVC AT THE MOMENT" IT THEN BEGAN RINGING // RANG SEVERAL TIMES AND THEN WENT TO BUSY SIGNAL.*"

891. At approximately 4:46 p.m., CHP CAD recorded: "*VEH CLR // CLR THE TONE // C4.*"

892. At approximately 5:02 p.m., CHP received information from a person identified in the CAD record as Kay Taylor.

893. Taylor advised CHP that PLAINTIFF was a protester, was protesting Scientology, had been "SWATTED MULTIPLE TIMES," and was then being watched on PLAINTIFF's DOA livestream.

894. At approximately 5:11 p.m., CHP received additional information again stating that PLAINTIFF had been swatted multiple times.

895. PLAINTIFF alleges that after the RV was searched, SLOPD advised PLAINTIFF he was a victim of swatting and removed his handcuffs.

896. PLAINTIFF alleges SLOPD thanked him for cooperating and advised him that CHP personnel wished to speak with him.

897. PLAINTIFF thereafter walked independently toward CHP officers, who were positioned in the parking lot, on the opposite side of PLAINTIFF's RV.

**2. SLOPD Search of RV and Officer ETHERTON's Removal of Livestreaming Cellular Phone**

898. When officers ordered PLAINTIFF to exit the RV, one of PLAINTIFF's cellular phones was resting on his lap.

899. PLAINTIFF feared that reaching for the cellular phone could cause officers to mistake the device for a firearm and use lethal force.

900. PLAINTIFF therefore avoided touching the device and, as he exited, maneuvered his legs so that the cellular phone dropped onto the driver-side floorboard near the pedals while PLAINTIFF kept his hands visible.

901. While PLAINTIFF remained handcuffed and detained in the rear of an SLOPD patrol vehicle, SLOPD personnel entered and cleared the RV to search for the firearm described by the reporting party.

902. From his position in the rear of the SLOPD patrol vehicle, PLAINTIFF observed portions of the SLOPD search while CHP personnel remained nearby. The beginning of PLAINTIFF's recorded livestream also depicts SLOPD personnel conducting the search.

903. PLAINTIFF could not see the front passenger side of the RV from his position inside the SLOPD patrol vehicle.

904. Before PLAINTIFF was ordered from the RV, a Samsung S24 Ultra cellular phone, valued at approximately $1,300, was mounted on a tripod inside the RV with its camera positioned to record the driver-side area and the anticipated interaction with law enforcement.

905. The tripod-mounted cellular phone was connected to a charger and microphone and was actively livestreaming when SLOPD personnel entered the RV.

906. Because PLAINTIFF was handcuffed and detained in the patrol vehicle, he was unable to retrieve, control, or reposition the tripod-mounted cellular phone while officers searched the RV.

907. The active livestream recorded SLOPD Officer ETHERTON removing the tripod-mounted cellular phone from inside the RV.

908. ETHERTON placed the tripod-mounted cellular phone outside the RV and repositioned it so that the camera no longer faced or recorded the RV interior in the manner in which PLAINTIFF had positioned it.

909. PLAINTIFF did not consent to ETHERTON removing or repositioning the cellular phone.

910. Because PLAINTIFF remained detained in the SLOPD patrol vehicle, he was unaware at the time that ETHERTON had removed and repositioned the cellular phone and believed that the livestream remained positioned to record the law-enforcement activity occurring inside the RV.

911. The second cellular phone remained on or near the driver-side floorboard where PLAINTIFF had allowed it to fall when exiting the RV.

912. No machine gun was located, no firearm matching the reporting party's allegation was found, and no drugs or other contraband were discovered during the search.

913. SLOPD did not retain the tripod-mounted cellular phone as evidence and did not return it to its original location or recording position inside the RV before concluding its involvement.

914. As a result of the repositioning, the active livestream no longer captured portions of the police activity inside the RV that PLAINTIFF had positioned the cellular phone to record.

### 3. SLOPD Did Not Retain The Cellular Phones As Evidence

915. After advising PLAINTIFF that he was a victim, SLOPD officers did not seize his cellular phones and left one cellular phone in the parking lot and the other cellular phone on the driver-side floorboard in the RV.

916. SLOPD officers did not tell PLAINTIFF that SLOPD believed he was the source of the false 911 calls.

917. SLOPD officers did not recover or seize the two cellular phones from inside the RV for evidentiary purposes.

918. SLOPD did not return the tripod-mounted cellular phone to its original position inside the RV.

919. PLAINTIFF never gave permission to SLOPD to remove the property from his RV.

920. PLAINTIFF did not return his property to his RV because he voluntarily went to talk to the CHP officers.

921. Because PLAINTIFF was handcuffed inside the SLOPD patrol vehicle, he was unaware that his livestream camera had been removed from the RV, and believed the interaction was still being recorded.

922. Before PLAINTIFF was ordered out of the RV, he faced his camera to the door of the driver side to record his interaction with officers.

## E. CALIFORNIA HIGHWAY PATROL ("CHP")

923. PLAINTIFF informed CHP officers that he was an activist and livestreamer protesting Scientology.

924. PLAINTIFF informed CHP officers that he had repeatedly been subjected to false emergency calls and armed police detentions.

925. The CHP Arrest/Investigation Report File No.1037-745-24 recorded that PLAINTIFF advised officers he had been detained at gunpoint in Ventura the previous night.

926. That same report further documents that PLAINTIFF reported approximately eleven gunpoint police detentions during the preceding four months.

927. PLAINTIFF further advised CHP that LAPD was already investigating similar swatting incidents and that PLAINTIFF had been treated as a victim in those investigations.

928. PLAINTIFF informed CHP officers that the Ventura encounter had been livestreamed and could be independently verified.

929. PLAINTIFF also stated to CHP that he had been livestreaming during the July 10, 2024 incident.

930. PLAINTIFF advised officers that the livestream provided evidence of his conduct during the time the anonymous caller claimed PLAINTIFF was engaged in criminal activity.

931. PLAINTIFF offered to show officers his livestream, recent call history, and the persons whom he had actually called.

932. PLAINTIFF further offered to unlock his cellular phones himself so officers could inspect limited information relevant to determining whether PLAINTIFF had placed the emergency call.

933. The CHP Arrest/Investigation Report File No.1037-745-24 stated that Sergeant Charles WILSON and Officer Phillip OLSEN searched PLAINTIFF's YouTube channel.

934. WILSON and OLSEN observed multiple YouTube videos showing PLAINTIFF being detained by police following police reports.

935. Those videos depicted multiple prior incidents in which PLAINTIFF had been detained by law enforcement following emergency reports.

**1. Search**

936. PLAINTIFF alleges that a CHP officer walked around the RV and went inside the RV without a warrant.

937. CHP Arrest-Investigation Report File No. 1037-745-24 states that CHP officers assisted SLOPD during the detention and in ensuring that no other persons remained inside PLAINTIFF's RV.

938. After SLOPD cleared the vehicle and turned the investigation over to CHP, Officers OLSEN and PEREZ conducted an additional protective sweep of the RV for the reported weapon.

939. No weapon was found.

940. The same report states that, during the search, CHP officers encountered PLAINTIFF's two cellular phones on the ground outside the driver's-side door,

including one phone still mounted on a tripod and connected to a charger and microphone.

941. PLAINTIFF alleges that this tripod-mounted cellular phone had been actively livestreaming from inside the RV before SLOPD entered the vehicle and was removed and repositioned outside during the police search.

942. At the time of the seizure PLAINTIFF was not informed that he remained detained or was under arrest and was no longer handcuffed or put in the back of the car.

## 2. Seizure and Defendant-Specific CHP Participation

943. According to the CHP report, Sergeant WILSON instructed PEREZ to seize PLAINTIFF's two cellular phones.

944. At approximately 5:28:05 p.m., one second after the CHP CAD entry concerning the additional anonymous allegations, CHP CAD recorded: "PTY HAS BEEN RELEASED / 2 ... BLACK CELLPHONES HAVE BEEN TAKEN FOR EVIDENCE."

945. The CHP report stated that the seizure decision was made "[d]ue to the circumstances of the call and the frequency of Hochstetter being detained by police...."

946. Before the seizure, WILSON and OLSEN reviewed PLAINTIFF's YouTube channel, including videos depicting prior law-enforcement detentions that PLAINTIFF had identified as swatting incidents.

947. PEREZ took custody of PLAINTIFF's two cellular phones pursuant to WILSON's direction and thereafter transferred custody of the devices to HENDRICKS.

948. HENDRICKS received the cellular phones from PEREZ and completed a CHP 36 Property Receipt identifying the two black cellular phones and referencing PC § 148.3.

949. PLAINTIFF alleges that the copy of the CHP Form 36 Property Receipt initially provided to him on July 10, 2024, when the cellular phones were seized, designated the property as "Safe Keeping" in Box A.

950. On information and belief, the later "EVIDENCE" designation was associated with the continued retention and subsequent forensic examination of PLAINTIFF's cellular phones.

951. PLAINTIFF alleges that McMICHAEL arrived during the July 10, 2024 investigation while PLAINTIFF was detained and while CHP personnel were addressing and inventorying PLAINTIFF's cellular phones.

952. PLAINTIFF further alleges that McMICHAEL was briefed concerning the circumstances of the incident, including that no weapon matching the reported firearm had been located.

953. PLAINTIFF alleges that McMICHAEL was present while the cellular phones remained in CHP custody following the investigation at the scene.

954. PLAINTIFF alleges that LOPEZ and PROPER were present during relevant portions of the July 10, 2024 investigation and during the events surrounding CHP's seizure of PLAINTIFF's cellular phones.

955. PLAINTIFF further alleges that LOPEZ and PROPER were present while PLAINTIFF objected to the seizure and requested the return of his cellular phones.

956. During the July 10 investigation, PLAINTIFF informed CHP personnel that he was a livestreamer, that he had repeatedly been subjected to false emergency reports and armed police encounters, and that no firearm matching the caller's allegation had been located.

957. PLAINTIFF also informed CHP personnel that his livestream and cellular phones contained contemporaneous information concerning his activities during the period covered by the reported emergency call and offered to show

officers his livestream, recent call history, and persons he had actually contacted.

958. After BRADSHAW obtained that information concerning the original caller, CHP continued to retain both of PLAINTIFF's cellular phones.

959. The cellular phones remained outside PLAINTIFF's possession following the July 10, 2024 incident and were subsequently transferred for additional investigative handling and later subjected to forensic examination pursuant to the September 6, 2024 LAPD warrant.

**3. Release**

960. After SLOPD released PLAINTIFF from handcuffs, CHP did not advise PLAINTIFF that he remained detained or that he was under arrest.

961. PLAINTIFF believed he was speaking with CHP as the victim of a crime.

**4. CHP Follow-Up Investigation of Call To Service**

962. At approximately 9:00 p.m. on July 10, 2024, BRADSHAW contacted CHP Communications and requested that a Communications employee review the original 911 audio recording.

963. The Communications employee reviewed the call and reported that the call lacked ordinary background noise, that the caller sounded calm despite claiming that a machine gun had just been pointed at him, and that the caller did not sound as though he was driving despite claiming that he was actively following PLAINTIFF's RV.

964. Based upon those observations, the Communications employee expressed the belief that the caller was stationary and was making a false report to dispatch.

965. CHP continued to retain both of PLAINTIFF's cellular phones after BRADSHAW obtained this information concerning the original caller.

966. On July 18, 2024, HENDRICKS emailed PROPER under the subject "Hochstetter 216" and transmitted the CHP investigative report concerning PLAINTIFF, stating that it was being provided "as requested per Sergeant McMichael." BRADSHAW was copied on the communication.

967. PROPER thereafter requested the investigative narrative in Word format. HENDRICKS responded by transmitting an attachment titled "Hochstetter Narrative.docx," with BRADSHAW again copied on the communication.

## F. COMPLAINT

### 1. CHP

968. At approximately 6:47 p.m. on July 10, 2024, while PLAINTIFF was present at the CHP San Luis Obispo Area Office seeking the return of his property, CHP CAD incident No. 240710SL0, associated with File No. 1037-745-24, was reopened.

969. At that time, PLAINTIFF demanded return of his two cellular phones seized earlier that day and documented on CHP Form 36, Evidence/Property No. E 20240082.

970. PLAINTIFF sought to make a report concerning the false emergency call and informed Sergeant WILSON that he wanted to make a formal complaint concerning the seizure.

971. The CHP report acknowledges PLAINTIFF's request to file a complaint.

972. When asked whether a supervisor could take the complaint, the officer stated that he was the supervisor and would not take a complaint.

973. PEREZ instead of taking the complaint, ran the license plates of PLAINTIFF's friend, a San Luis Obispo resident who had picked him up; PEREZ and WILSON then left.

### 2. SLOPD Complaint

974. After the July 10, 2024 incident and seizure of his two cellular phones, PLAINTIFF went to SLOPD to complain about the felony stop and seizure and to report that he believed he had again been the victim of a swatting.

975. The first officer who spoke with PLAINTIFF identified himself as the watch commander and stated that the officers involved in the incident had already gone home for the night.

976. A second officer later came outside to take PLAINTIFF's complaint. During that contact, the first officer stated that the involved officers were still at the station, contradicting his earlier representation that they had gone home.

977. PLAINTIFF described the false machine-gun report, the fact that no weapon was found, and the seizure of his two cellular phones.

978. SLOPD records confirm an assistance-related contact involving PLAINTIFF outside the police station but state that no formal report was completed.

979. PLAINTIFF alleges that SLOPD failed to train officers on how to properly file a complaint

980. PLAINTIFF alleges that SLOPD failed to train officers to be honest when officers misrepresented the truth by claiming that all officers had left for the day.

981. PLAINTIFF alleges that SLOPD failed to train officers about making a record of a use of force incident when officers pulled guns and pointed them at PLAINTIFF putting his life at risk.

### <u>3. CHP Arrest-Investigation Report Dated September 6, 2024</u>

982. The CHP Arrest-Investigation Report identifies September 6, 2024 as the date Sergeant WILSON reviewed or approved the report concerning the July 10, 2024 incident and the seizure of PLAINTIFF's cellular phones.

983. That review occurred approximately eight weeks after the incident and on the same date LAPD obtained judicial authorization to conduct a forensic search of the seized cellular phones.

984. When PLAINTIFF attempted to file a complaint after the July 10 incident, he was informed that he was under investigation.

985. PLAINTIFF was never notified that CHP had classified or documented the incident through an Arrest-Investigation Report or that the report was reviewed or approved on September 6, 2024.

986. CHP never contacted PLAINTIFF after the July 10 seizure of his cellular phones.

987. PLAINTIFF was never issued a citation, notice to appear, court date, or other directive requiring him to appear in court concerning the incident.

988. PLAINTIFF was not arrested, booked, or prosecuted for allegedly making a false emergency report or for any other offense arising from the July 10 incident.

989. No criminal charges were filed against PLAINTIFF based upon the July 10 machine-gun allegation, the CHP investigation, or evidence obtained from the seized cellular phones.

990. The available records do not explain why CHP's report was reviewed or approved approximately eight weeks after the incident or why the review occurred on the same date GOMEZ obtained LAPD's warrant.

991. PLAINTIFF does not allege from the matching dates alone that CHP and LAPD coordinated the timing. PLAINTIFF alleges that the unexplained concurrence, the statement that he was under investigation, and the interagency transfer of his cellular phones warrant discovery concerning communications among CHP, LAPD, WILSON, GOMEZ, and other participating personnel.

## G. SEARCH WARRANT AND FORENSIC EXAMINATION OF PLAINTIFF'S CELLULAR PHONES

### 1. Delayed Application for a Forensic Search Warrant

992. No warrant authorizing a forensic examination of PLAINTIFF's cellular phones was obtained when the phones were seized on July 10, 2024.

993. After the seizure, both cellular phones remained continuously in government custody and outside PLAINTIFF's possession and control.

994. Approximately eight weeks later, on September 6, 2024, GOMEZ sought a warrant authorizing a forensic examination of both cellular phones.

995. At the time GOMEZ applied for the warrant, the cellular phones had already been located, identified, physically secured, and beyond PLAINTIFF's ability to alter, conceal, destroy, or remove their contents for approximately eight weeks.

996. GOMEZ did not seek the warrant solely to determine whether PLAINTIFF placed the allegedly false emergency call that caused the July 10, 2024 felony stop in San Luis Obispo.

997. Instead, GOMEZ connected PLAINTIFF's cellular phones to a broader LAPD investigation involving the Church of Scientology, Scientology protesters, social-media livestreamers, and allegedly false emergency calls.

998. GOMEZ stated that, beginning in December 2023, LAPD's Crimes Against Persons Unit received numerous swatting calls, criminal-threat reports, invasion-of-privacy reports, and disturbing-the-peace calls that she characterized as "targeting the Church of Scientology."

999. GOMEZ described activists protesting and livestreaming encounters involving Scientology members and law-enforcement officers.

1000. GOMEZ identified PLAINTIFF as one of the principal activists/livestreamers and identified his "DOA" and "Defender of Ants" social-media presence.

### 2. Characterization of Protest and Livestreaming Activity

1001. In her affidavit, GOMEZ characterized the activities of the Scientology protesters as an "aggressive form of civil harassment."

1002. GOMEZ alleged that "activists verbally berate" Scientology members, disrupted meetings, and attempted to provoke physical confrontations.

1003. GOMEZ wrote concerning the protesters' activity: "*The activists/social media livestreamers have invoked their first-amendment right to protest to justify their aggressive actions.*"

1004. GOMEZ then alleged that another form of harassment employed by activists and social-media livestreamers consisted of using Voice over Internet Protocol ("VOIP") telephone numbers to place false 911 and emergency calls.

1005. GOMEZ alleged that some of these calls falsely reported violence, active shooters, suicide scenarios, and other emergencies that generated tactical police or fire responses.

1006. GOMEZ further alleged that the resulting emergency responses could then be livestreamed and used as social-media content.

### 3. GOMEZ's Knowledge That PLAINTIFF Was A Swatting Victim

1007. GOMEZ's affidavit acknowledged that, on May 10, 2024, PLAINTIFF reported alleged vandalism involving a Scientology member.

1008. GOMEZ acknowledged that PLAINTIFF provided his cellular telephone number, (630) 465-2762, in connection with that victim report.

1009. GOMEZ further acknowledged that she personally verified PLAINTIFF's telephone number when PLAINTIFF appeared at the LAPD NE Div. on May 21, 2024.

1010. GOMEZ's affidavit also described the May 27, 2024 "man with a gun" incident, Incident No. 24052700002246.

1011. GOMEZ acknowledged that LAPD officers monitored PLAINTIFF's livestream when the firearm report was generated and subsequently determined that the incident was a swatting.

1012. GOMEZ personally reviewed the recording of that incident.

1013. Before seeking the September 6, 2024 warrant, GOMEZ had reviewed LAPD investigative materials identifying PLAINTIFF as the victim of a false emergency report made at a Scientology location.

1014. GOMEZ had reviewed PLAINTIFF's livestream from the incident, which recorded PLAINTIFF's activities during the period addressed by the reported emergency.

1015. GOMEZ stated that LAPD had previously obtained warrants concerning telephone numbers used to make investigated swatting calls.

1016. According to GOMEZ, those telephone numbers were associated with TextNow or other VOIP functionality and lacked identifiable subscriber information.

1017. GOMEZ explained that TextNow could operate on cellular phones, computers, tablets, and other communication devices.

1018. GOMEZ did not state that investigators had found TextNow installed on either of PLAINTIFF's seized cellular phones before she sought the September 6, 2024 warrant.

1019. GOMEZ acknowledged that PLAINTIFF informed CHP officers that he had been livestreaming when the July 10, 2024 incident occurred.

1020. GOMEZ acknowledged that PLAINTIFF informed the officers he believed he was again being swatted.

1021. GOMEZ further acknowledged PLAINTIFF's account of a gunpoint police incident in Ventura the preceding night and PLAINTIFF's report that he had experienced approximately eleven gunpoint police detentions during the preceding four months.

1022. Despite this information, GOMEZ characterized PLAINTIFF as "*a person of interest in many 'swatting' and harassment investigations*."

1023. GOMEZ expressed her belief that PLAINTIFF was one of the persons responsible for using electronic communications to initiate false contact with 911 for the purpose of annoying or harassing Scientology members.

1024. GOMEZ alleged violations of PC sections 653x(a) and 148.3.

1025. GOMEZ further stated: "*I believe that Scott Hochstetter is engaging in this behavior to create content for his social media channel 'DOA' on YouTube which provides revenue for him.*"

1026. LAPD had nevertheless independently determined that at least one high-risk firearm report involving PLAINTIFF was a swatting.

**4. Scope and Duration of the Requested Search.**

1027. GOMEZ did not request a search limited to determining whether PLAINTIFF placed the July 10, 2024 emergency call.

1028. GOMEZ instead requested authorization to examine all messages, including the contents of messages sent to or received from other telephone numbers.

1029. GOMEZ also requested all telephone numbers called or received, PLAINTIFF's contacts, available location information, device-owner information, application information, stored photographs and videos, and stored documents, including maps, typed documents, journals, and emails.

1030. GOMEZ further requested broadly described electronic information concerning locations, communications allegedly reflecting the mindset of suspects, photographs, audio recordings, visual recordings, and information allegedly establishing a nexus or motive concerning the broader history of police responses.

1031. The requested search period began at 12:01 a.m. on December 1, 2023, and continued through 9:00 p.m. on July 10, 2024.

1032. This period included weeks during which PLAINTIFF had not yet participated in the Los Angeles Scientology protest movement.

1033. The warrant therefore authorized the examination of more than seven months of PLAINTIFF's private expressive, documentary, associational, location, and communications data.

1034. GOMEZ sought authority for forensic personnel to create duplicate images or copies of PLAINTIFF's electronic media.

1035. The application contemplated the creation of evidentiary copies, the retention of a master copy in evidence storage, and offsite forensic processing.

1036. The application advised the issuing judge that forensic processing could take more than five business days, could exceed forty-five business days in complicated matters, and could take twelve months or longer because of a backlog and limited forensic personnel.

1037. The application represented that information determined to be unrelated to the warrant's objective would be sealed and would not be subjected to further review, use, or disclosure without additional court authorization.

**5. Identification, Review, and Approval of the Warrant**

1038. GOMEZ's warrant application identified both cellular phones as being located in a CHP evidence locker at 675 California Boulevard in San Luis Obispo.

1039. The cellular phones were identified as CHP Evidence No. E20240082, Items 1 and 2.

1040. The warrant package bears handwritten supervisory or reviewing initials on each page, including "KA 39130" and "BJM 34232."

1041. On information and belief, the handwritten initials "KA 39130" identify AUSTIN, and the handwritten initials "BJM 34232" identify MARTIN as reviewers or approvers of the warrant package.

1042. On information and belief, AUSTIN and MARTIN reviewed or approved the warrant package in their supervisory or reviewing capacities before it was presented to the issuing judge.

1043. Judge P.J. Mirich issued the search warrant on September 6, 2024, at approximately 10:33 p.m.

1044. GOMEZ requested authorization for nighttime service, and nighttime service was granted.

1045. The warrant did not reflect a request for Hobbs sealing, delayed disclosure, or an extension of the period for completing and filing the return.

1046. The warrant specifically identified two cellular phones that were already secured inside the CHP evidence facility in San Luis Obispo.

### 6. July 10 Incident and Disputed Description of the Phones' Locations

1047. GOMEZ relied upon the July 10, 2024 San Luis Obispo incident as part of the factual basis for searching PLAINTIFF's cellular phones.

1048. GOMEZ described the reported "machine gun" allegation and the resulting felony stop.

1049. GOMEZ expressly acknowledged that officers conducted a protective sweep of PLAINTIFF's vehicle and that "no weapons were located."

1050. GOMEZ then described the discovery of PLAINTIFF's cellular phones as follows:

> "No weapons were located but CHP officers found two cellular phones. One was located on the ground outside of the driver's side door. The second was located on a tripod, connected to a charger and microphone, on the ground outside the driver's door of the suspect's vehicle."

1051. PLAINTIFF disputes GOMEZ's description of the original locations of the two cellular phones.

1052. PLAINTIFF alleges that the tripod-mounted cellular phone had been inside PLAINTIFF's RV and was actively recording when SLOPD officers entered the vehicle.

1053. PLAINTIFF alleges that officers removed and repositioned the tripod-mounted cellular phone after entering the vehicle.

1054. PLAINTIFF further alleges that the second cellular phone fell onto the driver-side floorboard and remained inside the vehicle until officers entered or otherwise accessed it.

1055. GOMEZ described CHP's asserted reason for seizing the cellular phones as follows: "Due to the frequency of Scott being detained by the police CHP seized the cellular phones as evidence in the investigation of the false 911 calls."

1056. The repeated police detentions referenced by GOMEZ were the same incidents PLAINTIFF had identified as evidence that he was repeatedly being targeted by false emergency reports.

### 7. Failure To Provide Notice And Return Seized Cellular Phones

1057. After CHP seized PLAINTIFF's two cellular phones on July 10, 2024, GOMEZ subsequently obtained custody of the cellular phones pursuant to her warrant.

1058. PLAINTIFF was not notified by GOMEZ that LAPD had taken possession of the cellular phones and was not provided with the LAPD Request for Return of Property, Form 10.10.03, or a receipt for the transfer.

1059. PLAINTIFF first learned that GOMEZ had taken possession of his cellular phones when PLAINTIFF contacted the CHP seeking information concerning the property and CHP personnel advised him that GOMEZ had retrieved the cellular phones.

1060. LAPD Administrative Order No. 5, issued by the Office of the Chief of Police, requires Department personnel to provide Form 10.10.03 and a property receipt to persons from whom property is seized.

1061. The Order further provides that persons submitting the form are to be notified within 7–10 business days whether the property is available for return, being held as evidence, or subject to forfeiture.

**8. Execution, Transfer, and Chain of Custody**

1062. GOMEZ subsequently completed a Return to Search Warrant.

1063. In the return, GOMEZ swore: "On September 6, 2024 I served the search warrant and submitted the cellular phones to Los Angeles Police Department, Technical Investigations Division ("TID"), to conduct a forensic search."

1064. The warrant was issued in Los Angeles County at approximately 10:33 p.m. on September 6, 2024.

1065. At that time, the cellular phones were documented as being in CHP custody in San Luis Obispo, approximately 190 miles from Los Angeles and approximately three hours away by vehicle.

1066. The return states that the warrant was served and that the cellular phones were submitted to LAPD TID on the same calendar date that the warrant was issued.

1067. PLAINTIFF does not presently allege that GOMEZ personally drove to San Luis Obispo, personally transported the cellular phones, or used any particular physical-transfer procedure not established by the available records.

1068. PLAINTIFF alleges that the available records do not identify each person who possessed, transferred, received, or stored the cellular phones during the period they remained in government custody.

1069. GOMEZ's sworn return stated that LAPD TID subsequently conducted a forensic examination of PLAINTIFF's two cellular phones.

1070. GOMEZ stated that she received the resulting data from LAPD TID on January 23, 2025.

1071. GOMEZ stated that the extracted data had been downloaded onto a hard drive for her to view and analyze.

1072. By January 23, 2025, LAPD therefore possessed a separate forensic data set derived from PLAINTIFF's two cellular phones.

1073. GOMEZ's Return to Search Warrant was sworn before a magistrate on February 10, 2025.

**9. Prolonged Retention and Resulting Harm**

1074. Although LAPD TID had completed its forensic extraction and provided the resulting data to GOMEZ by January 23, 2025, the government continued retaining PLAINTIFF's physical cellular phones.

1075. PLAINTIFF met with an LAPD NE Div. detective who stated that he had taken over the swatting investigations and attributed the length of PLAINTIFF's February 11, 2025 detention to that investigation.

1076. On or about March 18, 2025, while attempting to recover his cellular phones, PLAINTIFF was informed by an LAPD officer that another jurisdiction had broken the case and that law enforcement knew the identity of the suspect.

1077. PLAINTIFF has not been contacted by any agency, as the victim of the crimes of the false swatting and is unaware of any prosecution of the subject.

1078. PLAINTIFF alleges that the cellular phones were not physically returned to him until approximately March 18, 2025, approximately eight months after their seizure on July 10, 2024.

1079. No criminal charge was brought against PLAINTIFF arising from the July 10, 2024 machine-gun allegation and no criminal charges were brought against PLAINTIFF based upon evidence allegedly recovered through the forensic examination of the two cellular phones.

1080. During the period of seizure and retention, PLAINTIFF was deprived of the possession and use of both cellular phones.

1081. That deprivation prevented PLAINTIFF from using the cellular phones' communications, navigation, recording, livestreaming, authentication, and evidence-preservation functions.

1082. PLAINTIFF relied upon the cellular phones to receive authentication codes and access social-media and other online accounts protected through two-factor authentication.

1083. The loss of the cellular phones caused PLAINTIFF to lose or experience delayed access to social-media and other online accounts for periods ranging from days to months.

1084. PLAINTIFF used the cellular phones and associated accounts to communicate, publish, livestream, document protest activity, preserve evidence, and report on the events he observed.

1085. The prolonged deprivation consequently interfered with PLAINTIFF's ability to communicate, publish, engage in activism, document public events, preserve evidence, and continue his livestreaming and reporting activities.

1086. As a result of the prolonged seizure and retention, PLAINTIFF suffered loss of use, loss of access to online platforms, interference with expressive activity, and lost publishing, recording, reporting, and livestreaming opportunities.

### 10. Prolonged Retention and Eventual Release of PLAINTIFF's Phones

1087. PLAINTIFF was not provided a written explanation identifying the criminal proceeding, evidentiary necessity, or other basis requiring such a period of retention.

1088. In a subsequent email to PLAINTIFF, GOMEZ stated: "Your cell phones are ready to be released next week."

1089. GOMEZ further identified LAPD Property Disposition Coordinator Rosemary Arroyo as the person handling the release and instructed PLAINTIFF regarding identification requirements for obtaining the cellular phones.

1090. The cellular phones remained outside PLAINTIFF's possession for approximately eight months before LAPD ultimately authorized their release.

## H. CUMULATIVE FACTUAL ALLEGATIONS

1091. PLAINTIFF alleges that, during the period described above, his protest, recording, livestreaming, and publication activities were repeatedly discussed in communications involving Scientology personnel and law-enforcement personnel and were the subject of reports, investigations, enforcement actions, evidence submissions, and requests for law-enforcement action.

1092. During the same period, law enforcement received repeated information that PLAINTIFF had been subjected to false emergency reports, while later investigative materials also referenced the frequency of police contacts and swatting incidents involving PLAINTIFF when evaluating whether he was connected to false emergency calls.

1093. Scientology personnel and government actors also maintained recurring communications concerning PLAINTIFF, his protest activity, and law-enforcement responses to that activity.

1094. PLAINTIFF discloses that the arrests on February 16, 2024 and May 25, 2024 are currently being litigated in Case No. 2:26-cv-01630-DOC-KS,*Hochstetter v. City of Los Angeles*, et al. and are only plead here for background facts.

# VI. CAUSES OF ACTION

## A. FIRST CLAIM FOR RELIEF

**First Amendment Retaliation 42 U.S.C. § 1983**

**Against Defendants GOMEZ, WILSON, OLSEN, CESAR, VALENZUELA, ETHERTON, ROLON, LOPEZ and DOE DEFENDANTS 6-50, in Their Individual Capacities**

1095. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1096. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 for violation of his rights secured by the First Amendment to the United States Constitution.

1097. PLAINTIFF brings this claim against GOMEZ, WILSON, OLSEN, CESAR, VALENZUELA, ETHERTON, ROLON, and presently unidentified DOE DEFENDANTS 6-50 based upon their own conduct, knowledge, direction, authorization, participation, or other causal involvement in the retaliatory acts alleged herein.

1098. PLAINTIFF engaged in protected First Amendment activity, including protesting and criticizing Scientology, recording and livestreaming public events and encounters with law enforcement, communicating with members of the public, and publishing commentary concerning matters of public concern.

1099. The relevant Defendants knew of PLAINTIFF's protected activity before or during the conduct challenged in this claim.

1100. Defendants thereafter subjected PLAINTIFF to the adverse actions specifically attributed to each Defendant below, including seizure and retention of cellular phones used for recording and livestreaming, interference with an active livestream, the subsequent investigation and forensic search of extensive digital information, and the materially adverse public characterization alleged against VALENZUELA.

1101. PLAINTIFF alleges that these actions were objectively capable of chilling a person of ordinary firmness from continuing to engage in the protected activity described above.

1102. As to GOMEZ, the September 6, 2024 warrant affidavit expressly incorporated PLAINTIFF's Scientology protest activity, livestreaming, invocation of First Amendment rights, social-media publication, and generation of revenue into the investigative narrative supporting the requested forensic search.

1103. PLAINTIFF alleges that GOMEZ's use of his protected protest, recording, livestreaming, and publication activity as part of the asserted investigative basis for the search supports an inference that PLAINTIFF's protected activity was a substantial or motivating factor in GOMEZ's challenged conduct.

1104. As to WILSON, PLAINTIFF alleges that WILSON reviewed PLAINTIFF's YouTube channel and livestreaming activity with OLSEN immediately before directing PEREZ to seize PLAINTIFF's cellular phones.

1105. During that investigation, PLAINTIFF had informed law enforcement that he was a livestreamer, that he had repeatedly been subjected to swatting incidents, and that the cellular phones and livestream contained contemporaneous evidence bearing on whether the July 10 emergency report was false.

1106. PLAINTIFF alleges that the timing and circumstances of WILSON's review of PLAINTIFF's protected recording and livestreaming activity immediately before directing seizure of the devices used for that activity together with WILSON's knowledge that the devices contained contemporaneous evidence concerning the emergency report, support an inference that PLAINTIFF's protected activity was a substantial or motivating factor in WILSON's challenged conduct.

1107. As to OLSEN, PLAINTIFF alleges that OLSEN reviewed PLAINTIFF's YouTube channel with WILSON, participated in the investigation and discussions preceding the seizure, and knew that PLAINTIFF used the cellular phones to record, livestream, and document his encounters with law enforcement.

1108. PLAINTIFF alleges that, based on OLSEN's participation in the investigation and discussions preceding the seizure, coupled with his knowledge that the cellular phones were being used for protected recording and livestreaming, OLSEN's participation in the investigation and seizure decision was substantially motivated by PLAINTIFF's protected recording and livestreaming activity.

1109. As to LOPEZ, PLAINTIFF alleges that LOPEZ, a CHP officer whose first name is presently unknown, was present during relevant portions of the July 10, 2024 investigation, observed WILSON and OLSEN review PLAINTIFF's YouTube channel and livestreaming activity depicting prior law-enforcement detentions identified as swatting incidents, was present when WILSON directed PEREZ to seize PLAINTIFF's cellular phones used for protected recording and livestreaming, was present while PLAINTIFF informed officers he was a livestreamer and that the phones/livestream contained contemporaneous evidence bearing on whether the emergency report was false, was present while PLAINTIFF objected to the seizure and requested return of the phones, had the opportunity to intervene or direct return, and continued to participate in the seizure and retention of the phones despite that knowledge, thereby personally participating in the retaliatory seizure.

1110. As to ETHERTON, PLAINTIFF alleges that, while PLAINTIFF was handcuffed in an SLOPD patrol vehicle, ETHERTON removed PLAINTIFF's tripod-mounted, microphone-connected, actively livestreaming cellular phone

from inside the RV and repositioned it outside so that it no longer recorded the RV interior as PLAINTIFF had arranged.

1111. PLAINTIFF alleges that the device's recording function was apparent and that ETHERTON's intentional interference with the active livestream prevented PLAINTIFF from continuing to document portions of the police activity occurring inside the RV.

1112. PLAINTIFF alleges that the circumstances alleged, including ETHERTON's direct interference with an actively recording device during police activity, support an inference that PLAINTIFF's protected recording and livestreaming activity was a substantial or motivating factor in ETHERTON's interference.

1113. As to VALENZUELA, PLAINTIFF alleges that, during the November 3, 2024 incident, while PLAINTIFF was engaged in protected recording, protest activity, and efforts to obtain police and child-protection assistance concerning a minor, VALENZUELA said to uninvolved members of the public that "Protesters were threatening to kill a cop."

1114. PLAINTIFF alleges that the recorded events materially contradicted VALENZUELA's statement and instead showed PLAINTIFF requesting lawful assistance from police and child-protection authorities.

1115. PLAINTIFF alleges that VALENZUELA's statement falsely portrayed the protest group with which PLAINTIFF was present as presenting a lethal threat to law enforcement.

1116. PLAINTIFF alleges that, under the circumstances alleged herein, VALENZUELA's conduct constituted adverse action substantially motivated by PLAINTIFF's protected Scientology protest and recording activity and was of a kind that would chill a person of ordinary firmness from continuing such protected activity.

1117. As to ROLON, PLAINTIFF alleges that on October 13, 2024, ROLON encountered PLAINTIFF while PLAINTIFF was openly engaged in

Scientology protest and livestreaming activity on or adjacent to a public street and sidewalk.

1118. ROLON directed PLAINTIFF away from the area, threatened him with arrest for trespass, physically contacted him twice, and displayed a baton during the confrontation.

1119. PLAINTIFF repeatedly asserted that he was on a public sidewalk, requested the permit or other legal authority restricting his access, and expressly invoked his right to protest.

1120. PLAINTIFF alleges that ROLON's physical interference, threat of arrest, and display of force in response to PLAINTIFF's continued protest activity constituted adverse action capable of chilling a person of ordinary firmness from continuing protected First Amendment activity.

1121. As to CESAR, PLAINTIFF alleges that during the December 14, 2024 Scientology event, CESAR exercised supervisory authority over LAPD enforcement affecting PLAINTIFF's access to public streets and sidewalks while PLAINTIFF was openly engaged in protected Scientology protest and livestreaming activity.

1122. PLAINTIFF repeatedly requested the operative City permit and challenged the differential treatment of other pedestrians who were permitted to traverse areas from which PLAINTIFF was being excluded.

1123. CESAR nevertheless advised that LAPD would rely upon the permit/work-order information available to officers, advised that Scientology could initiate a PPA for trespass, and participated in restricting PLAINTIFF's access under threat of arrest while the scope of the actual sidewalk closure remained disputed and inconsistently described by LAPD personnel.

1124. PLAINTIFF alleges that the threatened arrest and exclusion from areas otherwise being traversed by members of the public constituted adverse action

substantially motivated by, or selectively directed toward, PLAINTIFF's protected protest activity.

1125. As to presently unidentified DOE DEFENDANTS 6-50, PLAINTIFF alleges that they personally participated in, directed, authorized, approved, assisted, or caused one or more of the retaliatory acts alleged herein with knowledge of PLAINTIFF's protected activity. PLAINTIFF will substitute their true names and particular conduct when learned through discovery.

1126. PLAINTIFF does not allege that protected speech was necessarily the sole reason for every challenged action. PLAINTIFF alleges that his protected activity was a substantial or motivating factor in the challenged conduct and that the retaliatory motive was a but-for cause of the particular adverse action for which each responsible Defendant is liable.

1127. PLAINTIFF alleges liability against each named DEFENDANT and DOE DEFENDANTS 6-50 only for that Defendant's own conduct, knowledge, intent, authorization, direction, participation, or causal responsibility.

1128. As a direct and proximate result of the retaliatory conduct, PLAINTIFF suffered interference with and chilling of protected expressive activity, loss of possession and use of cellular phones used to communicate, record, publish, and livestream, loss of contemporaneous recording evidence, interference with account access, and other injuries alleged in this Complaint.

## B. SECOND CLAIM FOR RELIEF

**Fourth Amendment Unreasonable Seizure and Prolonged Retention of Property 42 U.S.C. § 1983**

**AGAINST DEFENDANTS WILSON, PEREZ, HENDRICKS, BRADSHAW, OLSEN, ETHERTON, McMICHAEL, PROPER, GOMEZ, LOPEZ and DOE DEFENDANTS 6-50, in their individual capacities.**

1129. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1130. PLAINTIFF brings this claim against WILSON, PEREZ, HENDRICKS, BRADSHAW, OLSEN, ETHERTON, McMICHAEL, PROPER, GOMEZ, LOPEZ, and presently unidentified DOE DEFENDANTS 6-50 based upon their respective personal participation in, direction of, authorization of, assistance with, or other involvement in the seizure and/or continued retention of PLAINTIFF's cellular phones, as follows:

1131. As to WILSON, PLAINTIFF alleges that WILSON personally directed PEREZ to seize PLAINTIFF's cellular phones after WILSON and OLSEN reviewed PLAINTIFF's YouTube channel and observed videos depicting his prior encounters with police.

1132. As to PEREZ, PLAINTIFF alleges that PEREZ personally participated in the initial seizure of PLAINTIFF's cellular phones. After WILSON instructed PEREZ to seize the cellular phones into evidence, PEREZ took custody of both cellular phones and placed them in the patrol vehicle before transferring custody to the reporting officer.

1133. As to OLSEN, PLAINTIFF alleges that OLSEN personally participated in the protective sweep during which the two cellular phones were discovered and, together with WILSON, reviewed PLAINTIFF's YouTube channel before the cellular phones were seized.

1134. As to HENDRICKS, PLAINTIFF alleges that HENDRICKS subsequently received or maintained custody of PLAINTIFF's cellular phones after PEREZ transferred custody to the reporting officer, and that HENDRICKS was identified as the booking employee on the CHP property receipt.

1135. As to BRADSHAW, PLAINTIFF alleges that BRADSHAW personally participated in the post-seizure investigation by obtaining a review of the original 911 recording on the evening of July 10, 2024.

a. That review produced information indicating that the original caller's account was inconsistent with the circumstances represented during the call, including the absence of expected background noise, the caller's calm demeanor, and indications that the caller was stationary despite claiming to be following PLAINTIFF's RV.

b. CHP nevertheless continued to retain PLAINTIFF's cellular phones after BRADSHAW obtained that information.

c. BRADSHAW remained included in the CHP investigation after July 10, including the July 18, 2024 internal transmission of the "Hochstetter 216" investigative report and "Hochstetter Narrative.docx."

d. PLAINTIFF alleges BRADSHAW's conduct as part of the continued investigation and retention period following the initial seizure and seeks to impose liability upon BRADSHAW only to the extent his own investigative participation and causal involvement contributed to the continued retention of the cellular phones after the factual basis supporting their retention had diminished

1136. As to ETHERTON, PLAINTIFF alleges that ETHERTON intentionally took physical control of PLAINTIFF's tripod-mounted cellular phone, removed it from inside the RV, and repositioned it without PLAINTIFF's consent while PLAINTIFF was restrained and unable to recover or reposition the device himself.

1137. PLAINTIFF alleges that ETHERTON's conduct meaningfully interfered with PLAINTIFF's possession and ongoing use of the cellular phone to record and livestream police activity.

1138. PLAINTIFF does not allege that ETHERTON participated in CHP's later evidentiary seizure or prolonged retention of the cellular phones and seeks liability against ETHERTON only for his own temporary physical control and interference with the device.

1139. As to McMICHAEL, PLAINTIFF alleges that McMICHAEL personally participated in the post-seizure investigative handling of PLAINTIFF's cellular phones. McMICHAEL arrived while PLAINTIFF was detained and while CHP personnel were addressing and inventorying PLAINTIFF's cellular phones and was briefed concerning the incident, including that no weapon matching the reported firearm had been located.

1140. On July 18, 2024, HENDRICKS transmitted the investigative report concerning PLAINTIFF to PROPER, stating that it was provided "as requested per Sergeant McMichael."

1141. PLAINTIFF alleges these facts as evidence of McMICHAEL's own post-seizure investigative involvement and does not seek to impose liability upon him merely because of his supervisory position.

1142. As to PROPER, PLAINTIFF alleges that PROPER personally participated in the post-seizure investigative handling of PLAINTIFF's cellular phones. On July 18, 2024, HENDRICKS transmitted the "Hochstetter 216" investigative report to PROPER, stating that it was provided "as requested per Sergeant McMichael."

1143. PROPER then requested the investigative narrative in Word format, and HENDRICKS transmitted the requested narrative. PLAINTIFF alleges these specific acts as evidence of PROPER's own post-seizure investigative involvement and does not seek to impose liability upon PROPER merely because of his position or presence.

1144. As to GOMEZ, PLAINTIFF alleges that GOMEZ personally obtained custody of the cellular phones that were seized in July ("JULY PHONES") pursuant to the September 6, 2024 warrant, submitted those phones for forensic examination, received the extracted information, and subsequently communicated with PLAINTIFF concerning their release.

a. By January 23, 2025, GOMEZ had received the extracted information on a separate hard drive and therefore knew that a forensic data set had been preserved separately from the physical JULY PHONES. The physical cellular phones nevertheless remained in government custody for additional weeks.

b. On information and belief, GOMEZ participated in determining when the JULY PHONES would be released from investigative custody. This allegation is based upon her role in obtaining the cellular phones and the extracted information, her subsequent email advising PLAINTIFF that the phones were ready for release, and her identification of the property disposition coordinator handling that release.

c. PLAINTIFF alleges that continued retention of the physical JULY PHONES after completion of the forensic extraction was unreasonable under the totality of the circumstances, including the preservation of the extracted information on separate media, the additional period of retention, and the substantial interference with PLAINTIFF's use of the devices for communication, authentication, recording, and livestream.

d. PLAINTIFF seeks to hold GOMEZ responsible for the period of continued deprivation caused by her own custody, investigative decisions, and participation in the disposition of the JULY PHONES. Her alleged responsibility under this claim concerns those devices and her own conduct after becoming involved in their custody.

e. As a direct and proximate result of GOMEZ's alleged participation in the unreasonable continued retention, PLAINTIFF suffered additional loss of possession and use of the JULY PHONES and the resulting communications, account-access, recording, livestreaming, and other injuries alleged herein.

1145. As to LOPEZ, PLAINTIFF alleges that LOPEZ, a CHP officer whose first name is presently unknown, was present during relevant portions of the July 10, 2024 investigation and during the events surrounding CHP's seizure of PLAINTIFF's cellular phones. LOPEZ observed WILSON and OLSEN review PLAINTIFF's YouTube channel, was present when WILSON directed PEREZ to seize the cellular phones, was present while PLAINTIFF informed officers he was a livestreamer, that no firearm matching the reported firearm had been located, that he had been repeatedly subjected to false emergency reports and armed police encounters, that his livestream and cellular phones contained contemporaneous evidence concerning the false emergency report and offered to show officers his livestream, recent call history, and persons contacted, and was present while PLAINTIFF objected to the seizure and requested return of the cellular phones. LOPEZ had the opportunity to intervene to prevent or terminate the unreasonable seizure and failed to do so. PLAINTIFF alleges that LOPEZ thereby personally participated in the continued seizure as an integral participant who was aware of the circumstances surrounding the seizure and PLAINTIFF's objections to the continued retention of his cellular phones.

1146. As to DOE DEFENDANTS 6-50, PLAINTIFF alleges that presently unidentified officers, supervisors, investigators, or other governmental actors personally participated in, directed, authorized, approved, maintained, transferred, assisted, or knowingly permitted the initial seizure and/or continued retention of PLAINTIFF's cellular phones and will be identified through discovery.

1147. PLAINTIFF does not concede that Defendants possessed a lawful basis to seize either cellular phone without a warrant.

1148. Independently and in the alternative, even if Defendants establish that the circumstances permitted them to temporarily secure the cellular phones at the

scene, PLAINTIFF alleges that any such temporary justification did not authorize their prolonged warrantless retention after the circumstances supporting the initial seizure materially diminished or ceased.

1149. No firearm matching the reporting party's allegation was located, PLAINTIFF was released without arrest or citation, PLAINTIFF repeatedly informed law enforcement that he was the victim of another swatting, and PLAINTIFF advised officers that his livestream and telephone information contained contemporaneous evidence relevant to determining whether the emergency report was false.

1150. CHP subsequently obtained additional information materially undermining the credibility of the original emergency caller, including information concerning the circumstances and characteristics of the 911 call.

1151. PLAINTIFF alleges that WILSON, HENDRICKS, BRADSHAW, McMICHAEL, PROPER, LOPEZ and applicable DOE DEFENDANTS 6-50, according to their respective conduct, knowledge, authority, and opportunity to act, participated in, authorized, maintained, approved, transferred, or failed to terminate the continued retention after the asserted factual justification for continued possession materially diminished.

1152. PLAINTIFF further alleges that any legitimate need to preserve evidence did not itself require uninterrupted physical possession of both cellular phones for approximately eight weeks before judicial authorization for a forensic search was obtained.

1153. The continued retention deprived PLAINTIFF of the possession and use of cellular phones that he used for communication, account access, two-factor authentication, navigation, recording, livestreaming, publication, and preservation of evidence.

1154. PLAINTIFF alleges that the governmental interest in continued possession materially diminished as the investigation progressed, while the interference

with PLAINTIFF's possessory, communications, evidentiary, and expressive interests remained substantial.

1155. PLAINTIFF alleges that the initial warrantless seizure was unreasonable and, independently and in the alternative, that the continued possession of both cellular phones for approximately eight weeks before obtaining a forensic-search warrant was unreasonable under the totality of the circumstances.

1156. PLAINTIFF therefore alleges that the initial seizure and/or prolonged retention violated his Fourth Amendment right to be free from unreasonable seizures.

1157. PLAINTIFF alleges that less intrusive and more directly targeted investigative means were available. Law enforcement could have sought appropriate legal process directed to the telephone carrier, VOIP provider, TextNow, Google, YouTube, or other relevant service providers for available subscriber, connection, account, access, session, IP-address, and call records rather than continuing to deprive PLAINTIFF of possession and use of both physical cellular phones.

1158. Law enforcement could also have sought timely preservation of relevant provider records while obtaining the legal process necessary to obtain them.

1159. Because the repeated false emergency calls closely tracked PLAINTIFF's movements and activities as publicly broadcast through his livestreams, investigators could have sought available YouTube or Google records associated with the relevant livestreams and compared such information with the timing, subscriber information, IP-address information, and other digital evidence associated with the false emergency calls.

1160. PLAINTIFF alleges that these investigative alternatives were materially less intrusive and more directly targeted to identifying the person or persons originating the false emergency calls than maintaining physical possession of

both of PLAINTIFF's cellular phones for approximately eight weeks before obtaining judicial authorization for a forensic search.

1161. As a direct and proximate result of the conduct of the named and DOE DEFENDANTS 6-50, PLAINTIFF suffered loss of possession and use of his property, interference with communications and account access, loss of recording and livestreaming capability, loss of evidentiary functions, and the other injuries alleged in this Complaint.

## C. THIRD CLAIM FOR RELIEF

### Fourth Amendment - Unreasonable Search and Judicial Deception 42 U.S.C. § 1983

### Against Defendants GOMEZ, AUSTIN, MARTIN, and DOE DEFENDANTS 6-50, in Their Individual Capacities

1162. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1163. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 for violation of his rights secured by the Fourth Amendment to the United States Constitution.

1164. PLAINTIFF brings this claim against GOMEZ, AUSTIN, MARTIN, and presently unidentified DOE DEFENDANTS 6-50 based upon their respective personal participation in, preparation of, review of, approval of, submission of, authorization of, execution of, or other personal involvement in the challenged warrant and forensic search, as follows:

a. As to GOMEZ, PLAINTIFF alleges that GOMEZ prepared and obtained the September 6, 2024 warrant and personally presented the warrant application to the issuing magistrate.

b. As to AUSTIN, PLAINTIFF alleges, on information and belief, that AUSTIN personally reviewed, approved, authorized, or otherwise

participated in the warrant application before its submission to the issuing magistrate.

c. As to MARTIN, PLAINTIFF alleges, on information and belief, that MARTIN personally reviewed, approved, authorized, or otherwise participated in the warrant application before its submission to the issuing magistrate.

d. As to DOE DEFENDANTS 6-50, PLAINTIFF alleges that presently unidentified officers, investigators, supervisors, or other governmental actors personally participated in preparing, reviewing, approving, submitting, executing, or causing the challenged warrant or forensic search and will be identified through discovery.

1165. On September 6, 2024, GOMEZ obtained a warrant authorizing the forensic examination of PLAINTIFF's two cellular phones, including the duplication and retention of extensive digital information.

1166. PLAINTIFF alleges that GOMEZ's September 6, 2024 affidavit omitted material information concerning the broader pattern of suspected swatting directed at Scientology protesters.

a. As alleged the reported incidents were not confined to PLAINTIFF. The incidents preceding the warrant included:

b. Multiple suspected swatting incidents involving Zachary Ellison during April, May, and June 2024, including armed detentions at locations.

c. Eight suspected swatting incidents involving Daniel from Salem.

d. Suspected swatting incidents involving minor protester SS, including the January 23, 2024 armed detention with Jasiah Adler, and incidents on July 7, July 8, July 9, and August 26, 2024;

e. Suspected swatting incidents involving Luna on January 23 and February 2, 2024, and Jessica Palmadesa on March 4, March 25, and May 26, 2024.

f. Before seeking the warrant, GOMEZ had personally been informed that numerous other Scientology protesters were also being subjected to swatting.

g. PLAINTIFF had additionally informed GOMEZ during the May 21, 2024 interview that he had experienced approximately nine suspected swatting incidents. PLAINTIFF alleges GOMEZ's knowledge of the broader pattern based upon information personally communicated to her, rather than merely attributing to her every record possessed by LAPD or another law-enforcement agency.

h. PLAINTIFF acknowledges that GOMEZ's affidavit disclosed the May 27, 2024 swatting determination, her review of that recording, and PLAINTIFF's report of approximately eleven gunpoint police detentions during the preceding four months.

i. The challenged omission concerns the additional information known to GOMEZ that repeated suspected swatting also affected other protesters. Nevertheless, the affidavit relied upon the frequency of PLAINTIFF's police detentions in explaining the seizure of his cellular phones and advanced the theory that PLAINTIFF initiated false emergency calls to generate livestream content and revenue.

1167. The omitted information was material because the repeated targeting of other protesters supplied a factual explanation for recurring emergency responses that did not depend upon PLAINTIFF originating the calls.

1168. PLAINTIFF alleges that GOMEZ's prior personal knowledge of other protesters' victimization, considered together with her reliance upon the frequency of PLAINTIFF's detentions to support suspicion against him, supports an inference that the omission was deliberate or made with reckless disregard for whether the affidavit presented a materially misleading account.

1169. PLAINTIFF alleges that, when the omitted information concerning other protesters is included and the affidavit is evaluated as a whole, the repeated emergency responses and PLAINTIFF's livestreaming activity did not establish probable cause to believe that evidence of his commission of the alleged false-report offenses would be found on either seized cellular phone. As further alleged herein, the affidavit identified no evidence connecting either device to a telephone number, account, or communication used to originate the investigated false emergency calls. PLAINTIFF alleges that the corrected affidavit would not have established probable cause for the challenged search.

1170. PLAINTIFF alleges that the omissions and misleading presentation were material to the issuing magistrate's determination of probable cause.

1171. The warrant authorized examination of extensive private digital information, including messages, telephone records, contacts, location information, photographs, videos, application information, documents, journals, emails, audio, and other stored data for the period beginning December 1, 2023 and continuing through July 10, 2024.

1172. That period began before PLAINTIFF joined the Los Angeles Scientology protest activity described in this Complaint and was not limited to determining whether PLAINTIFF originated the July 10 emergency call or used a particular telephone number, account, application, or service.

1173. PLAINTIFF alleges that the warrant therefore authorized examination of months of private communications, expressive and associational information, location information, photographs, videos, documents, and other digital data without adequately establishing a nexus between those categories of information, the particular offenses under investigation, and PLAINTIFF's two cellular phones.

1174. PLAINTIFF alleges, on information and belief, that AUSTIN and MARTIN personally reviewed and approved the warrant package before it was presented to the issuing magistrate, as reflected by the supervisory or reviewing initials appearing on the warrant documents and identified in the factual allegations above.

1175. PLAINTIFF alleges that AUSTIN and MARTIN are liable only to the extent their personal review and approval of the warrant application, together with their knowledge of or reckless disregard for the material deficiencies alleged herein, establish personal causal participation in the challenged search and judicial deception, and not merely because of their supervisory positions.

1176. PLAINTIFF further alleges that presently unidentified DOE DEFENDANTS 6-50 personally participated in one or more of the following acts: preparing, reviewing, approving, submitting, executing, or causing the challenged warrant or forensic search. PLAINTIFF will identify their particular conduct when learned through discovery.

1177. The warrant was executed and PLAINTIFF's cellular phones were subjected to forensic examination and duplication pursuant to the authorization obtained by GOMEZ.

1178. PLAINTIFF alleges that the resulting search violated the Fourth Amendment requirements of probable cause, particularity, and reasonableness and caused the privacy, possessory, expressive, and other injuries alleged above.

1179. PLAINTIFF brings the judicial-deception component of this claim under the principles recognized in *Franks v. Delaware, 438 U.S. 154 (1978).*

1180. As a direct and proximate result of the foregoing judicial deception and the resulting issuance and execution of the search warrant, PLAINTIFF's cellular phones remained in government custody, were transferred for forensic examination, and were subjected to a broad search and extraction of private digital information.

1181. PLAINTIFF suffered the prolonged loss of possession and use of his cellular phones, interference with communications and account access, loss of recording and livestreaming capabilities, invasion of informational privacy, emotional distress, and other compensable injuries.

1182. These injuries were caused by the issuance and execution of the warrant that PLAINTIFF alleges would not have issued, or would not have issued in the same scope, absent the material misrepresentations and omissions alleged above.

## D. FOURTH CLAIM FOR RELIEF

## Municipal Liability 42 U.S.C. § 1983 (Monell) Against Defendant CITY OF LA

1183. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1184. PLAINTIFF alleges LAPD maintained a custom and practice of

a. accepting and acting upon accusations supplied by Scientology security personnel without independent verification,

b. refusing PPAs requested by Scientology protesters while granting PPAs requested by Scientology personnel, and

c. treating Scientology protest speech as probable cause for investigation and prosecution under PC § 302."

d. accusing victims of swatting of making false 911 calls

1185. PLAINTIFF alleges that the Chief of Police and the Police Commission were aware of these customs and practices after numerous complaints and communications.

1186. PLAINTIFF alleges deliberate indifference that the Police Commission received actual notice of this custom through Plaintiff's February 11, 2025 complaint and the OIG follow-up, yet took no corrective action.

1187. PLAINTIFF alleges causation as this custom directly caused the retaliatory investigation, selective PPA enforcement, and malicious prosecution alleged herein.

1188. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 against CITY OF LA for constitutional injuries caused by its own policies, customs, practices, failures to train or supervise, and deliberate indifference to the constitutional rights at issue.

1189. PLAINTIFF does not seek to impose liability upon CITY OF LA under a theory of respondeat superior.

1190. PLAINTIFF further alleges that the December 14, 2024 Shrine-event incident provides additional evidence of inadequate procedures, briefing, supervision, and training concerning enforcement of event permits and public-sidewalk restrictions adjacent to Scientology events.

1191. Multiple LAPD personnel gave inconsistent descriptions of which sidewalks and access routes were closed while enforcement decisions affecting PLAINTIFF were nevertheless made under threat of trespass arrest.

1192. These events occurred during the same period in which CITY OF LA personnel were separately addressing Scientology's occupation and use of public-right-of-way areas through unpermitted planters.

1193. PLAINTIFF further alleges that similar sidewalk restrictions had previously affected other known Scientology protesters, including Audit LA and Aja, despite prior CITY OF LA and LAPD communications recognizing the First Amendment implications of restricting those sidewalks.

1194. These prior incidents are alleged as evidence of notice, recurring practice, and failure to correct known public-forum enforcement problems.

1195. The sidewalk-access problem was known to CITY OF LA and LAPD months before the December 14, 2024 incident.

1196. On April 18, 2024, after consultation with LAPD, CITY OF LA personnel rejected requested additional sidewalk closures because they would be "overburdensome for freedom of speech," constitute an "overreach," and interfere with "the rights of all individuals to free speech and access to public spaces."

1197. LAPD and CITY OF LA personnel also knew that Scientology's event permits repeatedly preserved pedestrian access. Scientology representative KRAUSKOPF acknowledged that LAPD had refused broader pedestrian exclusion because the permit language provided that closures were for exclusion of vehicles only and that the public at large could not be denied street access except in an emergency.

1198. On June 2, 2024, LAPD supervisory personnel were further advised that Scientology could not obstruct public access to a sidewalk, street, or curb without BSS authorization and that an unauthorized obstruction of public space would be illegal. Defendants AUSTIN and GOMEZ received or were copied on that communication.

1199. During June 2024, BSS separately documented unpermitted materials and planters occupying public-right-of-way areas and directed that the obstructions be removed. Nevertheless, protesters continued to encounter physical and police-enforced restrictions upon use of the same general sidewalk and easement areas.

1200. By October 1, 2024, CITY OF LA imposed express conditions requiring that both sidewalks on LRH Way remain open and accessible to the public and that signs be posted advising the public that the sidewalks were open.

1201. Despite that accumulated notice, PLAINTIFF alleges that LAPD personnel thereafter continued to threaten or enforce exclusion of known Scientology protesters from public streets and sidewalks, including the October 13,

November 17, and December 14 incidents involving PLAINTIFF and the earlier restrictions involving Audit LA and Aja.

1202. PLAINTIFF alleges that the recurrence of similar restrictions after repeated governmental recognition of the public-access and First Amendment issues supports an inference that the problem was not merely an isolated misunderstanding by a single officer, but reflected inadequate training, briefing, supervision, and corrective measures concerning the enforcement of Scientology event permits and the constitutional rights of protesters.

1203. PLAINTIFF alleges that these sidewalk-related customs, practices, and training or supervisory deficiencies were a moving force behind the First Amendment injuries alleged herein because LAPD personnel repeatedly enforced or threatened to enforce restrictions against PLAINTIFF without consistently verifying the governing permit, while relying upon representations or demands from Scientology personnel concerning where PLAINTIFF could stand, walk, protest, or remain.

1204. PLAINTIFF alleges that adequate training, supervision, and corrective measures concerning public-forum access and event-permit enforcement would have prevented or materially reduced the repeated threats of arrest and exclusion alleged in the October 13, November 17, and December 14 incidents.

**THEORY A — Persistent Practice of Relying on Private-Entity-Supplied Information Without Adequate Independent Verification**

1205. PLAINTIFF alleges that CITY OF LA, through LAPD, maintained or permitted a persistent and widespread practice under which LAPD personnel received, circulated, incorporated, and operationally used information supplied by Scientology security and legal personnel concerning PLAINTIFF

and other Scientology protesters without adequate independent verification or adequate consideration of materially contrary information.

1206. As alleged in the factual allegations above, the practice included repeated direct communications between Scientology personnel and LAPD officers, detectives, supervisors, and command personnel; recurring transmission of PLAINTIFF-specific allegations and evidence; standing CAD information identifying Scientology security contacts; event-planning and operational communications concerning protesters; and communications involving investigative, prosecutorial, and interstate governmental action concerning PLAINTIFF.

1207. PLAINTIFF alleges that these interactions occurred repeatedly over a period of months, involved multiple LAPD personnel and supervisory levels, and were not limited to a single isolated encounter.

1208. PLAINTIFF further alleges that the recurring communications were not confined to line-level personnel. LAPD supervisory and command personnel were included in communications concerning PLAINTIFF, Scientology protesters, enforcement options, and the accumulation and coordination of evidence.

1209. Among other things, HERNANDEZ advised CITY OF LA and LAPD personnel that LAPD had engaged in "many discussions with Scientology" and "many internal discussions" concerning enforcement involving protesters and First Amendment rights.

1210. PLAINTIFF further alleges that TORRES forwarded a Scientology-related communication to LAPD Major Crimes command personnel and stated that "Scientology is pushing hard on this guy" and that LAPD needed to make sure its "i's are dotted." These communications are alleged not as independent proof of municipal liability, but as specific facts supporting an inference that

knowledge of the recurring enforcement and investigative practices reached supervisory and command levels.

1211. PLAINTIFF further alleges that the repeated communications between Scientology personnel and LAPD personnel, including communications concerning the collection and coordination of evidence for prosecution, occurred over an extended period and involved multiple officers, detectives, supervisors, and command personnel. PLAINTIFF alleges that this recurring institutional interaction supports an inference of notice concerning the risks identified above and is relevant to whether the CITY OF LA failed to implement adequate verification, supervisory review, training, and corrective measures.

1212. PLAINTIFF further alleges that information supplied through these recurring channels included allegations of criminal conduct as well as information concerning PLAINTIFF's protest, livestreaming, recording, and other constitutionally protected expressive activity.

1213. PLAINTIFF alleges that GOMEZ subsequently incorporated substantially similar characterizations of Scientology protesters, PLAINTIFF's activism, livestreaming, repeated police encounters, and alleged motive into the September 6, 2024 warrant application seeking access to more than seven months of PLAINTIFF's private digital information.

1214. PLAINTIFF alleges that the foregoing practice was a moving force behind the Fourth Amendment and First Amendment injuries alleged in this action because information arising from or reinforced through these recurring private-government channels was incorporated into the investigation and warrant process without adequate independent verification or consideration of materially contrary evidence.

**THEORY B — Persistent Practice of Acting on Private Accusations Without Adequate Independent Probable-Cause Review**

1215. PLAINTIFF separately alleges a recurring LAPD practice of acting upon accusations and PPA requests supplied by private persons and Scientology security personnel without adequate independent assessment of materially contrary or exculpatory information.

1216. The factual allegations incorporated above identify repeated incidents in which LAPD personnel received private accusations concerning PLAINTIFF, discussed the evidentiary requirements for arrests or prosecutions, received videos and witness information from Scientology personnel, and continued investigative or enforcement activity despite contrary information or questions raised by responding officers.

1217. PLAINTIFF alleges these prior incidents as evidence relevant to custom, notice, supervision, investigative practice, and deliberate indifference, and does not seek in this action to recover duplicative damages for arrests or seizures expressly identified elsewhere in this Complaint as the subject of separate litigation.

1218. PLAINTIFF alleges that the same alleged deficiency in independent verification was relevant to the investigation underlying the September 6, 2024 warrant, where information pointing toward PLAINTIFF as a recurring swatting victim existed alongside information portraying his repeated police encounters and protected livestreaming activity as circumstances supporting suspicion.

1219. PLAINTIFF alleges that this recurring practice contributed to the constitutional injuries asserted in this action by permitting materially adverse private allegations to enter and remain within PLAINTIFF's investigative

history without adequate consideration of contrary or exculpatory information before further governmental action was taken.

**THEORY C — Failure to Train, Supervise, and Correct Known Constitutional Risks**

1220. PLAINTIFF alleges that CITY OF LA maintained or permitted deficiencies in training, supervision, and correction concerning constitutional risks arising from:

a. reliance upon information supplied by interested private parties without adequate independent verification;
b. consideration of readily available exculpatory or contradictory video and other evidence;
c. preparation and supervisory review of warrant applications, including the obligation not to deliberately or recklessly present materially false or incomplete probable-cause information;
d. the First Amendment right to protest, criticize, record, livestream, and document police activity without retaliation; and
e. investigation of recurring false emergency reports, including preservation, cross-referencing, and use of available digital and provider evidence before treating an apparent victim of repeated swatting as a suspected perpetrator and seeking broad access to that person's electronic devices.
f. interpretation and enforcement of temporary street- and sidewalk-closure permits affecting traditional public fora;
g. distinguishing vehicular street closures from lawful pedestrian exclusion from public sidewalks;

h. determining whether a private event organizer or private security personnel possessed lawful authority to exclude protesters from public streets or sidewalks;

i. avoiding viewpoint-based or selectively enforced restrictions where ordinary pedestrians were permitted access while known protesters were excluded or threatened with arrest; and

j. requiring officers to verify the operative permit and its actual terms before threatening arrest for trespass or disturbing the peace based upon a protester's refusal to leave a public forum.

1221. PLAINTIFF alleges that the recurring incidents, communications, investigations, supervisory involvement, and protest-related enforcement practices described above provided notice to identified LAPD supervisory and command personnel of the risk that inadequate verification, investigation, warrant review, and protection of First Amendment activity could result in constitutional violations.

1222. PLAINTIFF further alleges that, before September 6, 2024, LAPD's knowledge of recurring false emergency reports involving PLAINTIFF was not limited to a single officer or isolated incident.

1223. HERNANDEZ, Cassandra Roscher, VALENZUELA, and other LAPD personnel had personally encountered PLAINTIFF during firearm-related emergency responses arising from reports concerning PLAINTIFF.

1224. Before the September 6, 2024 warrant application, LAPD also maintained CAD instructions expressly recognizing recurring swatting threats at Scientology locations, PLAINTIFF repeatedly advised LAPD that he was being swatted, and LAPD independently determined that the May 27, 2024 firearm report involving PLAINTIFF was a swatting.

1225. PLAINTIFF alleges that, despite the CITY OF LA's existing notice concerning recurring swatting and the need to distinguish victims from

perpetrators, the challenged investigative and warrant practices continued, culminating in the September 6, 2024 warrant and the subsequent forensic examination and duplication of PLAINTIFF's cellular phones and private digital information.

1226. PLAINTIFF alleges that these pre-warrant circumstances support an inference that LAPD personnel had notice of a substantial possibility that PLAINTIFF was a recurring victim of false emergency reports rather than their originator.

1227. On February 11, 2025, Cassandra Roscher and VALENZUELA subsequently participated as reporting employees in another LAPD investigation in which PLAINTIFF was expressly classified as the victim of a false report of emergency services.

1228. PLAINTIFF alleges the February 11, 2025 report as evidence that the recurring swatting pattern continued and was subsequently expressly documented by LAPD, not as notice preceding the September 6, 2024 warrant.

1229. PLAINTIFF alleges that the pre-warrant pattern made the risk of constitutional injury neither isolated nor unforeseeable and placed responsible LAPD personnel on notice of the need for appropriate investigation, documentation, training, supervision, and corrective measures.

1230. PLAINTIFF does not allege that HERNANDEZ, Cassandra Roscher, or VALENZUELA is individually liable merely because each participated in or responded to a swatting incident.

1231. Their involvement is alleged in this Monell theory as evidence of LAPD's institutional knowledge.

1232. PLAINTIFF alleges that, despite the notice described above, CITY OF LA did not implement or enforce adequate training, supervision, review, or corrective measures concerning the identified constitutional risks.

1233. PLAINTIFF alleges that the customs, practices, and training or supervisory deficiencies identified above were a moving force behind the constitutional injuries asserted in this action, including the allegedly retaliatory investigation, the September 6, 2024 warrant application, the resulting forensic search and duplication of PLAINTIFF's private digital information, and the related interference with PLAINTIFF's protected expressive activity.

**E. FIFTH CLAIM FOR RELIEF**

**California Bane Act — Cal. Civ. Code § 52.1**

**Against Defendants PEREZ, WILSON, OLSEN, GOMEZ, WALTERS, ROLON, JACQUIN, and FESPERMAN in Their Individual Capacities; SOSA, DOE 1 GRILL, DOE 2 CEMENT WORKER, DOE 3 PHONE, DOE 4 TRENCHCOAT, D'AMATO and DOE 5 GIJANE as Private Individuals; OPSINC SECURITY, KRAUSKOPF, BMS, CSCCI, CSWUS, and CSLA as Private Entities; and DOE DEFENDANTS 6–50.**

1234. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1235. PLAINTIFF brings this claim pursuant to California Civil Code § 52.1 against the named Defendants and presently unidentified DOE DEFENDANTS 6-50 whose own conduct, by threat, intimidation, coercion, or intentional application of force, interfered or attempted to interfere with PLAINTIFF's exercise or enjoyment of rights secured by the Constitution or laws of the United States or California.

1236. PLAINTIFF alleges the following conduct under this claim:

a. The seizure, prolonged retention, and subsequent forensic search of PLAINTIFF's cellular phones following the July 10, 2024 swatting incident;

b. ROLON's October 13, 2024 physical interference and threats during PLAINTIFF's protest and recording activity on or adjacent to a public street and sidewalk;

c. JACQUIN's and FESPERMAN's November 17, 2024 threats to arrest PLAINTIFF under PC § 415 unless he left the public sidewalk;

d. DOE 1 GRILL's May 10, 2024 overturning of PLAINTIFF's protest table and grill, spilling food and damaging equipment, and the accompanying intimidation described herein;

e. DOE 2 CEMENT WORKERS June 3, 2024 threatening gestures toward PLAINTIFF while he protested, recorded, and questioned the cement work;

f. The planter installation and maintenance attributed to BMS that physically excluded protesters from the easement previously used for protest and food distribution;

g. DOE 3 PHONE's October 10, 2024 striking of PLAINTIFF's hand and cellular phone, taking control of the cellular phone, stopping the livestream, and refusing its return; and

h. SOSA's, DOE 4 TRENCHCOAT's, and DOE 5 GIJANE's November 23, 2024 physical contact with PLAINTIFF while following him and directing him away from the public sidewalk.

1237. PLAINTIFF alleges OPSINC's responsibility for the conduct of DOE 3 PHONE, SOSA, and DOE 5 GIJANE within the scope of their employment, as specifically described below

1238. As to PEREZ, PLAINTIFF alleges that PEREZ personally seized PLAINTIFF's cellular phones after no reported firearm had been located, after

PLAINTIFF repeatedly asserted that he was the victim of a swatting, objected to the deprivation, and identified the cellular phones and livestream as contemporaneous evidence bearing upon the falsity of the emergency report.

1239. As to WILSON, PLAINTIFF alleges that WILSON reviewed PLAINTIFF's YouTube and livestreaming activity with OLSEN before directing PEREZ to seize the cellular phones, notwithstanding information that PLAINTIFF claimed to be a recurring swatting victim, that no reported firearm had been located, and that the devices contained contemporaneous evidence of PLAINTIFF's activities.

1240. As to OLSEN, PLAINTIFF alleges that OLSEN participated in the investigation and review of PLAINTIFF's livestreaming activity immediately preceding the seizure and knew or had reason to know that the devices were being used for recording, communication, livestreaming, and preservation of evidence.

1241. As to GOMEZ, PLAINTIFF alleges that GOMEZ subsequently obtained the September 6, 2024 warrant authorizing forensic examination of PLAINTIFF's cellular phones and incorporated PLAINTIFF's Scientology protest, livestreaming, publication, and social-media activity into the investigative narrative supporting the search.

a. PLAINTIFF further alleges that GOMEZ knew that PLAINTIFF had repeatedly claimed to be a swatting victim and that his recordings could contain contemporaneous and potentially exculpatory evidence, yet sought authorization to search extensive private expressive, communications, and digital information contained on the devices.

b. PLAINTIFF alleges that the seizure and continued deprivation were not merely incidental property interferences.

c. The cellular phones were the principal devices through which PLAINTIFF livestreamed, recorded police activity, communicated with

others, published protected expression, documented his location and conduct, and preserved evidence concerning the repeated emergency calls directed against him.

1242. As to ROLON, on October 13, 2024, ROLON encountered PLAINTIFF while PLAINTIFF was livestreaming and engaged in Scientology protest activity on or adjacent to a public street and sidewalk near 4810 Sunset Boulevard.

a. PLAINTIFF repeatedly asserted that he was on a public sidewalk, requested the permit or other legal authority allegedly restricting his access, objected to being removed from the area, and expressly asserted his right to continue protesting.

b. During that encounter, ROLON made physical contact with PLAINTIFF on two occasions while directing him away from the area. PLAINTIFF immediately and repeatedly objected to ROLON touching him.

c. ROLON also removed or displayed his baton during the confrontation and threatened PLAINTIFF with arrest if PLAINTIFF did not comply with the direction to leave.

d. PLAINTIFF alleges that he was not physically attacking ROLON, was not attempting to flee, and posed no immediate physical threat requiring the application or threatened application of force.

e. PLAINTIFF thereafter requested a supervisor and immediately reported that ROLON had physically touched him twice and displayed his baton while interfering with PLAINTIFF's protest activity. PLAINTIFF requested a formal complaint.

f. PLAINTIFF alleges that ROLON's physical contact, display of a baton, and threatened arrest constituted threat, intimidation, coercion, and physical interference directed toward causing PLAINTIFF to cease or

relocate his protected activity and to submit to the restriction imposed upon his use of the public area.

g. PLAINTIFF alleges specific intent based upon ROLON's contemporaneous knowledge that PLAINTIFF was asserting his right to protest and remain on a public sidewalk, PLAINTIFF's repeated objections to ROLON's physical interference, and ROLON's continuation of the challenged conduct through physical contact, display of his baton, and threat of arrest while directing PLAINTIFF away from the area.

1243. As to WALTERS, PLAINTIFF alleges that, as Commanding Officer of LAPD NE Div., WALTERS personally participated in recurring command-level communications concerning Scientology events, anticipated protest activity, public access, enforcement issues, and LAPD responses involving PLAINTIFF and other Scientology protesters.

1244. WALTERS's participation included directing additional patrol activity and requesting updates concerning the March 31, 2024 Scientology event, receiving AUSTIN's report that Gutierrez had moved protesters across Fountain Avenue, and directing staff on June 2, 2024 to arrange a meeting involving Richardson, WALTERS, AUSTIN, Oreb, and additional LAPD personnel concerning Richardson's requests for police intervention and enforcement.

1245. On June 2–3, 2024, WALTERS received Detective Ventura's communication stating that Scientology could not obstruct public access to a sidewalk, street, or curb without BSS authorization and that an unauthorized obstruction of public space would be illegal. WALTERS personally acknowledged that communication by replying, "Copy."

1246. As to PEREZ and WILSON, and to the extent established by the allegations concerning OLSEN's own participation, PLAINTIFF alleges specific intent

based upon their knowledge of PLAINTIFF's repeated assertions that he was a swatting victim, his objections to the deprivation of his cellular phones, the expressive and evidentiary functions of those devices, and their respective affirmative participation in the challenged deprivation.

1247. As to GOMEZ, PLAINTIFF alleges specific intent based upon her knowledge of PLAINTIFF's Scientology protest and livestreaming activity, her knowledge of the recurring swatting allegations involving PLAINTIFF, her knowledge that the recordings could contain contemporaneous evidence, and her incorporation of PLAINTIFF's protest, publication, livestreaming, and social-media activity into the investigative narrative supporting the challenged forensic search.

1248. As to WALTERS, PLAINTIFF alleges liability only to the extent his own participation, direction, authorization, knowledge, and causal conduct establish the specific intent required by California Civil Code § 52.1 in connection with a constitutional deprivation alleged herein, and not merely because of his supervisory rank.

1249. As to JACQUIN and FESPERMAN, PLAINTIFF alleges that each personally confronted PLAINTIFF while he was protesting Scientology and threatened him with arrest under PC § 415 unless he left the public sidewalk. PLAINTIFF left because of the threatened arrest.

1250. PLAINTIFF alleges that JACQUIN and FESPERMAN made the threat of arrest for the purpose of compelling PLAINTIFF to leave the public sidewalk and thereby intentionally interfered with PLAINTIFF's exercise of the First Amendment rights alleged herein.

1251. As to D'AMATO, PLAINTIFF alleges that D'AMATO monitored PLAINTIFF's livestreams and location in real time and repeatedly contacted, represented that he contacted, or encouraged others to contact law

enforcement with allegations that PLAINTIFF possessed firearms, narcotics, or was otherwise engaged in criminal conduct.

a. PLAINTIFF alleges that D'AMATO's conduct was not merely criticism, commentary, or a good-faith report of suspected crime. PLAINTIFF alleges that D'AMATO encouraged reports designed to generate law-enforcement intervention against PLAINTIFF, offered a monetary reward for PLAINTIFF's arrest, and, immediately before an armed law-enforcement stop, predicted that PLAINTIFF would be stopped and identified the particular law-enforcement station that would conduct the stop.

b. PLAINTIFF alleges that D'AMATO acted with the specific purpose of causing or attempting to cause coercive law-enforcement intervention against PLAINTIFF and thereby interfering with PLAINTIFF's freedom of movement, bodily liberty, protest, recording, livestreaming, and other protected expressive activity.

c. The resulting and threatened armed police interventions caused PLAINTIFF fear, anxiety, emotional distress, heightened vigilance, interference with his sense of personal safety, and chilling of his protected activities. PLAINTIFF alleges liability under California Civil Code § 52.1 based upon D'AMATO's own intentional conduct and not merely upon statements or opinions concerning PLAINTIFF.

d. As to D'AMATO, PLAINTIFF further alleges that D'AMATO publicly offered a monetary reward for the slashing of PLAINTIFF's tires while simultaneously monitoring and discussing PLAINTIFF's activities and location online.

e. Tires belonging to PLAINTIFF and PLAINTIFF's girlfriend were subsequently slashed, including a January 5, 2025 incident recorded on video involving an individual known as LVC. D'AMATO later

livestreamed concerning the damage, while LVC participated in or commented through D'AMATO's online channel during the relevant period.

f. PLAINTIFF alleges that D'AMATO's offer of money for damage to PLAINTIFF's property, considered together with his efforts to generate law-enforcement intervention against PLAINTIFF, constituted intimidation and coercive conduct intended to interfere with PLAINTIFF's freedom of movement, protest, livestreaming, and continued presence at locations where he engaged in protected activity.

g. PLAINTIFF reasonably feared that D'AMATO's viewers or associates would act upon such statements, particularly after vehicles associated with PLAINTIFF were actually damaged. The conduct caused PLAINTIFF fear, anxiety, heightened vigilance, emotional distress, and apprehension that continued protest or livestreaming could result in additional attacks upon his person or property.

1252. As to KRAUSKOPF, PLAINTIFF incorporates the factual allegations concerning her personal identification of PLAINTIFF to LAPD, requests for officer briefings and coordinated enforcement, and efforts to obtain restrictions on protesters' access to public streets and sidewalks.

a. PLAINTIFF alleges that KRAUSKOPF knew of his protected speech, protest, recording, and livestreaming and had received notice of the permit limitations preserving pedestrian access.

b. Her continued pursuit of exclusionary enforcement, considered with her PLAINTIFF-specific communications and the other facts alleged, supports PLAINTIFF's allegation that she specifically intended to interfere with his exercise of those rights.

c. PLAINTIFF alleges, on information and belief, that KRAUSKOPF knowingly participated in procuring the coercive exclusion described in

the factual allegations, including the use of threatened arrest to compel PLAINTIFF to leave public areas where he was engaged in protected activity.

d. PLAINTIFF bases this inference on her requests for coordinated enforcement, her identification of PLAINTIFF for officer briefings, her knowledge of the limits on pedestrian exclusion, and the related enforcement conduct alleged herein.

e. The threatened exercise of police authority compelled PLAINTIFF to leave and interrupted his protected activities. PLAINTIFF alleges that KRAUSKOPF's knowing participation was a substantial factor in causing that interference and the resulting emotional distress and other injuries alleged in this Complaint.

1253. As to DOE 2 CEMENT WORKER, PLAINTIFF alleges that, on the morning of June 3, 2024, this defendant was performing work inside the BMS building when PLAINTIFF questioned the cement work while protesting in the easement.

a. LAPD officers had directed protesters to use that easement the preceding day. DOE 2 CEMENT WORKER gestured for PLAINTIFF to be quiet and immediately followed that gesture with a throat-cutting gesture directed toward PLAINTIFF.

b. PLAINTIFF alleges that the combined gestures threatened physical violence for continuing his protest, recording, and questioning.

c. The worker was physically nearby and appeared capable of carrying out the threatened violence, causing PLAINTIFF reasonably to fear for his safety.

d. Unidentified Scientology security guards then approached and stood immediately beside PLAINTIFF in the easement before accusing him of striking them.

e. PLAINTIFF denies striking the guards and ROSENDO appeared at the scene in a police vehicle but did not approach or speak with PLAINTIFF.

f. Following the guards' accusations and ROSENDO's appearance, PLAINTIFF feared that he would be arrested and left the immediate area.

g. PLAINTIFF alleges that DOE 2 CEMENT WORKER intended through the threatening gestures to compel him to stop or limit his expressive activity.

h. The threat caused fear and emotional distress and contributed to the interruption of his protest; the morning's encounter preceded service of the restraining order later on June 3, 2024.

1254. As to DOE 1 GRILL, PLAINTIFF alleges that, on May 10, 2024, this defendant approached PLAINTIFF's protest and food-distribution area and intentionally overturned his table and grill, spilling food and damaging the grease pan.

a. DOE 1 GRILL then continued walking while David Sanchez and two other men stood nearby and stared at PLAINTIFF.

b. The men had parked in a private Scientology parking lot near the vehicle displaying Strike Out Against Drugs graphics associated with Sanchez and obtained food from the private Scientology café.

c. PLAINTIFF alleges these circumstances as evidence of their access to Scientology facilities, without alleging that access alone establishes an employment or agency relationship.

d. PLAINTIFF understood the overturning of his equipment and the accompanying men's positioning and staring as intimidation directed at his continued protest and food-distribution activity.

e. The incident caused PLAINTIFF to experience a panic attack requiring an ambulance response and another protester followed the men as they departed and reported that bottles were thrown at him.

f. PLAINTIFF alleges this conduct based on that protester's account and does not identify DOE 1 GRILL as the person who threw the bottles absent further identification.

g. PLAINTIFF observed no intervention by Scientology security to stop the conduct. To PLAINTIFF's knowledge, Scientology security neither provided surveillance footage of the attacks to LAPD nor independently reported the attacks.

h. PLAINTIFF separately called 911, and LAPD took a report concerning the bottle-throwing incident.

i. PLAINTIFF alleges that DOE 1 GRILL's intentional use of force against his protest equipment was intended to intimidate him and interfere with his continued protest and expressive activity, causing property damage, fear, and emotional distress.

j. PLAINTIFF attributes the overturning of the equipment to DOE 1 GRILL and the other men's conduct to each participant as specifically described above.

1255. As to BUILDING MANAGEMENT SERVICES ("BMS"), PLAINTIFF alleges on information and belief that BMS participated in maintaining the planter installation that physically excluded protesters from the portion of the easement previously used for protest and food distribution.

a. This allegation is based on the ACE hearing notice identifying BMS as the party contesting Citation No. IE0021241 and the subsequent correspondence identifying BMS in the planter-enforcement matter.

b. After service of the restraining order and removal of the protest supplies, planters were immediately installed in the cleared area.

c. PLAINTIFF alleges that the timing, location, and physical effect of the installation support an inference that the responsible parties intended to prevent Scientology protesters from returning to that area.

d. PLAINTIFF alleges BMS's responsibility for its own participation in the challenged installation and maintenance.

e. DOE 2 CEMENT WORKER's performance of work inside the BMS building is alleged as a separate factual connection;

1256. As to the SCIENTOLOGY ENTITY DEFENDANTS, PLAINTIFF alleges liability only to the extent that an employee, security officer, agent, or representative acting within the scope of employment or agency committed or participated in a violation of California Civil Code § 52.1 alleged herein.

1257. Where the presently available records identify the responsible private actor only as acting for "Scientology" and do not identify the particular corporate principal, PLAINTIFF pleads liability against the responsible SCIENTOLOGY ENTITY DEFENDANT or DEFENDANTS in the alternative.

1258. As to DOE 3 PHONE, PLAINTIFF alleges that this defendant intentionally used physical force against PLAINTIFF's hand and cellular phone, took control of the phone, stopped the livestream, and refused PLAINTIFF's request for its return during the October 10, 2024 encounter. PLAINTIFF alleges that the sequence of the physical contact, control of the device, and termination of the livestream demonstrates an intent to stop PLAINTIFF from recording and broadcasting his protest and the encounter. This conduct interrupted PLAINTIFF's expressive activity and deprived him of control and use of his cellular phone during the incident.

1259. As to SOSA, DOE 4 TRENCHCOAT, and DOE 5 GIJANE, PLAINTIFF alleges that each followed him and made physical contact with him while directing him away from the public sidewalk on November 23, 2024.

PLAINTIFF repeatedly objected to being touched and requested the authority for his exclusion while observing other pedestrians being permitted to pass. PLAINTIFF alleges that the physical contact accompanying the directions to leave was intended to compel him to stop using that location for protest and livestreaming. PLAINTIFF attributes the physical contact and accompanying conduct to each participant as described in the factual allegations.

1260. As to OPSINC, PLAINTIFF alleges employer liability for the violations of California Civil Code section 52.1 committed by DOE 3 PHONE, SOSA, and DOE 5 GIJANE as alleged above. PLAINTIFF alleges that these guards were acting within the scope of their employment while performing security duties at their assigned locations and confronting PLAINTIFF in connection with those duties. PLAINTIFF seeks to hold OPSINC responsible under the doctrine of respondeat superior for the resulting harm. PLAINTIFF does not presently attribute DOE 4 TRENCHCOAT's conduct to OPSINC.

1261. As to DOE DEFENDANTS 6-50, PLAINTIFF alleges liability only against those presently unidentified Defendants whose own intentional conduct satisfies the requirements of California Civil Code § 52.1. PLAINTIFF will substitute their true names and particular conduct when learned through discovery.

1262. PLAINTIFF alleges liability against each Defendant only for that Defendant's own conduct, knowledge, intent, participation, authorization, direction, or other causally related acts or omissions.

1263. As a direct and proximate result of the conduct alleged above, PLAINTIFF suffered interference with his constitutional rights, loss of use of property, interference with recording, livestreaming and communication, invasion of privacy, interference with protected protest activity, emotional distress, and other damages alleged herein.

1264. PLAINTIFF seeks all remedies available under California Civil Code § 52.1 against those Defendants whose own conduct satisfies the statute.

## F. SIXTH CLAIM FOR RELIEF

**Civil Conspiracy to Deprive Constitutional Rights**
**Against Defendants GOMEZ, TORRES, HALL, ROSENDO, HERNANDEZ, PEDERSEN, HUBER, OSMON, KRAUSKOPF, WHEELER, MOXON and DOE DEFENDANTS 6-50, in Their Individual Capacities; and BMS, CSCCI, CSWUS, and CSLA**

1265. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1266. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 based upon an alleged agreement and joint action between government actors and private actors that resulted in the deprivation of PLAINTIFF's constitutional rights.

1267. The agreement between the Scientology Entity Defendants, HUBER, PEDERSEN, MOXON, KRAUSKOPF, and LAPD officers including GOMEZ, TORRES, AUSTIN, and ROSENDO had as its specific object the suppression of Plaintiff's First Amendment-protected protest activity through retaliatory investigation, selective PPA enforcement, malicious prosecution, and the seizure of Plaintiff's electronic devices based on the four agreements;

a. Major Crimes instructing Scientology personnel to continue making reports;
b. officers coordinating the mechanics of arrest with Scientology security before contacting Plaintiff;
c. Gomez's warrant application incorporating Plaintiff's protected speech into the probable-cause narrative; and

d. Torres's transmission of Scientology-related reports to West Virginia prosecutors.

1268. PLAINTIFF alleges that the repeated PLAINTIFF-specific communications, exchange of evidence, requests for governmental action, investigative activity, and resulting governmental conduct alleged throughout this Complaint provide circumstantial evidence from which a meeting of the minds and common objective may be inferred.

1269. PLAINTIFF alleges, based upon the facts and circumstantial evidence alleged herein, that the following Defendants knowingly participated in the alleged common objective.

1270. As to GOMEZ, PLAINTIFF alleges that GOMEZ received PLAINTIFF-specific information and evidence from Scientology personnel, participated in the continuing investigation concerning PLAINTIFF, and subsequently sought the September 6, 2024 warrant in which PLAINTIFF's protest, livestreaming, publication, repeated police encounters, and alleged motive were incorporated into the investigative narrative.

1271. As to TORRES, PLAINTIFF alleges that TORRES received information, witnesses, statements, and extensive video material from Scientology personnel concerning PLAINTIFF and subsequently transmitted PLAINTIFF-related investigative material to West Virginia authorities, including what TORRES described as "the three police reports that were taken against Scott Hochstetter for the Church of Scientology."

1272. As to HALL, PLAINTIFF alleges that HALL participated in follow-up investigation of allegations concerning PLAINTIFF's Scientology protest activity and prepared investigative material characterizing PLAINTIFF's conduct and protest activity as alleged in the factual allegations above.

1273. As to ROSENDO, PLAINTIFF alleges that ROSENDO, while acting in a supervisory capacity, facilitated a PPA sought by Scientology personnel after

the responding officer had initially declined to make the arrest, stating: "Alright, if you want to do a PPA, that's fine. We'll do a PPA."

1274. As to HERNANDEZ, PLAINTIFF alleges that HERNANDEZ was repeatedly included in PLAINTIFF-specific communications concerning protest activity and requests for law-enforcement action, sought information concerning PLAINTIFF's West Virginia probation, and suggested that West Virginia authorities be notified concerning the California arrest.

a. On May 20, 2024, HERNANDEZ expressly acknowledged that LAPD had engaged in 'many discussions with Scientology' and 'many internal discussions' concerning enforcement and protesters' First Amendment rights.

b. PLAINTIFF alleges that the totality of these repeated PLAINTIFF-specific communications supports an inference of knowing participation in the alleged joint activity rather than mere involvement in an isolated police response.

1275. As to PEDERSEN, PLAINTIFF alleges that PEDERSEN repeatedly supplied PLAINTIFF-specific information and evidence to LAPD personnel, including GOMEZ and TORRES, communicated concerning prosecution and PLAINTIFF's West Virginia probation, and stated that she needed something effective done to get PLAINTIFF "off the streets or out of this area."

1276. As to HUBER, PLAINTIFF alleges that HUBER repeatedly made reports concerning PLAINTIFF's protected protest activity, supplied information concerning PLAINTIFF to LAPD, communicated directly with GOMEZ and other LAPD personnel, and participated in the recurring channels of communication between Scientology security and LAPD described in the factual allegations above.

1277. As to OSMON, PLAINTIFF alleges that, while serving as Security Director for CSLA, he repeatedly communicated and coordinated with LAPD

concerning PLAINTIFF and other Scientology protesters, requested police intervention and enforcement against PLAINTIFF, and participated in joint efforts to characterize and restrict PLAINTIFF's protected protest activity.

1278. As to KRAUSKOPF, PLAINTIFF incorporates the factual allegations concerning her communications as Head of Legal for CSWUS with LAPD, BSS, the LACA's office, and CD13 regarding event permits, street and sidewalk access, anticipated protests, security planning, requests for police personnel, and reported swatting calls.

1279. PLAINTIFF alleges that those communications gave KRAUSKOPF notice of the vehicle-only limitations in the event permits and the CITY OF LA's stated restrictions on excluding pedestrians and demonstrators from public areas. Despite that notice, she continued seeking changes to permit language and enforcement practices that would facilitate excluding protesters.

1280. PLAINTIFF alleges that her privatization requests and characterizations of protesters, considered with the other facts pleaded, support an inference that her objective included restricting access because of their opposition to Scientology.

1281. KRAUSKOPF personally identified PLAINTIFF to LAPD, supplied information concerning his anticipated protest activity, requested officer briefings and coordinated responses, and communicated with officers concerning the results of prior enforcement.

1282. PLAINTIFF alleges that these acts, considered together with the governmental conduct described in the factual allegations, constituted her knowing participation in the alleged common objective of using governmental authority to restrict PLAINTIFF's protected protest, recording, and livestreaming.

1283. PLAINTIFF relies on the content, sequence, and relationship of these communications to the challenged enforcement as evidence of

KRAUSKOPF's knowledge, purpose, and participation in the alleged joint conduct.

1284. The subsequently pleaded October 2024 requirements preserving public sidewalk access remain part of that chronology and context.

1285. PLAINTIFF alleges that her participation contributed to the exclusions and resulting interference with his protected activities described herein.

1286. As to WHEELER and MOXON, PLAINTIFF incorporates the factual allegations concerning the June 3, 2024 restraining-order proceeding and related LAPD involvement. PLAINTIFF alleges that their purpose was to obtain and use restrictions on his presence near Scientology property to suppress his criticism, protest, recording, livestreaming, and community food distribution.

1287. WHEELER supplied the disputed accounts of PLAINTIFF's conduct underlying the petition. MOXON presented those accounts and attributed Comer's third-party statements to PLAINTIFF as evidence of a purported conspiracy to murder MOXON. PLAINTIFF alleges that these presentations knowingly mischaracterized his conduct and his discussion of statements that he had not adopted and had disavowed.

1288. PLAINTIFF alleges that WHEELER and MOXON knowingly pursued the common objective of excluding him from the protest area through judicial restrictions and police involvement. In support of the alleged improper purpose, PLAINTIFF relies on the previously pleaded discrepancies in WHEELER's accounts, the omission of material context from video evidence and the attribution of Comer's statements to PLAINTIFF.

1289. The circumstances supporting that inference include three officer's departure from the Scientology event area, someone placed the restraining order on PLAINTIFF's van, and then when plaintiff approached the van three LAPD officers who had been circling about outside the permitted event area came to

PLAINTIFF and informed him he can not be within 100 yards and that PLAINTIFF will be arrested if he returns.

1290. PLAINTIFF alleges that the LAPD does not serve restraining orders during overtime private security duty.

1291. PLAINTIFF alleges that the resulting exclusion interrupted his protected speech, protest, recording, and livestreaming and prevented him from personally supervising the equipment and supplies that remained at the location.

1292. PLAINTIFF seeks damages for the constitutional deprivation allegedly caused by the joint conduct, including resulting emotional distress and interference with his activities.

1293. As to CSCCI, CSWUS, and CSLA, PLAINTIFF alleges that each entity participated through the conduct of its respective security, legal, public-affairs, or other personnel alleged herein.

a. Entity liability is alleged only to the extent the challenged conduct resulted from each entity's own policy, custom, practice, authorization, institutional decision-making, or joint action with governmental actors.

1294. As to BMS, PLAINTIFF alleges that BMS participated in the planter-related conduct and resulting administrative enforcement dispute concerning the public right-of-way.

a. A December 10, 2024 Administrative Citation Enforcement notice concerning Citation No. IE0021241 was addressed to BMS, care of Jeanne M. Reynolds, and stated that the addressee had requested an administrative hearing concerning the citation.

1295. The accompanying ACE email transmitted the hearing materials to William Delvac and Jennifer KRAUSKOPF.

1296. PLAINTIFF alleges that BMS's identification as the party contesting the citation, together with the other facts alleged concerning the planter

installation, maintenance, and enforcement, supports an inference that BMS knowingly participated in the joint activity alleged herein.

1297. As to DOE DEFENDANTS 6-50, PLAINTIFF alleges that presently unidentified DOE DEFENDANTS 6-50 knowingly joined or participated in the alleged agreement or joint activity and committed acts in furtherance of the alleged common objective.

  a. PLAINTIFF will substitute their true names and particular conduct when learned through discovery.

1298. PLAINTIFF alleges that overt acts undertaken in furtherance of the alleged common objective included PLAINTIFF-specific communications and evidence sharing; recurring requests for enforcement and prosecutorial action; preparation and transmission of investigative reports; communications concerning PLAINTIFF's West Virginia probation; PPA activity; the installation, maintenance, and administrative enforcement of the planters restricting the public right-of-way; the use of the June 3, 2024 temporary civil-harassment restraining order and related LAPD involvement; and the subsequent investigation and warrant process alleged throughout this Complaint.

1299. PLAINTIFF alleges that the agreement and common objective are inferred from the totality, sequence, repetition, and interrelationship of the conduct alleged above and throughout the Complaint. PLAINTIFF does not contend that any single communication or act, standing alone, establishes the alleged conspiracy.

1300. PLAINTIFF alleges that the private Defendants acted under color of state law only insofar as the facts alleged establish that they jointly participated with government actors in conduct that caused or contributed constitutional deprivations alleged herein.

1301. PLAINTIFF does not allege that every communication between Scientology personnel and government officials was improper or that every government employee necessarily participated in the alleged conspiracy.

1302. PLAINTIFF alleges that the named and DOE DEFENDANTS 6-50 identified in this claim knowingly participated in the alleged joint activity described above and undertook acts in furtherance of that activity that caused or contributed to the constitutional deprivations alleged in this Complaint.

1303. As a direct and proximate result of the alleged conspiracy and resulting constitutional deprivations, PLAINTIFF suffered interference with protected expressive activity, loss of liberty and property interests, seizure and prolonged retention of his cellular phones, forensic examination of private digital information, and the other injuries and damages alleged herein.

1304. PLAINTIFF does not rely upon the filing, prosecution, or maintenance of the Wheeler civil-harassment proceeding, standing alone, as an overt act establishing the conspiracy alleged in this claim.

1305. Rather, PLAINTIFF alleges that the circumstances surrounding the proceeding, including the alleged coordination with LAPD, the manner in which the order was served and enforced, the evidence presented in support of the petition, and the subsequent judicial findings, are additional circumstantial evidence of the alleged joint action and common objective.

## G. SEVENTH CLAIM FOR RELIEF

**Fourth Amendment Excessive Force 42 U.S.C. § 1983**
**Against Defendants ROLON, VALENZUELA, and DOE DEFENDANTS 6-50, in Their Individual Capacities**

1306. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1307. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 against the following Defendants, based upon their own conduct and causal responsibility:

a. As to ROLON, PLAINTIFF alleges that on October 13, 2024, while acting under color of state law, ROLON personally applied physical force to PLAINTIFF on LRH Way, including by making physical contact with PLAINTIFF on two occasions while directing him to leave the street and sidewalk under threat of arrest and pulled out his batton;

b. As to VALENZUELA, PLAINTIFF alleges that on February 11, 2025, VALENZUELA handcuffed PLAINTIFF in an unusual and painful position, causing severe pain in PLAINTIFF's hand, including loss of sensation and numbness, as well as sharp pain that on different occasions radiates up PLAINTIFF's hand.

c. PLAINTIFF immediately shouted out in extreme pain from the handcuffs and made clear that the handcuffing was causing significant pain, despite PLAINTIFF's prior experience being handcuffed on numerous occasions.

d. PLAINTIFF continues to experience pain in the affected hand at unpredictable and recurring times.

1308. At the time of the challenged physical contact, PLAINTIFF alleges that he was not physically attacking an officer, was not attempting to flee, and posed no immediate physical threat to ROLON or another person.

1309. PLAINTIFF alleges that the physical force used by ROLON was unnecessary to accomplish any legitimate governmental purpose and was objectively unreasonable under the totality of the circumstances.

1310. PLAINTIFF alleges that the challenged force was objectively unreasonable and violated his rights secured by the Fourth Amendment.

1311. As a direct and proximate result of the conduct of ROLON, and the responsible DOE DEFENDANTS 6-50, PLAINTIFF suffered humiliation, emotional distress, interference with bodily integrity, loss of his right to protest on a public street and the other damages alleged in this Complaint.

## H. EIGHTH CLAIM FOR RELIEF

**Fourth Amendment Unreasonable Seizure and Nonconsensual Biometric Fingerprinting 42 U.S.C. § 1983**

**Against Defendants ROSENDO and DOE DEFENDANTS 6-50, in Their Individual Capacities**

1312. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1313. Plaintiff's fingerprinting constituted a physical intrusion and trespass under *Jones v. United States*, 565 U.S. 406 (2012), because officers made physical contact with Plaintiff's restrained hands using a biometric scanning device.

1314. The fingerprinting was unreasonable because:

a. Plaintiff was not under arrest;
b. officers had informed Plaintiff he was the *victim* of a swatting call
c. Plaintiff was handcuffed and verbally objected to the procedure
d. no warrant authorized the fingerprinting;
e. officers had no individualized suspicion that Plaintiff had committed a crime; and
f. The fingerprints were obtained for investigatory purposes unrelated to the swatting call of which Plaintiff was the victim."

1315. Supervisor ROSENDO personally observed or became aware of Plaintiff's objections while the fingerprinting proceeded and failed to intervene to stop the unconstitutional seizure.

1316. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 against the following Defendants, based upon their own conduct and causal responsibility:

1317. As to ROSENDO, based upon his presence during the fingerprinting procedure and, to the extent established by the evidence and discovery, his personal observation or knowledge of PLAINTIFF's objections and his authorization, direction, approval, knowing permission, participation, or failure to intervene in the continued fingerprinting procedure;

  a. PLAINTIFF does not seek to impose liability upon ROSENDO merely because of supervisory rank or position. Liability is alleged only to the extent his own conduct, knowledge, authorization, direction, participation, or failure to intervene establishes causal responsibility for the challenged conduct.

  b. ROSENDO arrived at the scene during the fingerprinting procedure, acted in a supervisory capacity, personally observed or became aware of PLAINTIFF's verbal objections and personally authorized, directed, approved, knowingly permitted, or failed to intervene in the challenged procedure despite possessing a realistic opportunity to prevent or terminate it.

1318. As to DOE DEFENDANTS 6-50, presently unidentified officers who personally performed, assisted in, directed, authorized, approved, or knowingly permitted the compelled fingerprinting procedure or, where applicable, knew that the challenged procedure was occurring and had a realistic opportunity to prevent or terminate it; and

  a. DOE DEFENDANTS 6-50, to the extent discovery identifies additional officers who personally participated in or were causally responsible for the challenged biometric collection or associated continued restraint.

b. PLAINTIFF will substitute the true names and particular conduct of DOE DEFENDANTS 6-50, when their identities are learned through discovery

1319. On March 25, 2024, PLAINTIFF was subjected to an armed law-enforcement detention following an emergency call in which officers subsequently informed PLAINTIFF that he was the victim of a swatting incident.

1320. PLAINTIFF was restrained in handcuffs with his hands behind his back when officers manipulated PLAINTIFF's hands and used a mobile electronic device in connection with obtaining PLAINTIFF's fingerprint information.

1321. Officers had informed PLAINTIFF that he was a victim of the reported incident and asked whether he wanted to complete victim-related paperwork.

1322. PLAINTIFF did not voluntarily consent to the collection of his fingerprints or biometric information.

1323. While PLAINTIFF's hands remained restrained behind his back, PLAINTIFF believed officers were taking his fingerprints and expressly and repeatedly objected to what they were doing.

1324. PLAINTIFF told officers that, if he was a victim, he should not remain restrained in handcuffs and objected to the continued procedure.

1325. PLAINTIFF alleges that officers nevertheless continued the procedure despite his express objections and performed an additional fingerprint reading.

1326. Because PLAINTIFF's hands were restrained behind his back, PLAINTIFF could not directly observe the device being used or visually confirm at the time precisely what officers were doing with his hands or whether the device had successfully captured his fingerprint information.

1327. At the time of the March 25, 2024 incident, PLAINTIFF therefore believed and suspected that officers were obtaining his fingerprints based upon what he experienced during the detention and expressly objected on that basis, but he

could not visually confirm the device or the completed biometric-capture procedure.

1328. In August 2026, PLAINTIFF reviewed video that he had contemporaneously recorded during the March 25, 2024 incident and discovered that the recording captured portions of the fingerprinting procedure and the device being used by officers.

1329. PLAINTIFF had not previously realized that his contemporaneous recording had visually captured the fingerprinting procedure and the device used during that procedure.

1330. PLAINTIFF alleges that his August 2026 review of the recording provided visual confirmation and corroborating evidence concerning conduct that PLAINTIFF had previously experienced and believed was occurring while his hands were restrained behind his back.

1331. PLAINTIFF alleges that the compelled fingerprinting, together with his continued physical restraint for purposes of obtaining biometric information over his express objections, was unreasonable under the totality of the circumstances and exceeded the permissible scope and justification of the detention.

1332. PLAINTIFF alleges that the compelled fingerprinting and associated continued physical restraint were objectively unreasonable under the circumstances and violated PLAINTIFF's rights secured by the Fourth Amendment of the United States Constitution.

1333. As a direct and proximate result of the conduct of ROSENDO and the responsible DOE DEFENDANTS 6-50, PLAINTIFF suffered interference with his bodily security and privacy, physical restraint, humiliation, emotional distress, and the other injuries alleged in this Complaint.

## I. NINTH CLAIM FOR RELIEF

**Municipal Liability 42 U.S.C. § 1983 (Monell)**

**Against Defendant CITY OF SLO Only**

1334. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1335. PLAINTIFF brings this claim pursuant to 42 U.S.C. § 1983 against the following Defendant, based upon the municipality's own policies, customs, practices, deliberate indifference, and other legally sufficient bases for municipal liability:

1336. As to CITY OF SLO, based upon the policies, customs, practices, policies of inaction, deliberately indifferent failures to train or supervise, ratification, or other legally sufficient municipal conduct alleged herein.

1337. SLOPD maintained no written policy governing the handling of active recording devices during protective sweeps of vehicles.

1338. The need for such a policy was obvious because officers routinely encounter recording devices during vehicle stops, and the failure to have a policy was highly likely to result in the destruction or compromise of contemporaneous exculpatory evidence, a Fourth Amendment injury.

1339. SLOPD's failure to adopt such a policy caused SLOPD officers to reposition Plaintiff's tripod-mounted livestreaming telephone without documenting its original location or preserving its recording, thereby destroying contemporaneous evidence of Plaintiff's innocence.

1340. On July 10, 2024, SLOPD personnel conducted an armed felony stop of PLAINTIFF in response to an emergency report alleging that PLAINTIFF possessed or displayed a machine gun from his recreational vehicle.

1341. SLOPD personnel detained PLAINTIFF at gunpoint, placed him in handcuffs, entered and cleared his recreational vehicle, and located no firearm matching the reported threat.

1342. PLAINTIFF repeatedly informed responding personnel that he believed he was the victim of another swatting incident, described prior similar firearm reports, and advised officers that contemporaneous livestream and telephone information existed that could assist in determining whether the emergency report was false.

1343. During SLOPD's entry and clearing of the recreational vehicle, PLAINTIFF alleges that ETHERTON removed or repositioned a cellular phone that had been mounted on a tripod inside the vehicle, connected to power and a microphone, and actively livestreaming police activity.

1344. PLAINTIFF alleges that the device was moved outside the recreational vehicle and repositioned so that it no longer recorded the interior police activity in the manner in which PLAINTIFF had positioned it.

1345. PLAINTIFF alleges, subject to discovery concerning the City's actual policies and training, that CITY OF SLO maintained, permitted, or failed to adequately train and supervise SLOPD personnel concerning the constitutional limits governing interference with citizens' actively recording or livestreaming devices during police searches, protective sweeps, and other law-enforcement operations.

1346. PLAINTIFF further alleges, subject to discovery, deficiencies in training, supervision, or policy concerning preservation of the original location and condition of recording devices and other personal property encountered during joint-agency police operations.

1347. Immediately following the July 10 incident, PLAINTIFF went to SLOPD and attempted to make a complaint concerning the armed felony stop, the reported swatting, and the seizure of his cellular phones.

1348. The first officer who spoke with PLAINTIFF identified himself as the watch commander and initially stated that the officers involved in the incident had already gone home.

1349. A second officer later came outside to receive PLAINTIFF's complaint, and during that contact the first officer stated that the involved officers were still at the station, contrary to his earlier representation.

1350. PLAINTIFF described the false machine-gun report, the failure to locate a firearm, his contention that he had again been swatted, and the seizure of his cellular phones.

1351. SLOPD's subsequently produced records document an assistance-related contact with PLAINTIFF outside the police station but state that no formal report was completed.

1352. PLAINTIFF alleges that this contemporaneous complaint placed SLOPD personnel on notice that PLAINTIFF was challenging the circumstances of the armed operation and asserting that law-enforcement conduct had occurred during another false emergency report.

1353. PLAINTIFF does not allege that the failure to prepare a formal citizen-complaint report, standing alone, establishes a constitutional violation. PLAINTIFF alleges the handling of his contemporaneous complaint as evidence relevant to the City's practices concerning complaint intake, documentation, supervisory review, investigation, and accountability.

1354. PLAINTIFF subsequently sought City records concerning SLOPD's participation in the July 10 incident, communications involving outside agencies, Scientology-related information, and records concerning PLAINTIFF.

1355. On December 2, 2024, Deputy City Clerk Sara Armas circulated CPRA PRR24345 internally to Eric Wooten and Marjorie Menesez and copied Kelly Holcomb, Adria Smith, Rick Scott, Aaron Schafer, the LACA general mailbox, and the City Clerk.

1356. In that communication, Armas expressly advised the recipients that the LACA's office would conduct the search for emailed communications rather than individual staff members.

1357. PLAINTIFF alleges that this internal circulation demonstrates that the City's post-incident records handling was not confined to a single employee but involved personnel and offices across the City's administrative, police, clerk, and legal functions.

1358. PLAINTIFF does not allege that merely being copied on an email establishes that any particular employee read the communication, possessed actual knowledge of a constitutional violation, approved the underlying conduct, or possessed final policymaking authority.

1359. During the City's processing of PRR24345, Menesez stated that SLOPD did not have a "Scott Hochstetter" or "Kendrick Moxon" in its system and therefore had no responsive police records to provide.

1360. Wooten also reported that an initial search for references to PLAINTIFF after July 9, 2024 produced nothing responsive.

1361. Later that same day, however, Wooten advised City personnel that he had located "a reference to Scientology in the Daily Briefing Report for 7/10/24" and requested the public police log and Summary Sheet for DR No. 240710089.

1362. Menesez thereafter supplied the public log and advised that there was no report available to provide a summary.

1363. On December 3, 2024, Wooten advised Armas, Menesez, Holcomb, the LACA mailbox, Smith, and the City Clerk that additional searches had been performed but that no responsive records had been located.

1364. Minutes later, the City issued its formal response to PLAINTIFF stating "No responsive records were found," that "every effort" had been made to locate

responsive records, and that the City's search was believed to be "quite thorough."

1365. The July 10 operation was treated by SLOPD as an assisting-agency event rather than generating a formal SLOPD report, notwithstanding the armed felony stop, detention at gunpoint, vehicle clearing, and subsequent complaint made by PLAINTIFF.

1366. PLAINTIFF alleges that this treatment is relevant to whether SLOPD's policies and supervisory practices adequately required documentation, complaint intake, and accountability when SLOPD personnel participated in serious joint-agency operations.

1367. The City's later records handling identified additional records concerning the July 10 operation.

1368. On August 14, 2025, SLOPD employee Adria Smith identified Incident No. 240710069, advised PLAINTIFF concerning SLOPD body-worn-camera records, and stated that CHP was the primary agency concerning the incident.

1369. PLAINTIFF alleges that the progression from his immediate unsuccessful effort to obtain formal documentation of his complaint, through the City's initial inability to locate records associated with him, to the subsequent identification of police logs, briefing materials, incident numbers, and body-worn-camera records is relevant to the City's institutional practices concerning documentation, indexing, preservation, complaint intake, supervisory review, interdepartmental coordination, and accountability following significant joint-agency police operations.

**Municipal Policy, Inaction, Training, and Supervision**

1370. PLAINTIFF alleges that the foregoing events support an inference that the conduct may have resulted from broader CITY OF SLO policies, customs,

practices, inaction, or deficiencies in training and supervision, rather than isolated error

1371. PLAINTIFF alleges that the immediate complaint and subsequent records history provided information concerning deficiencies in documentation, complaint handling, supervision, and accountability and is relevant to whether responsible CITY OF SLO officials had notice of those deficiencies andConstitutionally deficient practices were permitted to continue.

1372. PLAINTIFF alleges ratification only where a final policymaker with legally sufficient authority had knowledge of the challenged constitutional conduct and affirmatively approved the conduct and its basis.

1373. PLAINTIFF does not allege that the CITY OF SLO's failure to investigate, failure to discipline, an inaccurate public-records response, receipt of an email, or inclusion on a copy of an email, standing alone, establishes ratification or municipal liability.

1374. PLAINTIFF further does not allege that SLOPD itself retained PLAINTIFF's two cellular phones for approximately eight weeks. PLAINTIFF alleges elsewhere that CHP personnel subsequently seized and maintained custody of those devices.

1375. PLAINTIFF seeks to hold CITY OF SLO liable for CHP's subsequent conduct only to the extent discovery establishes that an actionable City policy, municipal decision, or conduct attributable to SLOPD actually caused or was a moving force behind that separate constitutional deprivation.

1376. PLAINTIFF alleges that, to the extent discovery establishes a persistent municipal practice, custom, deliberately indifferent training or supervisory deficiency, decision of an authorized final policymaker, or other legally sufficient municipal policy, that policy or deficiency was a moving force behind the constitutional injuries attributable to SLOPD's own participation in the July 10 operation.

1377. PLAINTIFF does not allege that the CITY OF SLO's public-records responses themselves caused the July 10 constitutional violations. PLAINTIFF alleges those later events as circumstantial evidence relevant to municipal documentation, complaint handling, supervisory practices, institutional knowledge, and post-incident accountability.

1378. As a direct and proximate result of any policy, custom, practice, policy of inaction, deliberately indifferent training or supervisory deficiency, or final-policymaker decision established against CITY OF SLO, PLAINTIFF suffered the constitutional injuries and resulting damages alleged in this Complaint.

## J. TENTH CLAIM FOR RELIEF

**First Amendment Retaliatory Prosecution 42 U.S.C. § 1983**
**Against Defendants GOMEZ, TORRES, HALL, PEDERSEN, HUBER, OSMON, KRAUSKOPF, CSCCI, CSWUS, CSLA, and DOE DEFENDANTS 6-50**

1379. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1380. PLAINTIFF alleges that the participation described above was defendant-specific. TORRES received and/or assumed responsibility for Scientology-related cases involving PLAINTIFF; obtained PLAINTIFF-specific information from PEDERSEN; reviewed approximately 99 videos and short video clips concerning PLAINTIFF; sought additional information and witness statements concerning PLAINTIFF; and submitted the resulting evidence and investigation to the LACA's office for filing consideration. PEDERSEN supplied PLAINTIFF-specific identifying information, videos, witness information, and statements to LAPD personnel.

GOMEZ conducted follow-up investigations and incorporated PLAINTIFF's protest, livestreaming, publication, and social-media activity into investigative materials used in connection with the challenged prosecution; HALL conducted follow-up investigations and prepared investigative material concerning PLAINTIFF's protest activity; HUBER supplied information and reports concerning PLAINTIFF and communicated with LAPD personnel; and OSMON repeatedly communicated and coordinated with LAPD concerning PLAINTIFF and requested law-enforcement action against him. PLAINTIFF alleges these acts as the concrete conduct through which the identified Defendants were materially instrumental in causing the challenged prosecution.

1381. As to KRAUSKOPF, PLAINTIFF alleges that KRAUSKOPF, as Head of Legal for CSWUS, engaged in repeated communications and coordination concerning PLAINTIFF, Scientology protest activity, law-enforcement response, and enforcement of restrictions affecting protesters, including the following:

1382. On May 24, 2024, KRAUSKOPF specifically identified PLAINTIFF to LAPD Officer Corwin, copied OSMON, supplied information concerning PLAINTIFF's anticipated protest activity, requested that assigned officers be briefed concerning him, and requested coordination concerning how Scientology and LAPD could address the activity "on the ground."

1383. On February 24, 2024, KRAUSKOPF emailed WALTERS, HERNANDEZ, HUBER, OSMON and MOXON stating that protests "often bring about swatting calls to LAPD or LAFD" and requested a patrol unit and supervisor. On February 25, 2024, Scientology reported 35 protesters and "one swatting call to LAFD."

1384. On January 12, 2024, KRAUSKOPF contacted Deputy City Attorney Adena Hopenstand concerning enforcement of street and sidewalk closures and

requested a written response that could be shared with others involved in the matter.

1385. On January 29-31, 2024, KRAUSKOPF communicated with BSS Temo Llanes concerning the enforcement and potential privatization of LRH, including stating, "*I am looking into how to privatize L. Ron Hubbard Way*," and seeking information concerning the enforcement of street and sidewalk closures.

1386. PLAINTIFF alleges that KRAUSKOPF's repeated communications with LAPD and CITY OF LA personnel concerning PLAINTIFF, protesters, street and sidewalk restrictions, police response, and enforcement provide circumstantial evidence of her participation in the conduct alleged herein and were materially instrumental in obtaining, coordinating, or facilitating governmental action affecting PLAINTIFF's protected activity

1387. PLAINTIFF engaged in protected First Amendment activity, including protesting and criticizing Scientology, using amplified speech, recording and livestreaming public events and law-enforcement activity, publishing commentary, and communicating with the public concerning matters of public concern.

1388. On February 6, 2025, the LACA commenced *People v. Hochstetter*, Case No. 25CJCM00751, filing sixteen misdemeanor charges. This claim expressly excludes the two charges arising from May 25, 2024, which relate to separate litigation, and challenges only the fourteen charges arising from March 8, March 9, March 16, March 18, April 19, May 5, and May 6, 2024.

1389. The course of conduct preceding the challenged prosecution also included a PPA on May 5, 2024, and a second attempted PPA on May 6, 2024.

1390. Those events are alleged as part of the prosecution-related course of conduct and are not counted as additional criminal charges.

1391. PLAINTIFF alleges that GOMEZ, TORRES, HALL, PEDERSEN, HUBER, OSMON, KRAUSKOPF and applicable DOE DEFENDANTS 6-50 participated in developing, accumulating, supplying, transmitting, coordinating, or advocating complaints, reports, evidence, witnesses, investigative material, or requests for prosecutorial action that were materially instrumental in causing the fourteen challenged charges.

1392. PLAINTIFF further alleges that, where such conduct was undertaken by or on behalf of an entity Defendant, it was pursuant to, consistent with, authorized by, encouraged by, ratified by, or otherwise attributable to that entity's policies, practices, customs, institutional decisions, or coordinated relationship with governmental actors.

1393. PEDERSEN acted for CSCCI; KRAUSKOPF acted for CSWUS; and HUBER and OSMON acted for CSLA.

1394. As to the SCIENTOLOGY ENTITY DEFENDANTS, PLAINTIFF alleges liability under § 1983 only to the extent that the particular entity acted jointly with governmental actors in causing the challenged deprivation and the deprivation resulted from that entity's own policy, practice, custom, authorization, institutional decision-making, or conduct otherwise attributable to the entity under § 1983.

1395. PLAINTIFF further alleges that the challenged conduct was not merely the isolated or unauthorized conduct of a single private individual, but was undertaken, authorized, ratified, encouraged, facilitated, or maintained through institutional practices, directives, relationships, or coordinated conduct involving the SCIENTOLOGY ENTITY DEFENDANTS and governmental actors.

1396. To the extent applicable to any governmental entity Defendant, PLAINTIFF further alleges that the challenged deprivation was caused by an official policy, longstanding practice or custom, decision or act of an official

possessing final policymaking authority, or ratification of unconstitutional conduct by an authorized policymaker.

1397. Where the presently available governmental records identify the private participant only as "Scientology" or "the Scientologists," PLAINTIFF pleads the responsible SCIENTOLOGY ENTITY DEFENDANT or DEFENDANTS in the alternative as alleged above.

1398. PLAINTIFF alleges that the retaliatory purpose is supported by the sequence and content of the communications alleged above, including efforts to accumulate reports concerning PLAINTIFF, coordinate evidence for prosecutors, obtain charges against him, and PEDERSEN's statement that she needed something effective done to get PLAINTIFF "off the streets or out of this area."

1399. PLAINTIFF further alleges that investigative and prosecution materials treated his Scientology protest, criticism, megaphone use, recording, livestreaming, and invocation of First Amendment rights as evidence of criminal or harassing conduct, while relying upon materially inaccurate, incomplete, misleading, or inadequately verified information and failing to adequately account for materially contrary or exculpatory evidence.

1400. PLAINTIFF alleges that each of the fourteen challenged charges lacked probable cause when evaluated against the particular facts and evidence concerning that charge, including protected speech treated as criminal conduct, identification deficiencies, materially contrary or exculpatory evidence, questions by responding officers concerning whether criminal elements were satisfied, and reliance upon information supplied by interested private parties. PLAINTIFF further alleges that the absence of probable cause existed notwithstanding the information and evidence supplied or advanced by the designated Defendants in seeking or facilitating the prosecution.

1401. PLAINTIFF does not allege that the prosecutor's filing decision, standing alone, establishes liability. PLAINTIFF alleges that the designated Defendants were actively instrumental in causing, procuring, encouraging, or inducing the prosecution through materially misleading or incomplete information, reports, evidence packages, investigative characterizations, coordination, and requests for prosecutorial action.

1402. PLAINTIFF alleges that the designated Defendants failed or refused to adequately review available video evidence and failed or refused to obtain witness statements from protesters, to the extent alleged in the factual allegations concerning their respective investigations and conduct.

1403. PLAINTIFF further alleges that the fourteen challenged charges would not have been initiated but for the retaliatory conduct and materially misleading or incomplete information supplied, developed, transmitted, coordinated, or advocated by the designated Defendants.

1404. The prosecution resulted in a court-ordered stay-away restriction preventing PLAINTIFF from coming within approximately 100 yards of Scientology buildings, substantially burdening his movement and ability to continue the protected activity underlying the challenged reports.

1405. The fourteen charges challenged in this claim terminated without a conviction when they were dismissed on May 13, 2026.

1406. PLAINTIFF alleges that DOE DEFENDANTS 6-50 personally participated in inducing, procuring, preparing, transmitting, approving, or materially causing the challenged prosecution and will be identified through discovery.

1407. As a direct and proximate result, PLAINTIFF suffered interference with and chilling of protected speech and protest activity, restrictions upon movement, defense expenses and burdens, humiliation, emotional distress, and other compensable injuries.

1408. The prosecution-related communications continued after filing, including MOXON's March 18 and March 19, 2025 direct communications to HALL under the subject "People v. Hochstetter," requesting telephone contact concerning the pending case and Barrios' February 27, 2026 email to MOXON and KRAUSKOPF regarding contacting DDA Goldberg to combine the misdemeanor case into felony court..

1409. PLAINTIFF brings this retaliatory-prosecution claim consistent with*Hartman v. Moore, 547 U.S. 250 (2006).*

**K. ELEVENTH CLAIM FOR RELIEF**

**Fourth Amendment Malicious Prosecution 42 U.S.C. § 1983**
**Against Defendants GOMEZ, TORRES, HALL, PEDERSEN, HUBER, OSMON, KRAUSKOPF, CSCCI, CSWUS, CSLA, and DOE DEFENDANTS 6-50**

1410. PLAINTIFF realleges and incorporates by reference all preceding allegations of this Complaint to the extent applicable to this claim.

1411. PLAINTIFF alleges that GOMEZ, TORRES, HALL, PEDERSEN, HUBER, OSMON, KRAUSKOPF, CSCCI, CSWUS, CSLA, and applicable DOE DEFENDANTS 6-50 were materially instrumental in initiating, procuring, causing, or continuing criminal proceedings against PLAINTIFF without probable cause.

1412. On February 6, 2025, the LACA commenced*People v. Hochstetter*, Case No. 25CJCM00751, filing sixteen misdemeanor charges.

1413. This claim expressly excludes the two charges arising from May 25, 2024 and challenges only the fourteen charges arising from March 8, March 9, March 16, March 18, April 19, May 5, and May 6, 2024.

1414. The sixteen challenged charges consisted of paired violations of PC § 415(2) and LAMC § 41.57(a) arising from seven separate dates.

1415. The prosecution-related course of conduct also included a PPA on May 5, 2024, and a second attempted PPA on May 6, 2024.

1416. PLAINTIFF alleges the absence of probable cause as to each charge based upon the particular speech, conduct, witnesses, recordings, officer observations, contrary evidence, and investigative deficiencies associated with that date.

1417. PLAINTIFF further alleges that during investigation of the incidents underlying the misdemeanor prosecution, protesters possessed and offered contemporaneous video, livestream recordings, witness information, or other evidence materially bearing upon the events and the elements of the alleged offenses, but investigating officers declined or refused to receive, review, preserve, or incorporate portions of that contrary evidence.

1418. At the time the sixteen misdemeanor charges were filed, there was no probable cause to believe Plaintiff's conduct constituted a crime because:

a. Plaintiff's speech occurred on public sidewalks, which are traditional public forums;
b. PC § 302 requires disturbance of a religious service, and the body-worn camera footage reflects officers themselves questioning whether the statute applied and whether individual counseling constituted an 'assemblage' for worship;
c. the only alleged victims were Scientology security personnel who used false names when calling 911undermining their credibility; and
d. at least one alleged victim could not visually identify Plaintiff

1419. At the same time, investigators accepted, reviewed, accumulated, and transmitted extensive evidence supplied by Scientology security personnel,

including surveillance recordings, incident summaries, witnesses, and unsworn written statements.

1420. PLAINTIFF alleges that the resulting investigative record presented materially adverse private-party evidence without equivalent consideration of readily available contrary or exculpatory information.

1421. The May 5, 2024 incident provides contemporaneous evidence that responding officers themselves questioned whether facts sufficient to justify arrest had been established.

1422. The reporting witness stated that she could hear amplified speech but could not see or identify the speaker and Officer Juei Chien thereafter consulted a supervisor and declined to arrest PLAINTIFF.

1423. Only after Scientology security requested a supervisor did ROSENDO arrive and state, "Alright, if you want to do a PPA, that's fine. We'll do a PPA," after which the PPA was accepted.

1424. PLAINTIFF alleges that the initial refusal to arrest, the witness's inability to visually identify the speaker, and ROSENDO's subsequent acceptance of the PPA after Scientology security requested supervisory intervention are relevant to whether officers possessed facts establishing the elements of an offense and whether private pressure, rather than independently verified evidence, materially influenced the enforcement decision.

1425. On May 6, 2024, body-worn-camera footage again recorded LAPD officers expressly questioning the basis for a requested PPA and the alleged Scientology victim stated that she had been providing spiritual counseling, had not seen the speaker, and could not identify PLAINTIFF.

1426. Officers stated, "I don't want to do a PPA for this" and "Why are we arresting this guy?" and questioned whether individual spiritual counseling constituted an "assemblage of people" engaged in religious worship for purposes of PC § 302.

1427. While officers were questioning whether the statutory elements and identification had been established, Scientology security continued pressing for PLAINTIFF's arrest, supplying additional material, and one representative stated, "I'm just trying to get him arrested."

1428. PLAINTIFF alleges these contemporaneous statements as evidence of the weakness of the factual basis being presented, the interested private party's objective, and the failure to independently resolve materially disputed elements before the allegations were later incorporated into the prosecution-related history.

1429. The existence of a megaphone, bullhorn, or amplified speech did not, standing alone, establish probable cause for either charged offense and PC § 415(2) does not criminalize all loud communicative speech merely because another person is disturbed by it.

1430. When the alleged noise consists of communication, California law limits application of PC § 415 consistent with the First Amendment to circumstances involving a clear and present danger of imminent violence or purported communication used merely as a guise to disrupt lawful endeavors.*In re Brown*, 9 Cal. 3d 612 (1973).

1431. LAMC § 41.57(a) likewise does not prohibit possession or ordinary use of an amplification device as such.

a. It requires loud or raucous amplified noise that unreasonably interferes with, annoys, or disturbs others under the circumstances.

b. Accordingly, the presence or use of a megaphone did not itself establish the elements of the charged municipal offense.

1432. Much of the speech identified in the investigative materials consisted of criticism or advocacy, including statements that "Scientology is a cult," criticism of alleged human trafficking or abuse, and offers to assist Scientology members seeking to leave.

1433. Scientology representatives repeatedly characterized such speech as "hate" or "hate speech."

1434. PLAINTIFF alleges that such characterization did not itself transform protected criticism of a religion or religious organization into criminal conduct or establish probable cause for either charged noise offense.

1435. PC § 302 applies to the intentional disturbance of an "assemblage of people met for religious worship."

1436. PLAINTIFF does not contend that an activity loses all religious character merely because Scientology calls it auditing, counseling, training, or accepts payment or donations for it.

1437. Rather, PLAINTIFF alleges that investigators failed to distinguish between whether an activity might be religious in character and whether the particular activity allegedly disturbed satisfied the statutory requirement of an assemblage of people met for religious worship.

1438. That distinction was material because Scientology representatives used varying descriptions including "classroom services," "church services," "spiritual counseling," counseling sessions, auditing, and other activities, while responding officers themselves questioned whether individual counseling constituted the assemblage required by PC § 302.

1439. As to KRAUSKOPF, PLAINTIFF alleges that KRAUSKOPF, as Head of Legal for CSWUS, personally participated in communications and coordination concerning PLAINTIFF including May 24, 2024 specific identification of PLAINTIFF to LAPD Officer Corwin with request officers be briefed and coordination "on the ground,"

1440. February 24, 2024 request to WALTERS, HERNANDEZ, HUBER, OSMON, MOXON for patrol unit/supervisor stating protests "*often bring about swatting calls to LAPD or LAFD*," and continued prosecution-related communications as late as February 27, 2026 when Barrios contacted

MOXON and KRAUSKOPF in regards to contacting DDA Goldberg to combine misdemeanor case 25CJCM00751 to felony court, supporting inference KRAUSKOPF was materially instrumental in causing and continuing prosecution without probable cause.

1441. PEDERSEN acted for CSCCI; KRAUSKOPF acted for CSWUS; and HUBER and OSMON acted for CSLA in the prosecution-related communications and conduct alleged herein. Liability against each entity is based only upon its own authorization, institutional practices, policies, customs, or joint action with governmental actors.

1442. PLAINTIFF alleges that the prosecutorial decision was influenced by materially inaccurate, incomplete, misleading, or inadequately verified investigative material, including the treatment of constitutionally protected protest activity as evidence of criminal purpose and the failure to adequately account for materially contrary or exculpatory evidence.

1443. PLAINTIFF further alleges that the facts described above support an inference that the responsible Defendants acted with an improper purpose and with knowledge of, or reckless disregard for, materially inaccurate or incomplete information, and that their conduct was materially instrumental in causing the prosecution.

1444. The challenged prosecution subjected PLAINTIFF to legal process and a court-ordered restriction preventing him from coming within approximately 100 yards of Scientology buildings.

1445. PLAINTIFF alleges that, to the extent this restriction and any other restrictions imposed pursuant to the criminal proceeding constituted a seizure within the meaning of the Fourth Amendment, the seizure resulted from prosecution initiated without probable cause.

1446. PLAINTIFF does not allege that the mere requirement to appear in court, standing alone, necessarily constituted a Fourth Amendment seizure.

1447. The sixteen charges challenged herein terminated without a conviction when they were dismissed on May 13, 2026.

1448. PLAINTIFF alleges that DOE DEFENDANTS 6-50 materially participated in initiating, procuring, or causing the challenged prosecution and will identify their particular conduct through discovery.

1449. As a direct and proximate result of the prosecution and resulting legal restrictions, PLAINTIFF suffered loss of liberty, restrictions upon movement and protected protest activity, defense expenses and burdens, humiliation, emotional distress, and other compensable injuries.

1450. PLAINTIFF further alleges that prosecution-related communications continued during the prosecution, including repeated March 2025 requests from Scientology Attorney MOXON for direct telephone communication with HALL concerning *People v. Hochstetter.*

1451. PLAINTIFF alleges favorable termination consistent with *Thompson v. Clark, 596 U.S. 36 (2022)*, and alleges that probable cause for one charge does not defeat a malicious-prosecution claim concerning a separate charge lacking probable cause, consistent with *Chiaverini v. City of Napoleon, 602 U.S. 556 (2024)*.

## L. TWELFTH CLAIM FOR RELIEF

**First Amendment Unconstitutional Exclusion from Traditional Public Fora and Viewpoint Discrimination 42 U.S.C. § 1983**
**Against Defendants ROLON, CESAR, JACQUIN, FESPERMAN, KRAUSKOPF, MOXON, WHEELER, CSWUS, CSCCI, and CSLA as private entities, and DOE DEFENDANTS 6-50, in Their Individual Capacities.**

1452. PLAINTIFF realleges and incorporates the preceding allegations to the extent applicable to this claim.

1453. PLAINTIFF engaged in speech, protest, recording, and livestreaming concerning Scientology while using public streets and sidewalks.

1454. Public streets and sidewalks constitute traditional public fora in which PLAINTIFF's speech and protest activity were protected by the First Amendment.

1455. On October 13, 2024, ROLON directed PLAINTIFF away from a public sidewalk and threatened him with arrest for trespass while PLAINTIFF was protesting and livestreaming. PLAINTIFF requested the permit or other authority supporting the restriction and disputed that the sidewalk was closed.

1456. On November 17, 2024, JACQUIN and FESPERMAN threatened PLAINTIFF with arrest under PC § 415 unless he left the public sidewalk, and PLAINTIFF left after the threatened arrest.

1457. On December 14, 2024, CESAR participated in enforcement restricting PLAINTIFF's access to public streets and sidewalks while other pedestrians were permitted to traverse areas from which PLAINTIFF was being excluded and while LAPD personnel expressed differing understandings of the operative closure.

1458. CITY OF LA records alleged above included event-permit language stating that the closure was for the exclusion of vehicles only and that "[t]he public at large may not be denied access to any portion of any street except in cases of an emergency."

1459. CITY OF LA and LAPD personnel had also previously addressed requests by Scientology for additional sidewalk closures and the effect of those requested restrictions upon public access and speech, including Llanes' February 2, 2024 response to KRAUSKOPF that all permits have same conditions, changing language would be unfair and could bring all permits into question, and LACA's office was "not willing to do" so, and

BSS' October 2024 imposition of restrictions that "Both sidewalks are to be open and accessible to the public, and signs are to be posted on the sidewalks stating that the sidewalk is open to the public".

1460. As to MOXON and WHEELER, PLAINTIFF incorporates the factual allegations concerning the restraining-order proceeding and related LAPD involvement. PLAINTIFF alleges that WHEELER supplied materially misleading accounts of his conduct and that MOXON presented those accounts and attributed Comer's statements to PLAINTIFF to obtain restrictions interfering with his protected protest activity.

1461. PLAINTIFF further relies on the previously alleged omissions from the video evidence from May 31, 2024, concerning security guards surrounding PLAINTIFF and attempting to exclude him by accusing him of trespassing before the permitted closure began. Together with the other discrepancies and court findings pleaded above, PLAINTIFF alleges that this misleading presentation supports an inference that MOXON and WHEELER intended to suppress his criticism of Scientology.

1462. PLAINTIFF alleges that MOXON and WHEELER knowingly participated in joint action with LAPD personnel to use the restraining order and police authority to exclude him from public streets and sidewalks because of his protected expression. The alleged coordination and resulting exclusion interfered with PLAINTIFF's speech, protest, recording, livestreaming, and community food distribution.

1463. As to KRAUSKOPF, PLAINTIFF incorporates the factual allegations concerning her permit-enforcement requests, privatization efforts, requests for additional sidewalk closures, and coordination with LAPD concerning PLAINTIFF. PLAINTIFF alleges that she continued

pursuing exclusionary enforcement despite notice of permit limitations preserving pedestrian access and the City's objections to additional restrictions on demonstrators.

1464. PLAINTIFF alleges that KRAUSKOPF's communications, characterizations of protesters, and specific identification of PLAINTIFF to LAPD support an inference that she sought to restrict his access because of his criticism of Scientology.

1465. Her personal participation in seeking and coordinating the challenged enforcement contributed to his exclusion and the resulting interference with his protected speech, protest, recording, and livestreaming.

1466. PLAINTIFF further alleges that, to the extent the challenged conduct was undertaken on behalf of CSWUS, it was pursuant to, consistent with, authorized by, encouraged by, ratified by, or otherwise attributable to CSWUS's policies, practices, customs, institutional decisions, or coordinated conduct with governmental actors.

1467. As a direct and proximate result, PLAINTIFF was prevented from continuing his protest, recording, livestreaming, and communication from the locations from which he was excluded and suffered the injuries alleged herein.

1468. As to CSWUS, CSCCI, and CSLA, PLAINTIFF incorporates the factual allegations identifying each entity's participation through its legal, security, and other representatives in the challenged restrictions on public access and protest activity.

1469. KRAUSKOPF's and MOXON's conduct is attributed to each entity only insofar as the factual allegations establish that they acted with authority on that entity's behalf concerning the particular conduct at issue.

1470. PLAINTIFF alleges that the Scientology entity defendants responsibility arises from their respective policies, established practices, or decisions by persons possessing final policymaking authority concerning the

challenged exclusionary enforcement, as supported by the factual allegations.

1471. PLAINTIFF alleges that those institutional actions, carried out through the joint activity with governmental personnel described above, caused or contributed to the interference with his protected speech, protest, recording, and livestreaming.

1472. As to DOE DEFENDANTS 6–50, PLAINTIFF alleges that the unidentified persons described in the factual allegations personally directed or enforced his exclusion from public streets and sidewalks because of his Scientology protest and recording activity, including by blocking access or threatening arrest while permitting other pedestrians to pass.

1473. This claim concerns each defendant's own participation in the identified incidents. Private DOE defendants are included only insofar as they jointly participated with government officials in the challenged exclusion. Their conduct prevented or interrupted PLAINTIFF's protest, recording, and livestreaming.

## M. THIRTEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress (California Common Law) Against Defendant D'AMATO

1474. PLAINTIFF incorporates the preceding factual allegations concerning D'AMATO's conduct and the resulting injuries to PLAINTIFF.

1475. As alleged above, D'AMATO personally targeted PLAINTIFF by monitoring his location and livestreams, making and encouraging criminal accusations intended to generate police intervention, offering a monetary reward for PLAINTIFF's arrest, and publicly offering payment for the slashing of PLAINTIFF's tires.

1476. PLAINTIFF alleges that D'AMATO's conduct constituted a deliberate campaign of intimidation directed at PLAINTIFF.

1477. His solicitation of damage to PLAINTIFF's vehicle and efforts to provoke dangerous police encounters exposed PLAINTIFF to threatened physical harm and caused him to fear that continuing his protest and livestreaming would lead to further attacks or armed police intervention.

1478. PLAINTIFF alleges that this conduct, considered in its entirety and in the circumstances described above, was extreme and outrageous and exceeded the bounds of conduct ordinarily tolerated in a civilized community.

1479. D'AMATO intended to cause PLAINTIFF emotional distress and to frighten him into restricting his activities. Alternatively, D'AMATO acted with reckless disregard of the probability that his conduct, directed specifically at PLAINTIFF and his known whereabouts, would cause such distress.

1480. PLAINTIFF suffered severe emotional distress, including fear for his personal safety, anxiety, heightened vigilance, and apprehension that viewers or associates would act upon D'AMATO's solicitations or that additional police encounters would expose him to injury.

1481. These effects interfered with PLAINTIFF's sense of safety and his ability to continue protesting, traveling, recording, and livestreaming.

1482. D'AMATO spoke about PLAINTIFF's mother that he hoped she would be raped and semen put all about her.

1483. D'AMATO spoke about smashing PLAINTIFF's girlfriend's face if she got too close to him.

1484. PLAINTIFF suffered lasting anxiety that still persists from his ability to travel and livestream to his audience without being put at gunpoint by officers for false allegations of drugs and guns.

1485. PLAINTIFF also suffered extreme weight gain from D'AMATO's and others actions and statements.

1486. PLAINTIFF has extreme anxiety now when he hears police sirens or helicopters.

1487. PLAINTIFF is fearful to park his RV anywhere without the tires being slashed or people from the internet coming to confront PLAINTIFF or PLAINTIFF's friends.

1488. D'AMATO's own conduct was a substantial factor in causing PLAINTIFF's severe emotional distress. PLAINTIFF seeks recovery for the injuries caused by that conduct, including his fear arising from the solicitation of attacks upon his property and the threatened police interventions described above.

1489. As a direct and proximate result, PLAINTIFF suffered damages in an amount to be established at trial.

**N. FOURTEENTH CLAIM -**

**Fourteenth Amendment Procedural Due Process(Deprivation of Property Without Prompt Post-Seizure Hearing) 42 U.S.C. § 1983**

**Against Defendants GOMEZ, HALL, CITY OF LA, and CITY OF SLO**

1490. PLAINTIFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1491. The Fourteenth Amendment to the United States Constitution provides that no State shall deprive any person of property without due process of law.

1492. This guarantee requires that the government provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner before or promptly after depriving a person of a significant property interest.

1493. On July 10, 2024, state actors seized PLAINTIFF's two cellular phones.

1494. While the initial seizure may have been justified by the exigent circumstances of a felony stop, the subsequent prolonged retention of the cellular phones without a prompt post-seizure hearing was not.

1495. From July 10, 2024, until approximately March 18, 2025, a period of approximately eight months, Defendants retained PLAINTIFF's cellular phones in government custody.

1496. During this entire period, Defendants failed to provide PLAINTIFF with any prompt judicial or administrative hearing to contest the continued deprivation of his property.

1497. Defendants failed to provide PLAINTIFF with adequate notice of any available procedure for seeking the return of his property.

1498. When PLAINTIFF attempted to recover the cellular phones, he was informed he would have to wait one year.

1499. Defendant GOMEZ connected the cellular phones to a broad LAPD investigation, and Defendant HALL was the designated detective for returning property seized in a separate matter, yet PLAINTIFF's numerous attempts to recover his property were unavailing.

1500. The deprivation of PLAINTIFF's property was not*de minimis*.

1501. The seized cellular phones were essential to PLAINTIFF's ability to communicate, navigate, livestream, preserve evidence of his activities, and engage in his protest speech.

1502. PLAINTIFF also relied on the phones for two-factor authentication and, as a result of the prolonged seizure, lost access to online and social-media accounts he used to communicate and publish matters of public concern.

1503. At no time during the eight-month retention was PLAINTIFF charged with any crime arising from the July 10, 2024 incident or based on any evidence recovered from the seized cellular phones.

1504. The eight-month retention of PLAINTIFF's essential personal property without a prompt post-seizure hearing and without adequate notice of any procedure to contest the retention constituted an unreasonable and unlawful

deprivation of property in violation of the Due Process Clause of the Fourteenth Amendment.

1505. Defendants GOMEZ, HALL, the CITY OF LA, and the CITY OF SLO, acting under color of state law, caused or participated in this unconstitutional deprivation.

1506. WHEREFORE, PLAINTIFF prays for compensatory and punitive damages, declaratory relief, and such other relief as the Court deems just and proper.

### M. FIFTEENTH CLAIM

**Fourteenth Amendment Equal Protection (Selective Enforcement / Viewpoint Discrimination) 42 U.S.C. § 1983**

**Against Defendants CITY OF LA, GOMEZ, TORRES, AUSTIN, ROSENDO, WALTERS, HERNANDEZ, VALENZUELA, ROLON, HUBER, PEDERSEN, MOXON, KRAUSKOPF, and the SCIENTOLOGY ENTITY DEFENDANTS**

1507. PLAINTIFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

1508. The Fourteenth Amendment to the United States Constitution provides that no State shall deny to any person within its jurisdiction the equal protection of the laws.

1509. This guarantee prohibits the government from selectively enforcing facially neutral laws based on impermissible considerations, such as an intent to inhibit or punish the exercise of constitutional rights.

1510. Defendants, acting under color of state law and in concert with private actors, engaged in a pattern of selective enforcement against PLAINTIFF and other Scientology protesters.

1511. This selective treatment was based on PLAINTIFF's exercise of his First Amendment rights and his anti-Scientology viewpoint.

1512. Compared with others similarly situated, PLAINTIFF was selectively treated. PLAINTIFF was repeatedly investigated, arrested, and ultimately prosecuted on sixteen misdemeanor charges for engaging in protected speech activities, such as using a megaphone on a public sidewalk.

1513. In contrast, similarly situated individuals associated with Scientology who engaged in comparable or more serious conduct were not investigated, arrested, or prosecuted.

1514. Specific examples of this disparate treatment include, but are not limited to:

a. On numerous occasions, including on December 4, 2023, March 9, 2024, December 7, 2024, and October 4, 2024, LAPD officers refused to accept PPAs from PLAINTIFF and other protesters who were victims of battery, assault, and theft by Scientology-affiliated individuals.

b. Conversely, on May 5, 2024, and May 25, 2024, LAPD officers accepted PPAs from Scientology personnel against PLAINTIFF for alleged violations of PC § 302 arising from his protected speech.

c. Body-worn camera footage from these incidents shows LAPD officers coordinating the arrest with Scientology security and questioning whether the elements of the offense were even met.

d. On February 11, 2025, Scientology security personnel were permitted to stand inside yellow police tape during an active swatting investigation, while PLAINTIFF and other protesters were required to remain outside.

1515. The selective treatment was based on an impermissible motive: the intent to punish and inhibit PLAINTIFF's anti-Scientology speech.

1516. This retaliatory and discriminatory motive is evidenced by, among other things:

a. Scientology security personnel repeatedly characterize PLAINTIFF's protected speech as "hate" and "harassment" in reports to LAPD.

b. LAPD and Scientology personnel coordinating to "build a huge case" against PLAINTIFF, with Major Crimes instructing Scientology to continue making reports concerning his protected speech.

c. A Scientology representative stated to LAPD officers, "I'm just trying to get him arrested."

d. All sixteen misdemeanor charges brought against PLAINTIFF based on this coordinated effort were ultimately dismissed in the interest of justice.

1517. This course of conduct, wherein Defendants enforced laws against PLAINTIFF and other anti-Scientology protesters but failed to enforce the same laws against similarly situated individuals acting in Scientology's interests, constitutes selective enforcement based on viewpoint in violation of the Equal Protection Clause of the Fourteenth Amendment.

## VII. PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF respectfully requests judgment against the appropriate Defendants and the following relief:

A. Compensatory damages in an amount to be proven at trial for violations of PLAINTIFF's constitutional rights and injuries caused by Defendants' actionable conduct under California law, including severe emotional distress;

B. Punitive damages against individual Defendants in their individual capacities, to the extent permitted by law and supported by the evidence, in an amount sufficient to punish and deter future misconduct;

C. Nominal damages for violation of PLAINTIFF's First Amendment rights;

D. Special and general damages to the extent permitted by law, including damages arising from the deprivation of PLAINTIFF's property, expressive activity, and privacy interests;

E. Declaratory relief concerning the unlawfulness of the conduct established at trial;

F. Appropriate injunctive or equitable relief concerning the retention, forensic examination, duplication, storage, and use of PLAINTIFF's electronic data, to the extent such relief is legally available and supported by an ongoing injury;

G. An order requiring the return, deletion, destruction, or other appropriate disposition of forensic copies of PLAINTIFF's data to the extent permitted by law;

H. Attorneys' fees, if and to the extent permitted by 42 U.S.C. § 1988 or other applicable law;

I. Costs of suit; and

J. Such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

PLAINTIFF demands a trial by jury on all issues so triable.

Dated: September 11, 2026

______________________________

SCOTT HOCHSTETTER, PRO SE
5419 Hollywood Blvd., Ste C, 137
Los Angeles, CA 90027
Theloreofdoa@gmail.com